**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| JACOB RUDOLPH, MARK HANSEN, and JASON BUFFER, individually and on behalf of all others similarly situated, | No. 1:20-cv-02142 |
| Plaintiffs, | Hon. Thomas M. Durkin |
| v. | Magistrate Judge Gilbert |
| UNITED AIRLINES HOLDINGS, INC. and UNITED AIRLINES, INC., | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

<u>**CONSOLIDATED CLASS ACTION COMPLAINT**</u>

# TABLE OF CONTENTS

**Page**

I.     NATURE OF ACTION ..................................................................................1

II.    JURISDICTION, VENUE, AND CHOICE OF LAW ..................................3

III.   PARTIES ....................................................................................................4

     A.     Plaintiff Jacob Rudolph..................................................................4

     B.     Plaintiff Mark Hansen ...................................................................5

     C.     Plaintiff Jason Buffer ....................................................................6

     D.     Defendants ....................................................................................7

IV.   FACTS ........................................................................................................7

     A.     Background ...................................................................................7

     B.     The Novel Coronavirus Shutdowns And United's Resulting Flight
            Cancellations.................................................................................8

     C.     United's Flight Cancellations Mount.............................................13

     D.     United Refuses Passenger Refunds For Cancelled Flights.................15

     E.     The Department Of Transportation Repeatedly Reminds Airlines
            Regarding Their Refund Obligations..............................................16

     F.     Consumer Complaints Regarding United's Refusal To Provide Passengers
            Refunds For Cancelled Flights Abound, Confirming United's Failure To
            Act In Good Faith And Deal Fairly With Its Passengers.....................18

V.     CLASS ACTION ALLEGATIONS ................................................................20

VI.   CAUSE OF ACTION ...................................................................................23

        COUNT I - BREACH OF CONTRACT ........................................................23

PRAYER FOR RELIEF ...........................................................................................28

JURY DEMAND .....................................................................................................28

Plaintiffs JACOB RUDOLPH, MARK HANSEN, and JASON BUFFER, individually and on behalf of all others similarly situated (collectively referred to herein as "Plaintiffs"), for their Consolidated Class Action Complaint against Defendants UNITED AIRLINES HOLDINGS, INC. and UNITED AIRLINES, INC. (collectively "United" or "Defendants"), based upon personal knowledge as to their own actions and based upon the investigation of counsel regarding all other matters, complain as follows:

## I.     NATURE OF ACTION

1.      This Consolidated Class Action Complaint comes during a time of unprecedented hardship for so many Americans, with each day bringing different news regarding the novel coronavirus COVID-19. Social distancing, sheltering-in-place, and efforts to "flatten the curve" have separated loved ones from their relatives, closed many businesses, and further isolated those already in or at risk of further isolation. It has decimated nationwide employment. Nearly 9 in 10 Americans are or have been subject to a travel restriction, all to protect the health and welfare of the nation during this public health emergency.

2.      The separation caused by COVID-19 and related protective efforts have particularly impacted travel, including air travel. Opportunity and ability to travel is flat-out eliminated for many Americans, both financially and physically. A trip to the grocery store or pharmacy has been deemed a necessity and permitted; a spring break trip with family or travel for a business meeting is not.

3.      As a result, airlines, including United, slashed flight schedules in an effort to reduce expenses and protect their profits, resulting in thousands of flight cancellations for thousands more passengers. But such passengers face additional hardship if they booked their flights with United. To add to the difficulties such passengers already face, United refuses to issue monetary refunds to passengers with cancelled flights. It does so even though all airline

-1-

passengers are entitled to a refund if the airline cancels a flight, regardless of the reason the airline cancels the flight. Instead, United represents it will only rebook and/or provide travel vouchers.

4.     The need for monetary refunds over travel vouchers remains pressing. Travel vouchers provide little security in this public crisis, particularly where many individual Americans need money now to pay for basics, such as food and rent, and not restrictive, temporary credits towards future travel.

5.     Reflecting the need to provide individuals with such assistance, the Coronavirus Aid, Relief, and Economic Security Act ("CARES") is a bailout to the airlines, providing them about $58 billion in aid, including approximately $5 billion to United alone. But despite the faucet of taxpayer money that has and will flow its way, United refuses to comply with the law, comply with its own contracts, or operate in the interests of its customers.

6.     United's actions financially damaged Plaintiffs and the Class Members. Plaintiffs requested a refund for tickets on one or more cancelled flights and they were entitled to a refund. But like so many other passengers, United denied those requests. As a result, United breached its contracts with Plaintiffs and Class Members, limiting and forcing customers into a rebooked flight or travel voucher instead of returning their money.

7.     As a result, Plaintiffs bring this action to enforce United's contractual obligations because Plaintiffs and Class Members did not receive refunds for United cancelled flights, lost the benefit of their bargain, and/or suffered out-of-pocket loss and are entitled to recover compensatory damages, and attorney's fees and costs.[1]

---

[1] Implicitly acknowledging their right to a refund, United issued post-filing refunds to prior named plaintiffs John Compo, Timothy Rosenberger, Aaron Woolfson, Ivana Woolfson, and Nicholas Austin, who will now no longer serve as named Plaintiffs in this Consolidated Class Action Complaint. While Defendants have issued refunds to these individuals, presumably in a strategic effort to pick-off named

-2-

## II.    JURISDICTION, VENUE, AND CHOICE OF LAW

8.    This Court has jurisdiction over the subject matter presented by this consolidated complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the Class is a citizen of a State different from any Defendant, and in which the matter in controversy exceeds in the aggregate sum of $5,000,000.00, exclusive of interest and costs. Plaintiffs allege that the total claims of individual Class Members in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §§ 1332(d)(2) and (6). Defendants are citizens of Delaware and Illinois for purposes of diversity, whereas Plaintiffs are citizens of different states from Defendants. Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A). Furthermore, Plaintiffs allege that more than two-thirds of all of the members of the proposed Class in the aggregate are citizens of a state other than Illinois, where this action is originally being filed, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

9.    Venue is appropriate in this District because Defendants maintain their principal places of business, transact business, and are subject to personal jurisdiction in the Northern District of Illinois.

10.    In addition, United's largest hub (both in terms of passengers carried and the number of departures) is Chicago O'Hare International Airport, which is also located within the Northern District of Illinois. And on information and belief, events and transactions causing the

---

plaintiffs, Defendants continue to evade their refund obligations for the Plaintiffs named herein as well as the other Class Members.

claims herein, including United's decision-making regarding its refund policy challenged in this lawsuit, occurred within this judicial district.

11.     Furthermore, for those Plaintiffs and Class Members who purchased a ticket on United.com, Plaintiffs, the Class Members, and Defendants agreed to a choice of law provision. *See* Exhibit A, https://www.united.com/ual/en/us/fly/legal.html (last visited July 29, 2020) ("This Agreement is governed by the laws of the State of Illinois, U.S.A., without reference to conflicts of laws provisions. User consents to the exclusive jurisdiction and venue of courts in Cook County, Illinois, U.S.A., in all disputes arising out of or relating to the use of this website.").[2]

### III.     PARTIES

#### A.     Plaintiff Jacob Rudolph

12.     Plaintiff Jacob Rudolph is a citizen and resident of the State of Minnesota.

13.     On January 23, 2020, Plaintiff Rudolph purchased three tickets for domestic travel to occur on April 4, 2020, for travel to and from Hilton Head Island, South Carolina (HHH) to Minneapolis/St. Paul, Minnesota (MSP), with connecting flights in Chicago, Illinois (ORD).

14.     Plaintiff paid $1,521.45 for the April 4, 2020 tickets.

15.     On March 16, 2020, due to concerns with the COVID-19 pandemic, Plaintiff Rudolph submitted a written refund request for his tickets purchased through United's website.

---

[2] United's website's terms also explicitly provide that "[t]ransportation of passengers, baggage and cargo by United and certain regional carriers d/b/a United Express® is subject to the terms and conditions contained in United's Contract of Carriage, *in addition to any terms and conditions specified on united.com*, printed on or in a ticket jacket, ticket receipt, or in any published schedule. . . . By purchasing a ticket and accepting transportation, the passenger agrees to be bound by such terms and conditions." (emphasis added). Only if "there is a conflict between United's Contract of Carriage and any terms and conditions specified on united.com" does "the Contract of Carriage govern[ ]."

16.     However, between March 31, 2020 and April 1, 2020, United separately and completely denied Plaintiff Rudolph's refund request for each ticket, declaring that his ticket purchase does not qualify for a refund. Instead, on March 31, 2020, United represented in writing that Plaintiff Rudolph was only allowed a rebooking or ticket credit for travel within one year of the original ticket issue date. In addition, on April 2, 2020, Plaintiff Rudolph spoke with a United customer service representative, who again refused Plaintiff Rudolph's refund request on the same grounds.

17.     One or more segments of Plaintiff Rudolph's itinerary never occurred because the flights were cancelled by United.

18.     To date, United has not refunded Plaintiff Rudolph the price of his tickets and so Plaintiff Rudolph seeks to enforce his right to a refund.

19.     Furthermore, at no time did United advise Plaintiff Rudolph that the U.S. Department of Transportation on April 3, 2020 mandated prompt refunds.

20.     At the time of his ticket purchase, Plaintiff Rudolph understood that he would be entitled to a refund if his flight was cancelled.

**B.      Plaintiff Mark Hansen**

21.     Plaintiff Mark Hansen is a citizen and resident of the State of Washington.

22.     On or about March 4, 2020, Plaintiff Hansen purchased four roundtrip tickets for travel from Vancouver, British Columbia to Liberia, Costa Rica, connecting via Houston, through United's agent Expedia. Plaintiff Hansen paid $1,483.40 for the tickets for a trip beginning on March 28, 2020.

23.     United changed Plaintiff Hansen's itinerary several times, cancelling flight legs. Initially, United cancelled Plaintiff Hansen's flight legs from Houston to Costa Rica, which would have left Plaintiff Hansen and his family stranded in Houston. Then, United cancelled the

-5-

flight to Houston, re-routing him to Houston via LAX. United's cancellations whittled Plaintiff Hansen's trip down to the only flight left on the itinerary and then, two days before the scheduled departure date, United informed him that his whole itinerary was cancelled and issued him a flight credit.

24.     Following United's cancellations, Plaintiff Hansen contacted not only United but also United's agent, Expedia. On or about March 25, 2020, Plaintiff Hansen called United to request a refund but United's agent told him to contact Expedia. As directed, he reached out to Expedia in his efforts to obtain a refund, but to no avail.

25.     United has not refunded Plaintiff Hansen the price of his ticket and so Plaintiff Hansen seeks to enforce his right to a refund.

26.     Furthermore, at no time did United advise Plaintiff Hansen that the U.S. Department of Transportation on April 3, 2020 mandated prompt refunds.

27.     At the time of his ticket purchase, Plaintiff Hansen understood that he would be entitled to a refund if his flight was cancelled.

**C.     Plaintiff Jason Buffer**

28.     Plaintiff Jason Buffer is currently a citizen and resident of Hawaii but was a citizen and resident of New York State at the time of his relevant purchase of tickets from United.

29.     On or about August 22, 2019, Plaintiff Buffer purchased two roundtrip tickets for travel from New York, New York to Athens, Greece, via Frankfurt, Germany, through United's website. Plaintiff Buffer paid $668.00 for the tickets for a trip beginning on March 19, 2020.

30.     Approximately four days prior to his scheduled departure, Plaintiff Buffer received a call from a United customer service agent, informing him that at least one leg of his trip was cancelled, offering him only two choices: (1) a rebooking, or (2) a cancellation of the

rest of the trip with flight credits. He rejected the flight credits and said that he wanted a refund, but United would not provide a refund.

31.     United has not refunded Plaintiff Buffer the price of his tickets and so Plaintiff Buffer seeks to enforce his right to a refund.

32.     Furthermore, at no time did United advise Plaintiff Buffer that the U.S. Department of Transportation on April 3, 2020 mandated prompt refunds.

33.     At the time of his ticket purchase, Plaintiff Buffer understood that he would be entitled to a refund if his flight was cancelled.

**D.     Defendants**

34.     Defendant United Airlines Holdings, Inc. is a Delaware corporation authorized to do business in Illinois as a foreign corporation with a principal place of business located at 233 South Wacker Drive in Chicago, Illinois.

35.     Defendant United Airlines, Inc. is a Delaware corporation authorized to do business in Illinois as a foreign corporation with a principal place of business located at 233 South Wacker Drive in Chicago, Illinois.

36.     United Airlines Holdings, Inc. is a holding company and its principal, wholly-owned subsidiary is United Airlines, Inc.

37.     Collectively, Defendants are referred to as "United."

## IV.     FACTS

**A.     Background**

38.     In a typical service scenario, United and its regional carriers operate over 4,900 flights a day to 362 airports across six continents, with hubs at Chicago O'Hare International Airport, Newark Liberty International Airport, Denver International Airport, George Bush

Intercontinental Airport, Los Angeles International Airport, A.B. Won Pat International Airport, San Francisco International Airport, and Washington Dulles International Airport.

39.     In 2019, United operated over 1.7 million flights carrying over 162 million customers, utilizing 791 mainline aircraft for hub-to-hub travel, with the airline's regional carriers operating another 581 regional aircraft.[3] For its services, United posted $43.2 billion in operating revenue in the year ending December 31, 2019.

40.     United sells its airline seat inventory and fares through United's direct channels (such as United's direct-to-consumer sales website, www.united.com, and the company's mobile applications) and through traditional travel agencies and online travel agencies. With each ticket sale, United collects passenger identification information, including name, address, and telephone information.

41.     But regardless of the method by which United sells its tickets, United has breached its Contract of Carriage through its refusal to issue refunds to passengers for coronavirus-related flight cancellations.

**B.     The Novel Coronavirus Shutdowns And United's Resulting Flight Cancellations**

42.     On December 31, 2019, governmental entities in Wuhan, China confirmed that health authorities were treating dozens of cases of a mysterious, pneumonia-like illness. Days later, researchers in China identified a new virus that had infected dozens of people in Asia, subsequently referred to as the novel coronavirus, or COVID-19. By January 21, 2020, officials in the United States were confirming the first known domestic infections of COVID-19.

---

[3] United contracts with regional carriers to provide regional service branded as United Express, carrying traffic that connects to United's hubs and which allows flights to smaller cities that cannot be provided economically with mainline aircraft.

010910-11/1330684 V1

43.     Due to an influx of thousands of new cases in China, on January 30, 2020, the World Health Organization officially declared COVID-19 as a "public health emergency of international concern."

44.     The U.S. State Department warned travelers to avoid traveling to China and on January 31, 2020, the U.S. federal government restricted travel from China, thus beginning travel restrictions affecting passengers ticketed on domestic and international air travel to and from the United States.

45.     That same day, January 31, 2020, the U.S. Health and Human Services Secretary "determine[d] that a public health emergency exists and has existed since January 27, 2020, nationwide."[4]

46.     By February 29, 2020, COVID-19 restrictions continued to spread across the globe. As the number of global cases rose to nearly 87,000, the U.S. federal government issued its highest-level warning, known as a "do not travel" warning, for areas in Italy and South Korea that are most affected by the virus. The government also banned all travel to Iran and barred entry to any foreign citizen who had visited Iran in the previous 14 days.

47.     On March 11, 2020, the World Health Organization declared COVID-19 a pandemic. That same day, American officials announced yet another travel ban expansion, this time blocking most visitors from continental Europe to the United States.

---

[4] *Determination that a Public Health Emergency Exists*, U.S. Department of Health & Human Services (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.

The U.S. Department of Health & Human Services' declaration that a public health emergency exists was renewed on April 21, 2020. *Renewal of Determination that a Public Health Emergency Exists*, U.S. Department of Health & Human Services (Apr. 21, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/covid19-21apr2020.aspx.

-9-

48.     On March 13, 2020, the President of the United States of America issued the *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* ("Proclamation"), proclaiming that the COVID-19 outbreak constituted a national emergency in the United States, beginning March 1, 2020.[5]

49.     Domestic travel restrictions began on March 16, 2020, with seven counties in the San Francisco, California area announcing shelter-in-place orders. Other states, counties, and municipalities have followed the shelter-in-place orders and, as of April 7, 2020, 316 million people in at least 42 states, 3 counties, 9 cities, the District of Columbia, and Puerto Rico were urged to stay home.

50.     Various states, including Plaintiffs' home states and destinations, issued and implemented mandatory Stay-At-Home Orders. They are:

- Alabama, effective April 3, 2020

- Alaska, effective March 28, 2020

- Arizona, effective March 31, 2020

- California, effective March 19, 2020

- Colorado, effective March 26, 2020

- Connecticut, effective March 23, 2020

- Delaware, effective March 24, 2020

- District of Columbia, effective March 30, 2020

- Florida, effective April 3, 2020

- Georgia, effective April 3, 2020

---

[5] Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020), available at: https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

- Hawaii, effective March 25, 2020

- Idaho, effective March 25, 2020

- Illinois, effective March 21, 2020

- Indiana, effective March 24, 2020

- Kansas, effective March 30, 2020

- Kentucky, effective March 26, 2020

- Louisiana, effective March 23, 2020

- Maine, effective April 2, 2020

- Maryland, effective March 30, 2020

- Massachusetts, effective March 24, 2020

- Michigan, effective March 24, 2020

- Minnesota, effective March 27, 2020

- Mississippi, effective April 3, 2020

- Missouri, effective April 3, 2020

- Montana, effective March 28, 2020

- Nevada, effective April 1, 2020

- New Hampshire, effective March 27, 2020

- New Jersey, effective March 21, 2020

- New Mexico, effective March 24, 2020

- New York, effective March 22, 2020

- North Carolina, effective March 30, 2020

- Ohio, effective, March 23, 2020

- Oklahoma, effective March 24, 2020

010910-11/1330684 V1

- Oregon, effective March 23, 2020

- Pennsylvania, effective April 1, 2020

- Rhode Island, effective March 28, 2020

- Tennessee, effective April 2, 2020

- Texas, effective April 2, 2020

- Virginia, effective March 30, 2020

- Vermont, effective March 25, 2020

- Washington, effective March 23, 2020

- West Virginia, effective March 24, 2020

- Wisconsin, effective March 25, 2020

51.     On March 29, 2020, the President of the United States of America announced the extension of social distancing guidelines until April 30, 2020.

52.     On March 31, 2020, the United States Department of State issued a Global Level 4 Health Advisory not to travel.[6]

53.     Circumstances have not improved materially in the ensuing months. COVID-19 transmission has spiked across the United States as both the country and its constituent States have reported record infection and hospitalization rates since late June 2020.[7] As a result, numerous states have imposed travel restrictions and mandatory quarantines on out-of-state travelers. By way of example, California has once again imposed stay at home orders on all

---

[6] *Global Level 4 Health Advisory – Do Not Travel*, U.S. Department of State (Mar. 31, 2020), available at https://travel.state.gov/content/travel/en/traveladvisories/ea/travel-advisory-alert-global-level-4-health-advisory-issue.html.

[7] Nigel Chiwaya, 22 States and Two Territories have set a Daily Coronavirus Record since July 1, NBC News (July 14, 2020), available at https://www.nbcnews.com/news/us-news/july-2020-united-states-coronavirus-records-n1233828.

010910-11/1330684 V1

residents,[8] and Chicago, New York and New Jersey have imposed 14-day quarantines on visitors from many states,[9] all of which will further depress domestic travel.

**C.      United's Flight Cancellations Mount**

54.     As the restrictions expanded and virus fears mounted, United cancelled flights in the United States because of a desire to save on operating expenses.

55.     By March 4, 2020, United made public announcements of cuts to its April and May 2020 flight schedules.

56.     On March 10, 2020, United announced that the company was planning for public concern about the virus to increase and for domestic bookings to decrease in the weeks to come.

57.     And while United initially anticipated only 10–20% in flight cancellations for April and May, by March 15, 2020, it changed position and increased service cuts from the level it announced just 11 days earlier, cutting its flights by 50% for April and May. That same day, United's executives also informed investors they expected the flight cancellations would continue and extend into the summer travel period.

---

[8] *Coronavirus (COVID-19) Travel Restrictions by State*, Kayak, https://www.kayak.com/travel-restrictions/united-states (last visited July 22, 2020).

[9] *See New York, New Jersey Up Quarantine-Restricted States to 19 as Travel Fuels Fresh Outbreaks*, NBC4 New York (July 7, 2020), available at https://www.nbcnewyork.com/news/local/an-outbreak-anywhere-is-an-outbreak-everywhere-ny-nj-probe-travel-tied-outbreaks-as-covid-surges-across-nation/2502751/; Emergency Travel Order by City of Chicago (July 28, 2020), available at https://www.chicago.gov/city/en/sites/covid-19/home/emergency-travel-order.html#:~:text=Travelers%20from%20the%20following%20states,Tennessee%2C%20Texas%2C%20and%20Utah.

58.     United's concerns have proved prescient. In May and June 2020, United decreased its flight capacity by approximately 90% from 2019 levels.[10] The service cuts resulted in United flying roughly 525 daily flights in June, a 10% decrease year-over-year.[11]

59.     United signaled that it expected demand would increase substantially in the late Summer, announcing on July 1, 2020, nearly 25,000 new and reinstated flights for August.[12] Its hopes proved overly optimistic, however, as in a recent filing with the Securities Exchange Commission it said "it anticipates August capacity to be 65% lower than the same month a year ago, 'which includes certain adjustments that the company plans to make to the schedule previously announced on July 1, 2020, resulting from reduced demand to destinations experiencing increases in Covid-19 cases and/or new quarantine requirements or other restrictions on travel.'"[13]

60.     United went on to concede in that same SEC filing that it "plans to continue to proactively evaluate and cancel flights on a rolling 60-day basis until it sees signs of a recovery in demand, and expects demand to remain suppressed until a widely accepted treatment and/or vaccine for Covid-19 is available."

61.     Such future cancellations appear likely in light of COVID's resurgence both globally and in wide swaths of the continental United States. And, unfortunately for United's customers, they will remain subject to United's refusal to meet its contractual obligations.

---

[10] Dan Weil, *United Airlines Cancellations Decrease as Demand Increases*, The Street (May 19, 2020), available at https://www.thestreet.com/investing/united-airlines-ual-air-travel.

[11] Edward Russell, *US Carriers Signal Slow Recovery with United Airlines Planning to Cut June Flying by 90%*, The Points Guy (Apr. 20, 2020), available at https://thepointsguy.com/news/us-carriers-signal-slow-recovery-with-united-airlines-planning-to-cut-june-flying-by-90/.

[12] Pilar Wolfstelller, *United Sees Cancellations Rise, Warns Employees of Furloughs*, Flight Global (July 7, 2020), available at https://www.flightglobal.com/strategy/united-sees-cancellations-rise-warns-of-furloughs/139182.article.

[13] *Id.*

**D.      United Refuses Passenger Refunds For Cancelled Flights**

62.      As United announced flight cancellations (combined with decreased domestic bookings), United took a variety of steps to make it difficult, if not impossible, for consumers to receive any refund on pandemic cancelled flights.

63.      United wanted to retain the money paid to it given the severe economic losses it was incurring related to pandemic flight cancellations.

64.      Yet, United refuses to provide refunds for cancelled flights despite passengers' right to receive refunds for unused transportation, even for non-refundable tickets.

65.      Prior to June 2020,[14] United's Contract of Carriage provided that passengers were entitled to refunds when:

      a)      A passenger's ticket is affected by a Schedule Change that modifies the original departure and/or arrival time by 30 minutes or more and the passenger is not transported on alternative transportation within 7 days of the original flight and does not accept a voucher for future travel within one year; or

      b)      A passenger's flight is affected by an Irregular Operation and the passenger is not transported on another flight to the destination.

66.      The Contract of Carriage obligates United to refund the entire amount of the Ticket for entirely unused tickets, or a prorated amount for partially used Tickets. Further, the Contract of Carriage does not permit United to deduct any cancellation fee from the amount refunded to passengers for cancelled flights, and similarly requires United to refund any and all baggage, upgrade, and/or service fees paid in connection with a cancelled flight.

67.      In the midst of a worldwide pandemic, however, United chose to breach its contractual duty to issue refunds in connection with flight cancellations. During March 2020,

---

[14] In late June 2020 United amended its Contract of Carriage, following the cancellations of Plaintiffs' and the Class Members' flights.

United announced on four separate occasions that it had altered its refund practices, ultimately announcing on March 14 that it would only provide *credits* where its Contract of Carriage required refunds. But United did not actually amend its Contract of Carriage to reflect these changes at the time, it merely announced these policies publicly, likely in an effort to dissuade Plaintiffs and the Class Members from pursuing the refunds to which they were entitled.

68.     United's effort to deny full refunds was described by one airline travel website editor "as possibly 'the single most damaging airline policy in recent memory.'"[15]

**E.     The Department Of Transportation Repeatedly Reminds Airlines Regarding Their Refund Obligations**

69.     Furthermore, United's practice to refuse customers refunds for cancelled flights contradicts established transportation requirements that operate for the benefit and protection of airline consumers.

70.     Prior to the pandemic, the United States Department of Transportation ("DOT") advised consumers of their right to a refund for a cancelled flight: "If your flight is cancelled and you choose to cancel your trip as a result, you are entitled to a refund for the unused transportation—even for non-refundable tickets. You are also entitled to a refund for any bag fee that you paid, and any extras you may have purchased, such as a seat assignment."[16]

71.     Such rights did not change with the pandemic. Rather, on April 3, 2020, the DOT issued the Enforcement Notice Regarding Refunds By Carriers Given The Unprecedented Impact Of The COVID-19 Public Health Emergency On Air Travel ("Notice") reiterating that

---

[15] Adam Uren, *United Tweaks its Flight Refund Policy, and Customers are Not Happy*, Bring me the News (Mar. 9, 2020), https://bringmethenews.com/minnesota-lifestyle/united-tweaks-its-flight-refund-policy-and-customers-are-not-happy (quoting Zach Honig (@ZachHonig), Twitter (Mar. 8, 2020), https://twitter.com/ZachHonig/status/1236839520357748736).

[16] *Flight Delays & Cancellations*, U.S. Department of Transportation (Mar. 4, 2020), available at https://www.transportation.gov/individuals/aviation-consumer-protection/flight-delays-cancellations.

airlines, including United, are obligated to issue prompt refunds to customers whose flights are/were cancelled or changed significantly during the COVID-19 crisis.[17]

72.     The Notice states, in part, as follows:

> The Department is receiving an increasing number of complaints and inquiries from ticketed passengers, including many with non-refundable tickets, who describe having been denied refunds for flights that were cancelled or significantly delayed. In many of these cases, the passengers stated that the carrier informed them that they would receive vouchers or credits for future travel. But many airlines are dramatically reducing their travel schedules in the wake of the COVID-19 public health emergency. As a result, passengers are left with cancelled or significantly delayed flights and vouchers and credits for future travel that are not readily usable.

> Carriers have a longstanding obligation to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier. The longstanding obligation of carriers to provide refunds for flights that carriers cancel or significantly delay does not cease when the flight disruptions are outside the carrier's control (e.g. a result of government restrictions). The focus is not whether the flight disruptions are within or outside the carrier's control, but rather on the fact that the cancellation is through no fault of the passenger.

73.     Put another way, "[a] passenger is entitled to a refund if the airline cancelled a flight, regardless of the reason, and the passenger chooses not to be rebooked on a new flight on that airline."[18]

74.     Passengers are similarly entitled to a refund if an airline makes "a significant schedule change and/or significantly delays a flight and the passenger chooses not to travel."[19]

---

[17] *Notice*, DOT (Apr. 3, 2020), available at https://www.transportation.gov/sites/dot.gov/files/2020-04/Enforcement%20Notice%20Final%20April%203%202020.pdf.

[18] *Refunds*, U.S. Department of Transportation (Apr. 21, 2020), available at https://www.transportation.gov/individuals/aviation-consumer-protection/refunds.

[19] *Id.*

75. Moreover, continued failures to provide refunds by United and other airlines resulted in the release of a *second* DOT enforcement notice.[20]

76. Under that notice, the DOT restated that "airlines have an obligation to provide a refund to a ticketed passenger when the carrier cancels or significantly changes the passenger's flight, and the passenger chooses not to accept an alternative offered by the carrier."[21]

77. Not only is United refusing to refund passengers for cancelled flights, United is misleading passengers about their rights, including their rights under the Contract of Carriage, by making it difficult to locate information about refunds, refusing refunds, unilaterally providing travel vouchers if a passenger is unable to contact a United customer service representative, and waiting until the last minute to cancel flights to induce passengers to cancel their flights.

**F. Consumer Complaints Regarding United's Refusal To Provide Passengers Refunds For Cancelled Flights Abound, Confirming United's Failure To Act In Good Faith And Deal Fairly With Its Passengers**

78. Consistent with Plaintiffs' experience, many consumers have complained regarding United's conduct. A few examples follow.

79. For example, one passenger complained on Twitter that he had three flights for his family of five cancelled by United. He was refused a refund and falsely told "no other airlines are giving refunds."[22]

---

[20] *Frequently Asked Questions Regarding Airline Ticket Refunds Given the Unprecedented Impact of the COVID-19 Public Health Emergency on Air Travel*, DOT (May 12, 2020), available at https://www.transportation.gov/sites/dot.gov/files/2020-05/Refunds-%20Second%20Enforcement%20Notice%20FINAL%20%28May%2012%202020%29.pdf.

[21] *Id.*

[22] Greg Leonow (@Gregleonow), Twitter (March 21, 2020), https://twitter.com/gregleonow/status/1241467672019308544?cxt=HHwWgMC87aSRyroiAAAA (replying to United Airlines (@United)).

80.     Another passenger's trip to Hawaii at the end of March 2020 to attend a wedding was cancelled due to COVID-19. She does not want a future travel credit, because she can no longer afford to travel to Hawaii.[23]

81.     Sensitive to such consumer complaints, members of the U.S. Senate issued a joint letter to United urging it to provide full cash refunds to passengers with flights cancelled during the pandemic:

> We write to urge your airline to issue full cash refunds to all customers who cancel their flights during the COVID-19 crisis, and to American citizens who encounter flight cancellations while stranded in countries that implemented travel restrictions. The ongoing pandemic is placing enormous financial strain on millions of Americans, and families need cash to pay for essentials such as food, housing, and medical care. In light of this pressing need and the unprecedented bailout—to the tune of $25 billion—that the airline industry just received from Congress, we believe your company has a moral responsibility to provide real refunds, not travel vouchers, to consumers, and to support State Department efforts to repatriate any American citizens trying to come home.[24]

82.     United not only has a moral responsibility to provide real refunds, it has a legal obligation to do so, particularly in light of the substantial bailout it received from American taxpayers, including Plaintiffs and Class Members.

83.     Indeed, U.S. taxpayers, through the federal government, provided substantial assistance to the airline industry in order to insulate its most critical components—the men and women in its employ—from the economic hardship the pandemic might otherwise impose upon them. In March 2020, Congress passed the CARES Act, which, *inter alia*, provides more than

---

[23] Dawn Eldridge (@dawnzo8), Twitter (March 20, 2020), https://twitter.com/dawnzo8/status/1241130603971588108?cxt=HHwWmMC9maztsLkiAAAA (replying to United Airlines (@United)).

[24] Letter to Oscar Munoz, CEO of United Airlines, Inc. from U.S. Senator Edward J. Markey, et al. (March 31, 2020).

$58 billion in aid to U.S. airlines, notwithstanding the fact that over the past decade the country's

largest airlines have spent roughly 96% of their free cash flow on stock buybacks.

84.     United alone received $5 billion dollars under the CARES Act.[25]

## V.     CLASS ACTION ALLEGATIONS

85.     Plaintiffs sue under Rule 23(a), (b)(2), and Rule 23(b)(3) of the Federal Rules of

Civil Procedure, on behalf of themselves and a Class defined as follows:

> All persons in the United States that purchased tickets for travel on
> United Airlines flights scheduled to operate to, from, or within the
> United States from March 1, 2020, to the date of class certification
> and who were not issued a refund for cancelled and/or significantly
> changed flights on which the passenger did not travel.

In the alternative, Plaintiffs also assert subclass claims on behalf of Class Members in their

respective home states. Excluded from any Class or Subclass are Defendants, any entity in which

Defendants have a controlling interest, and Defendants' legal representatives, predecessors,

successors, assigns, and employees. Further excluded from any Class or Subclass is this Court

and its employees. Plaintiffs reserve the right to modify or amend the Class definition, as

appropriate, during this litigation.

86.     The definition of the Class is unambiguous. Plaintiffs are members of the Class

they seek to represent. Class Members can be notified of the class action through ticketing

contact information and/or address lists maintained in the usual course of business by

Defendants.

87.     Class Members are so numerous and geographically dispersed that their

individual joinder of all Class Members is impracticable. The precise number of Class Members

---

[25] *United Airlines Expects to Receive $5.0 Billion Through Payroll Support Program Under CARES Act*, United (Apr. 15, 2020), https://hub.united.com/united-payroll-support-program-cares-act-2645727457.html.

is unknown to Plaintiffs but may be ascertained from Defendants' records. Given the thousands of flight cancellations made by Defendants, that number greatly exceeds the number to make joinder possible. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

88.     Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the Class Members, making appropriate final injunctive relief and declaratory relief regarding the Class under Rule 23(b)(2), particularly those aspects of injunctive relief that require Defendants to adhere to their voluntary undertakings and agreements with Plaintiffs and the Class Members.

89.     Additionally, common questions of law and fact predominate over the questions affecting only individual Class Members. Some of the common legal and factual questions include:

a.     Whether Defendants formed contracts with Plaintiffs and Class Members through the act of selling them tickets for air travel, including under the Contract of Carriage;

b.     Whether Defendants have denied refunds to Class Members for cancelled and/or significantly delayed flights;

c.     Whether Defendants' conduct breached one or more terms of Defendants' contracts with Plaintiffs and Class Members;

d.     Whether Defendants acted in good faith and dealt fairly with passengers under their contracts;

e.     Whether Defendants owe refunds to Plaintiffs and Class Members for cancelled and/or significantly delayed flights, rather than a credit on a future flight;

f.     Whether Illinois law applies to the nationwide Class; and

g.     The nature and extent of damages, equitable relief, and other remedies to which Defendants' conduct entitles Plaintiffs and Class Members.

90.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Class Members. Similar or identical common law breach of contract violations are involved. Individual questions pale by comparison to the numerous common questions that predominate.

91.     The injuries sustained by Plaintiffs and the Class Members flow, in each instance, from a common nucleus of operative facts under Rule 23(a)(2)—Defendants' breaches of an identical contract and identical breach. In each case, Defendants cancelled and/or significantly delayed flights yet denied refunds to Class Members for such cancelled and/or significantly delayed flights.

92.     Plaintiffs and Class Members have been damaged by Defendants' contractual breaches through Defendants' practice of cancelling flights yet denying refunds to Class Members for such cancelled flights.

93.     Plaintiffs' claims are typical of the claims of the other Class Members. Plaintiffs paid for airline tickets but did not receive a refund for cancelled and/or substantially delayed flights.

94.     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are familiar with the basic facts that form the bases of the Class Members' claims. Plaintiffs'

-22-

interests do not conflict with the interests of the other Class Members they seek to represent. Plaintiffs have retained counsel competent and experienced in class action litigation and intend to prosecute this action vigorously. Plaintiffs' counsel has successfully prosecuted complex class actions, including breach of contract and consumer protection class actions. Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the Class Members.

95.     The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and Class Members. The relief sought per individual members of the Class is small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for the Class Members to seek redress individually. Even if the Class Members themselves could afford such individual litigation, the court system could not.

96.     Individual litigation of the legal and factual issues raised by Defendants' conduct would increase delay and expense to all parties and to the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court. Given the similar nature of the Class Members' claims and the absence of material differences in breach of contract laws upon which the Class Members' claims are based, a nationwide Class will be easily managed by the Court and the parties.

## VI.     CAUSE OF ACTION

## COUNT I - BREACH OF CONTRACT

97.     Plaintiffs restate, re-allege, and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

98.     A contract existed between Plaintiffs and Class Members as reflected in Defendants' Contract of Carriage (*see* Exhibit B).

99.     The Contract of Carriage reflects obligations voluntarily undertaken by Defendants.

100.    Moreover, Plaintiffs and Class Members did not draft the terms of the Contract of Carriage.  Rather Defendants (and/or Defendants' agents at Defendants' direction) drafted the Contract of Carriage.

101.    Defendants made offers to Plaintiffs and Class Members to enter into a contract for United to provide transportation services to Plaintiffs and Class Members through passenger tickets for air travel between specific locations, on specific flight numbers, on specific dates, at specific prices.

102.    Defendants' offer to provide transportation services to Plaintiffs and Class Members also included Defendants' term that it would refund Plaintiffs and Class Members for all cancellations and/or significantly changed flights.

103.    At all times relevant, Defendants' offer and terms were specifically identified in writing in Defendants' Contract of Carriage entered into between Plaintiffs and Class Members on one hand, and Defendants on the other, at the time of ticket purchases.

104.    Defendants' offer reflected a definite promise, showing a willingness to make an agreement for transportations services with passengers.

105.    Defendants' offer provided Plaintiffs and Class Members the power to agree to its terms through the act of purchasing one or more tickets for travel with Defendants.

106.    Defendants made such offers in writing through United's direct channels (such as United's direct-to-consumer sales website, www.united.com, and the company's mobile applications), traditional travel agencies, and online travel agencies.

107.    Numerous sections of the Contract of Carriage applicable at the time Plaintiffs and Class Members purchased their tickets confirm passengers' contractual rights to refunds for tickets and fees where a flight has been cancelled and/or significantly changed, regardless of the reason for a cancellation or delay.

108.    To wit, the terms of United's Contract of Carriage provides that when United cancels a flight due to Irregular Operations or a Schedule Change, United will refund the full fare and any charges paid for a ticket unused in its entirety, and in the case of partially used fares, at minimum, the prorated value of the unused segment (if not more). *See* Exhibit B at Rule 27.

109.    The Contract of Carriage also provides that if a passenger does not travel as a result of a "flight cancellation, Schedule Change, or Irregular Operations," United shall refund any baggage fees, upgrade fees, and other service fees, such as those relating to seating selection. *See* Exhibit B at Rule 27.

110.    The foregoing applies with equal force to *all* United tickets, regardless of whether they were deemed "refundable" or "non-refundable."

111.    Furthermore, United's Contract of Carriage also incorporates Plaintiffs' and Class Members' rights to refunds as required under applicable laws, regulations, rules, or security directives, such as DOT rules applicable to passenger refunds:

> This Contract of Carriage is subject to applicable laws, regulations, rules, and security directives imposed by governmental agencies, including but not limited to those imposed during or as a result of a national emergency, war, civil unrest or terrorist activities. In the event of a conflict between the Rules contained herein and such government laws, regulations, rules, security directives and their corresponding effects on UA's operation, the latter shall prevail.

*See* Exhibit B at Rule 3.

112.    The terms of Defendants' offer to provide transportation services contained a definite promise by Defendants and gave Plaintiffs and Class Members the power to agree to the terms of Defendants' offer to provide transportation services through, including but not limited to, the act of purchasing a ticket or accepting transportation on Defendants' aircraft.

113.    Plaintiffs and Class Members accepted Defendants' offer to provide transportation services, agreeing to the material terms contained in Defendants' offer.

114.    Plaintiffs and Class Members communicated their acceptance of Defendants' offer by purchasing one or more tickets thereby booking transportation services with Defendants.

115.    The agreement between Plaintiffs, the Class Members, and Defendants included an exchange of promises or value, *i.e.*, consideration. Here, Plaintiffs and Class Members provided Defendants with consideration in the form of amounts equal to the monetary value of the fare and all charges and taxes paid. In turn, Defendants issued tickets, promising and/or agreeing to provide transportation services to Plaintiffs and Class Members under the terms of the Contract of Carriage.

116.    Plaintiffs and Class Members performed all obligations and conditions required and expected of them and/or had a valid excuse for not performing any such obligations due to the COVID-19 pandemic. Defendants, on the other hand, failed to perform their obligations imposed under its agreements with Plaintiffs and Class Members as they did not transport Plaintiffs and Class Members and they failed to provide refunds where refunds are due.

117.    Moreover, the various national and state guidelines, laws, rules, and regulations related to the pandemic have frustrated Plaintiffs' and Class Members' ability to benefit from the Contract of Carriage and ability to travel, thus making their domestic and/or foreign air travel impossible, or at a minimum, impracticable.

-26-

118.    Defendants cancelled and/or significantly changed Plaintiffs' and Class Members' flights.

119.    Defendants failed to provide and/or outright refused refunds to Plaintiffs and Class Members for such cancelled and/or significantly changed flights for which Plaintiffs and Class Members did not accept alternative transportation.

120.    Defendants did so even though Defendants were contractually obligated to provide refunds to Plaintiffs and Class Members in such circumstances.

121.    To the extent that Defendants attempted to change their refund policy, as well as Defendants' attempts to apply any revised policies retroactively, to avoid providing refunds to Plaintiffs and Class Members, such attempts are void and unenforceable against Plaintiffs and Class Members and are contrary to both the Contract of Carriage and public policy, including as evidenced by enforcement notices issued by the DOT.

122.    Defendants have failed to perform its obligations according to the terms of the contracts and have materially breached their contracts with Plaintiffs and Class Members.

123.    Because of Defendants' failure to perform under the contracts, Plaintiffs and Class Members have been damaged and/or did not receive the refunds, benefits, payment, and/or performance to which they were entitled under the contract.

124.    As a result, Plaintiffs and Class Members have sustained monetary damages and are entitled to fair compensation in the form of complete refunds for all fares, charges, and taxes paid.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class Members request that the Court enter an order or judgment against Defendants including:

A.      Certification of the action as a Class Action under Rules 23(a), (b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, and appointment of Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.      Actual damages and refunds in the amount of unrefunded monies paid for United airline tickets, and any such other relief as available under the contract and/or law;

C.      Pre-judgment and post-judgment interest on such monetary relief;

D.      Other appropriate injunctive relief as permitted by law or equity, including an order directing Defendants to comply with their contractual obligations and/or enjoining Defendants from retaining refunds for United cancelled flights;

E.      The costs of bringing this suit, including reasonable attorney's fees; and

F.      All other relief to which Plaintiffs and members of the Class may be entitled by law or in equity.

## JURY DEMAND

Plaintiffs demand trial by jury on their own behalf and on behalf of Class Members.

Dated: July 29, 2020                       Respectfully submitted,

By */s/ Steve W. Berman*           
Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292
steve@hbsslaw.com

Daniel J. Kurowski
Whitney K. Siehl
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
(708) 628-4949
dank@hbsslaw.com
whitneys@hbsslaw.com

*Interim Co-Lead Counsel*

Daniel O. Herrera
Nickolas J. Hagman
CAFFERTY CLOBES MERIWETHER
&SPRENGEL LLP
150 S. Wacker, Suite 3000
Chicago, Illinois 60606
T: (312) 782-4880
F: (318) 782-4485
dherrera@caffertyclobes.com
nhagman@caffertyclobes.com

Bryan L. Clobes*
CAFFERTY CLOBES MERIWETHER
&SPRENGEL LLP
205 N. Monroe St.
Media, Pennsylvania 19063
T: (215) 864-2800
bclobes@caffertyclobes.com
*Admission pro hac vice forthcoming

*Interim Co-Lead Counsel*

010910-11/1330684 V1

-with-

Joseph G. Sauder*
Joseph B. Kenney*
SAUDER SCHELKOPF LLC
1109 Lancaster Ave.
Berwyn, PA 19312
Telephone: (888)-711-9975
Facsimile: (610) 421-1326
jgs@sstriallawyers.com
jbk@sstriallawyers.com
*Admission pro hac vice forthcoming

*Additional Counsel for Plaintiffs*

-30-

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on July 29, 2020, a true and correct copy of the foregoing was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

By */s/ Steve W. Berman*
Steve W. Berman