**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JACOB RUDOLPH, MARK HANSEN, and JASON BUFFER, individually and on behalf of all others similarly situated, )))) | |
| Plaintiffs, ) | No. 20 C 2142 |
| ) | |
| v. ) | |
| ) | Judge Thomas M. Durkin |
| UNITED AIRLINES HOLDINGS, INC. and UNITED AIRLINES, INC., )) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Jacob Rudolph, Mark Hansen, and Jason Buffer filed this putative nationwide class action alleging breach of contract by defendants United Airlines Holdings, Inc. and United Airlines, Inc. (together, "United") for failure to refund travel fares in the wake of the COVID-19 pandemic. Now before the Court are United's motions to stay Mr. Hansen's claim pending arbitration, R. 52, and to dismiss the consolidated complaint in its entirety, R. 44. For the following reasons, United's motion to stay is denied, and its motion to dismiss is granted in part, and denied in part.

**Background**

This case arises against the backdrop of numerous United flight cancellations during the COVID-19 pandemic. As discussed in more detail below, Plaintiffs allege that they sought refunds from United for travel plans never fulfilled, but were offered only credits for future travel. According to Plaintiffs, United's refusal to extend

refunds was in breach of its Conditions of Carriage ("COC"), a copy of which is attached to the complaint. A summary of the COC's key provisions is set forth below, followed by a review of the United States Department of Transportation's ("DOT") pronouncements regarding passenger refunds referenced in the complaint, and finally the allegations specific to each Plaintiff.

***United's Contract of Carriage.*** The COC groups cancellations into two categories: (1) "Voluntary" cancellations, in which a passenger cancels his flight; and (2) "Involuntary" cancellations, in which United initiates the cancellation. R. 41-2 at 82-87. For a "Voluntary" cancellation of a refundable ticket, the COC allows for a refund. But for a "Voluntary" cancellation of a non-refundable ticket, the COC does not. *Id.* at 86-87. Instead, the COC provides that United "may allow a portion of the non-refundable fare . . . to be applied towards the purchase of future travel." *Id.* at 87. In other words, United may offer a travel credit.

In turn, an "Involuntary" cancellation—a cancellation initiated by United— falls into one of three categories: (1) a "Force Majeure Event;" (2) a "Schedule Change;" or (3) "Irregular Operations." If United cancels a flight due to a Force Majeure Event, ticketed passengers are entitled to a travel credit, but no refund. *Id.* at 73-74. But if a cancellation is due to a Schedule Change or Irregular Operations (and affected passengers are not rebooked on another flight within the contractually required timeframe), United must issue a refund "upon request." *Id.* The COC defines a "Force Majeure Event" as:

> a.   Any condition beyond [United's] control including, but not limited to, meteorological or geological conditions, acts of God, riots,

terrorist activities, civil commotions, embargoes, wars, hostilities, disturbances, or unsettled international conditions, either actual, anticipated, threatened or reported, or any delay, demand, circumstances, or requirement due directly or indirectly to such condition;

b. Any strike, work stoppage, slowdown, lockout, or any other labor-related dispute involving or affecting [United's] services;

c. Any governmental regulation, demand or requirement;

d. Any shortage of labor, fuel, or facilities of UA or others;

e. Damage to [United's] Aircraft or equipment caused by another party;

f. Any emergency situation requiring immediate care or protection for a person or property; or

g. Any event not reasonably foreseen, anticipated, or predicted by [United].

*Id.* at 72. A "Schedule Change" is defined as:

[A]n advance change in [United's] schedule (including a change in operating carrier or itinerary) that is not a unique event such as Irregular Operations or Force Majeure Event.

*Id.* at 71. Finally, "Irregular Operations" are:

[A]ny of the following irregularities:

a. Delay in scheduled departure or arrival of a carrier's flight resulting in a Misconnection;

b. Flight or service cancellation, omission of a scheduled stop, or any other delay or interruption in the scheduled operation of a carrier's flight;

c. Substitution of aircraft type that provides different classes of service or different seat configurations;

d. Schedule changes which require Rerouting of Passengers at departure time of the original flight; or

e. Cancellation of a reservation by [United] pursuant to Rule 5.

*Id.* at 72-73. A Rule 5 cancellation includes (among other things) cancellations that

are "necessary or advisable by reason of weather or other conditions beyond UA's

control, (including, but not limited to acts of God, force majeure events, strikes, civil

3

commotions, embargoes, wars, hostilities, or other disturbances, whether actual, threatened, or reported)." *Id.* at 19-20.

> ***DOT Communications Regarding Refunds.*** The complaint notes that the

DOT has issued various statements regarding customer refunds. Prior to the COVID-19 pandemic, the DOT advised consumers as follows:

> If your flight is cancelled and you choose to cancel your trip as a result, you are entitled to a refund for the unused transportation—even for non-refundable tickets. You are also entitled to a refund for any bag fee that you paid, and any extras you may have purchased, such as a seat assignment.

R. 41 ¶ 70 (citing *Flight Delays & Cancellations*, U.S. Dep't of Trans., https://www.transportation.gov/individuals/aviation-consumer-protection/flight-delays-cancellations (Mar. 4, 2020)). In April 2020, and in the midst of the COVID-19 pandemic, the DOT issued an enforcement notice due to complaints that passengers had been offered only "vouchers or credits for future travel" after their flights were "cancelled or significantly delayed." *Id.* ¶ 71. That notice stated in relevant part:

> Carriers have a longstanding obligation to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier. The longstanding obligation of carriers to provide refunds for flights that carriers cancel or significantly delay does not cease when the flight disruptions are within or outside the carrier's control (e.g., a result of government restrictions). The focus is not whether the flight disruptions are within or outside the carrier's control, but rather on the fact that the cancellation is through no fault of the passenger.

*Id.* ¶ 72. The DOT issued a second enforcement notice in May 2020 reiterating that "airlines have an obligation to provide a refund to a ticketed passenger when the carrier cancels or significantly changes the passenger's flight, and the passenger

chooses not to accept an alternative offered by the carrier" (the April and May 2020 enforcement notices together, the "DOT Notices"). *Id.* ¶ 76.

***James Rudolph.*** Mr. Rudolph purchased three tickets for travel on United beginning on April 4, 2020 to and from Hilton Head, South Carolina to Minneapolis/St. Paul, Minnesota, with connecting flights in Chicago. *Id.* ¶ 13. He paid $1,521.45 for his tickets. *Id.* ¶ 14. Mr. Rudolph requested a refund on March 16, 2020 due to his concerns about the pandemic. *Id.* ¶ 15. United representatives denied his request, indicating that his ticket purchase did not qualify for a refund. *Id.* ¶ 16. Instead, Mr. Rudolph was offered a rebooking or ticket credit for travel within one year of the original purchase date. *Id.* Later, United cancelled one or more segments of his itinerary. *Id.* ¶ 17.

***Jason Buffer.*** Mr. Buffer purchased two roundtrip tickets for travel beginning on March 19, 2020 from New York, New York to Athens, Greece via Frankfurt, Germany. *Id.* ¶ 29. The tickets cost $668.00. *Id.* About four days before his departure, a United representative informed Mr. Buffer that at least one leg of his trip had been cancelled, and offered him a rebooking or cancellation of the remainder of his trip with flight credits. *Id.* ¶ 30. Mr. Buffer declined, and United declined his request for a refund. *Id.*

***Mark Hansen.*** Mr. Hansen used travel booking website Expedia to purchase four roundtrip tickets on United for travel beginning on March 28, 2020 from Vancouver, British Columbia, to Liberia, Costa Rica, with connecting flights via Houston, Texas. *Id.* ¶¶ 21-22. Mr. Hansen paid $1,483.40 for the tickets. *Id.* ¶ 22.

United changed Mr. Hansen's itinerary several times in the days leading up to the trip. It then canceled a portion of his itinerary, and ultimately canceled the remainder two days before his scheduled departure. *Id.* ¶ 23. United issued Mr. Hansen a flight credit. *Id.* Mr. Hansen contacted both Expedia and United for a refund, to no avail. *Id.* ¶ 24.

## I.      Motion to Stay Pending Arbitration

United moves to stay Mr. Hansen's claim pending arbitration, attaching the declaration of David Coons, Expedia's Vice President for Product and Technology, and Expedia's Terms of Use in support. The Court sets forth additional relevant facts from these exhibits below, before analyzing the parties' arguments.

### A.      Additional Background Facts

It is undisputed that before Expedia users like Mr. Hansen purchase airfare through the website, they are required to acknowledge that they have read and accepted specific terms and policies, including Expedia's Terms of Use. R. 53-1 ¶ 5. Among other things, the Terms of Use to which Mr. Hansen agreed included an arbitration clause stating in relevant part that:

> Any and all claims will be resolved by binding arbitration, rather than in court, except you may assert Claims on an individual basis in small claims court if they qualify. This includes any Claims you assert against us, our subsidiaries, travel suppliers or any companies offering products or services through us (which are beneficiaries of this arbitration agreement).

R. 53-1 at 44-45 ("Arbitration Clause"). The Terms of Use expressly indicate that airlines are "travel suppliers," and define "Claims" as "any disputes or claims relating in any way to . . . any services or products provided." *See id.* at 44, 47.

6

**B.    Standard**

The Federal Arbitration Act ("FAA") "governs the enforcement, validity, and interpretation of arbitration clauses in commercial contracts in both state and federal courts." *Jain v. de Mere*, 51 F.3d 686, 688 (7th Cir. 1995). It provides that "an agreement in writing to submit to arbitration an existing controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As such, the FAA embodies a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). But it "does not mandate enforcement of arbitration agreements entered in violation of federal regulations." *In re Conticomm. Servs., Inc. Sec. Litig.*, 1987 WL 10987, at *3 (N.D. Ill. May 8, 1987).

**C.    Analysis**

United argues that the Arbitration Clause contained in Expedia's Terms of Use is valid, and that Hansen's refund claim falls within its broad scope. Generally, ordinary contract principles govern whether an arbitration agreement is valid and enforceable. *First Options of Chicago v. Kaplan*, 514 U.S. 938, 944 (1995). Here, United contends that Washington state law and federal arbitration law control. Mr. Hansen does not contest this and the Court agrees. Indeed, the Terms of Use provide that the applicable law is the FAA, federal arbitration law, and for reservations made by U.S. citizens, the laws of the state in which the purchaser's billing address is located. R. 53-1 at 65. And the complaint indicates that Mr. Hansen is a citizen and resident of Washington state. R. 41 ¶ 21. Consistent with the FAA, Washington law recognizes a strong public policy favoring arbitration when "the parties agree[d] by

contract to submit their disputes to an arbitrator." *Davidson v. Hensen*, 954 P.2d 1327, 1330 (Wash. 1998). A valid and enforceable contract exists where: (1) the parties "objectively manifest their mutual assent;" (2) the terms assented to are "sufficiently definite;" and (3) the agreement is supported by consideration. *Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004).

Mr. Hansen does not meaningfully dispute that the Arbitration Clause is valid and enforceable with respect to covered claims between himself and Expedia. Instead, Mr. Hansen contends that the clause cannot bind him as to his breach of contract claim against United because: (1) the Airline Deregulation Act of 1978 ("ADA") prevents United from enlarging its COC through Expedia's Terms of Use; (2) federal regulations prohibit United from enforcing the Arbitration Clause; and (3) Mr. Hansen's claim does not fall within the scope of the Arbitration Clause.

***ADA Preemption.*** Mr. Hansen argues that United cannot acquire a right to arbitration that does not exist in the COC, because "federal precedent makes clear this dispute is governed exclusively by the terms of the COC (along with any terms specifically incorporated by reference)," and the Arbitration Clause was not so incorporated. R. 58 at 10. The ADA contains a preemption provision that prohibits a state from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713. As a result, the Supreme Court has held that courts are confined "in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement

based on state laws or policies external to the agreement." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 233 (1995).

United does not argue that the Arbitration Clause was incorporated into the COC. But it is unclear whether United is preempted from invoking the Arbitration Clause as a third-party beneficiary. Indeed, the purpose of the ADA's preemption provision is to prevent states from undoing federal *de*-regulation by imposing obligations on *air carriers*. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992) (ADA preemption intended to "ensure that the States would not undo federal deregulation with regulation of their own"). An order staying Mr. Hansen's refund claim pursuant to the FAA and the Arbitration Clause would not implicate these concerns. And Mr. Hansen cites no authority finding preemption in a case in which an air carrier sought to benefit from terms outside of its contract of carriage.[1] The Court thus declines to decide United's motion on this basis.

***Federal Regulations.*** Mr. Hansen next contends that DOT regulations prevent United from enforcing the arbitration agreement. Mr. Hansen points first to

---

[1] Each of the decisions Mr. Hansen cites in support of his argument held that the ADA preempted an effort to use state third-party beneficiary law to impose obligations on the air carrier beyond those to which it had agreed. *See McGarry v. Delta Air Lines, Inc.*, 2019 WL 2558199, at *5 (C.D. Cal. June 18, 2019) (plaintiff's claim as a third-party beneficiary to an agreement between Delta and another entity preempted); *A.C.L. Computers & Software, Inc. v. Fed. Express Corp.*, 2016 WL 946127, at *4 (N.D. Cal. Mar. 14, 2016) (plaintiff's breach of contract action as a third-party beneficiary to agreement between FedEx and another entity preempted); *In re Am. Airlines, Inc. Privacy Lit.*, 2005 WL 3323028, at *3-4 (N.D. Tex. Dec. 7, 2005) (plaintiff's breach of contract action preempted by ADA because it required court to apply state law to determine whether plaintiff had rights as a third-party beneficiary to the contract between the airline and another entity, and thus to impose obligations on the airline beyond that to which it agreed). Accordingly, those cases are inapposite.

14 C.F.R. § 253.10, which he argues makes clear that he is "entitled to sue in this Court" even if the Arbitration Clause is otherwise valid and enforceable. That regulation provides:

> No carrier may impose any contract of carriage provision containing a choice-of-forum clause that attempts to preclude a passenger, or a person who purchases a ticket for air transportation on behalf of a passenger, from bringing a claim against a carrier in any court of competent jurisdiction, including a court within the jurisdiction of that passenger's residence in the United States (provided that the carrier does business within that jurisdiction).

14 C.F.R. § 253.10. United concedes that this regulation "prohibits an airline from including an arbitration clause in its own Contract of Carriage." R. 63 at 5; *see also Jackson v. Payday Fin.,* LLC, 764 F.3d 765, 773 (7th Cir. 2014) ("An agreement to arbitrate is a type of forum selection clause.") (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 630-31 (1985)). But United argues that it still may rely on the Arbitration Clause, because Section 253.10's plain language only prohibits restrictions by air carriers in their own contracts of carriage, not travel booking websites like Expedia in their agreements with customers. United points out that Mr. Hansen fails to cite any authority that interprets Section 253.10 otherwise, and contends that at least one court has held that Section 253.10 does not prohibit arbitration in this context. *See* R. 63 at 5-6 ("United is not aware of any case in which a court has held that Section 253.10 (or any other DOT regulation) forbids United from enforcing a binding arbitration clause as a third-party beneficiary, and at least one court has reached the opposite conclusion.") (citing *Ward v. Am. Airlines, Inc.,* No. 4:20-cv-00371-O (N.D. Tex. Nov. 2, 2020)).

While the court in *Ward* did enforce the same Arbitration Clause under virtually identical circumstances, the court did not analyze or discuss Section 253.10. In fact, neither party cited any case law construing Section 253.10, and nor could the Court locate any. Nevertheless, the Court agrees with Mr. Hansen that United should not be permitted to do indirectly what federal regulations prohibit it from doing directly, particularly given the regulation's purpose to provide protections to consumers. *See* Jessica Rapoport, *Warsaw, Montreal, and the U.S. Department of Transportation: Consumer Protection for Forum Selection?*, 77 J. Air L. & Com. 247, 264 (2011) ("The title of the regulations promulgated—'Enhancing Airline Passenger Protections'—along with language of the regulation and commentary, evidence a strong intent and a concerted effort by the DOT to afford airline passengers a right to bring suit in the jurisdiction where they reside."). The Court will not aid an attempted end-run around the regulation. The motion to stay is denied.[2]

## II. Motion to Dismiss

Having determined that a stay is not proper as to Mr. Hansen's claim, the Court turns to United's motion to dismiss his and the other Plaintiffs' claims.

### A. Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled

---

[2] Because the Court denies United's motion to stay based on 14 C.F.R. § 253.10, the Court declines to address Mr. Hansen's other arguments in opposition to United's motion.

to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

**B. Analysis**

To state a breach of contract claim under Illinois law,[3] a plaintiff must plausibly allege: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach by the defendant; and (4) damages resulting from defendant's breach. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010). United argues that the complaint fails to allege a breach because: (1) the

---

[3] Plaintiffs allege and United does not dispute for purposes of this motion that the COC is governed by Illinois law.

COVID-19 pandemic and its fallout constitute a Force Majeure Event under the COC, meaning that United was not contractually required to provide a refund; and (2) the DOT Notices were not incorporated into the COC or otherwise binding on United, and thus do not change the result. United also contends that United Airlines Holdings, Inc. is not a proper defendant. The Court addresses each argument in turn.

***COC/Force Majeure Provision.*** United's principal argument is that Plaintiffs' claim fails as a matter of law because the COVID-19 pandemic and related restrictions and warnings referenced in the complaint constitute Force Majeure Events within the meaning of the COC. As a result, United was only obligated to extend a travel credit to affected passengers (which it did). United points specifically to the following allegations:

- On January 31, 2020, the United States Health and Human Services Secretary determined that COVID-19 posed a public health emergency, R. 41 ¶ 45;
- On February 29, 2020, the United States federal government issued a "do not travel" warning for areas most affected by the virus, *id.* ¶ 46;
- On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic, and the United States federal government announced an expansion of its travel ban, blocking most visitors from continental Europe to the United States, *id.* ¶ 47; and
- On March 31, 2020, the United States Department of State issued a Global Level 4 Health Advisory not to travel, *id.* ¶ 52.

R. 45 at 2-3. Additionally, United asks the Court to take judicial notice of the fact that Costa Rica's borders were closed to all persons other than citizens, residents, and foreign diplomats from March 18, 2020 through April 12, 2020—a date range that encompassed Mr. Hansen's planned travel. *See* R. 45 at 10, n.6. Further, and relevant to Mr. Rudolph's claim, United points out that Minnesota issued a mandatory stay-

at-home order prior to his travel dates. R. 41 ¶ 50. United argues that all of these allegations concern "condition[s] beyond [United's] control," "not reasonably foreseen, anticipated, or predicted," and thus fall squarely within the COC's definition of a Force Majeure Event. R. 45 at 11 (quoting R. 41-2 at 72).

In response, Plaintiffs point to the complaint's allegations that United's decision to cancel flights was based on pure economics. *See* R. 48 at 9 (citing R. 41 ¶¶ 54, 56-60) (alleging that United: "cancelled flights in the United States because of a desire to save on operating expenses;" was "planning" for "domestic bookings to decrease;" had "informed investors they expected the flight cancellations would continue;" and informed the SEC that it would "proactively evaluate and cancel flights" until it saw "signs of a recovery in demand"). And Plaintiffs argue that none of the circumstances that United cites outright prohibited the operation of the flights at issue. Finally, Plaintiffs contend that reading "Force Majeure Event" as broadly as United urges would eviscerate the Schedule Change and Irregular Operations provisions, such that *any* change that was unforeseen or beyond United's control would disqualify affected passengers from receiving refunds. For the most part, the Court agrees.

Indeed, while a force majeure provision generally must "be interpreted in accordance with its language and context, like any other provision in a written contract," *Wisc. Elec. Power Co. v. Union Pac. R.R. Co.*, 557 F.3d 504, 507 (7th Cir. 2009), courts must also "attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous," *Land of Lincoln*

14

*Goodwill Indus., Inc. v. PNC Fin. Servs. Grp., Inc.* 762 F.3d 673, 679 (7th Cir. 2014) (applying Illinois law). The Court agrees with Plaintiffs that reading "Force Majeure Event" too broadly could gut the Schedule Change and Irregular Operations provisions. *Compare* R. 41-2 at 72 (COC defining "Force Majeure Event" to include "[a]ny condition beyond [United]'s control," or "[a]ny event not reasonably foreseen, anticipated or predicted" by United), *with id.* at 73 (COC defining "Irregular Operations" to include "[f]light or service cancellation, omission of a scheduled stop, or any other delay or interruption in the scheduled operation of a carrier's flight"). Certainly, there must be some point where a Force Majeure Event ends, and a Schedule Change or Irregular Operation begins. And to the extent that boundary is unclear, the COC, drafted entirely by United, must be construed in Plaintiffs' favor.[4] *See Yasko v. Reliance Standard Life. Ins. Co.*, 53 F. Supp. 3d 1059, 1068 (N.D. Ill. 2014) (where the agreement may reasonably be interpreted in more than one manner, the "ambiguity must be construed against . . . the drafter") (citing *Tranzact Tech., Ltd. v. Evergreen Partners, Ltd.*, 366 F.3d 542, 546 n.2 (7th Cir. 2004)).[5]

---

[4] The Court notes that the COC definitions of "Force Majeure Event" and "Irregular Operations" seem to directly overlap. Indeed, by defining "Irregular Operations" to include a "[c]ancellation of a reservation by [United] pursuant to Rule 5," that definition includes cancellations that are "necessary or advisable by reason of weather or other conditions beyond UA's control, (including, but not limited to acts of God, force majeure events, strikes, civil commotions, embargoes, wars, hostilities, or other disturbances, whether actual, threatened, or reported)." R. 41-2 at 73.

[5] In a footnote, United cites to several decisions in which other courts have characterized the pandemic as a force majeure event. *See* R. 49 at 4 n.1 (collecting cases). However, none of those decisions are binding on this Court, and nor are they particularly persuasive; indeed, none concerned airfare refunds, and as discussed *supra*, force majeure provisions must be construed in accordance with their own language and context in any case.

But even assuming COVID-19 and/or the related restrictions United cites qualify as Force Majeure Events, that is not enough to excuse United from offering a refund for flights it cancels. Those events also must have directly and proximately caused the cancellations. *See Glen Hollow P'ship v. Wal-Mart Stores, Inc.*, 139 F.3d 901, 1998 WL 84144, at *3 (7th Cir. 1998) (for force majeure provision to excuse nonperformance, the nonperformance "must be both directly and proximately caused by" the allegedly triggering condition); *see also N. Ill. Gas Co. v. Energy Co-op., Inc.*, 461 N.E.2d 1049, 1058 (Ill. App. Ct. 1984) (the allegedly triggering condition must "clearly direct or prohibit an act which proximately causes non-performance or [the] breach"). And "generally the issue of proximate cause is a jury question." *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 615 (7th Cir. 2002) (courts can decide the issue of causation as a matter of law in "extreme circumstances," but typically only after discovery, not on the pleadings); *see also Palm Springs Mile Assocs., Ltd. v. Kirkland's Stores, Inc.*, 2020 WL 5411353, at *2 (S.D. Fla. Sept. 9, 2020) (the applicability of a *force majeure* clause in the context of COVID-19 is typically a "factual question that cannot be determined on a motion to dismiss"); *see also Gibson v. Lynn Univ., Inc.*, 2020 WL 7024463, at *4 (S.D. Fla. Nov. 29, 2020) (same). With this in mind, the Court takes Plaintiffs' claims in turn.

First, it is plausible that United cancelled Mr. Buffer's flights in mid-March 2020 "because of a desire to save on operating expenses" as the complaint alleges, R. 41 ¶ 54, and not because COVID-19 had been declared at that time as a public health emergency and global pandemic. Indeed, according to the complaint, United made

16

various statements in public filings with the SEC regarding "adjustments" to its flight schedule due to "reduced demand." *Id.* ¶¶ 59-60. And that United continued to operate some flights during this time cuts against blaming the pandemic itself. *See id.* ¶ 57 (alleging that United cut its flights by 50% for April and May). United does not contend that economic motivations constitute a Force Majeure Event, and nor could it. Ultimately, whether the cancellations at issue occurred because of economic considerations, or were due to restrictions and warnings related to the pandemic, can only be answered with discovery. Accordingly, United's motion is denied as to Mr. Buffer.

But Mr. Hansen's claim is another story. While Mr. Hansen contends that the Costa Rican border closures are "irrelevant," R. 48 at 11, the Court disagrees. It simply is not plausible that such closures were not a proximate cause of at least the cancellation of Mr. Hansen's travel in and out of Costa Rica in March and April 2020. Indeed, Costa Rica was Mr. Hansen's destination, not a layover, and no reasonable air carrier would agree to transport an American citizen and resident under those circumstances, where he would not be permitted entry on arrival. Such a government-ordered closure falls comfortably within the definition of a Force Majeure Event. *See* R. 41-2 at 72 (COC defining "Force Majeure Event" to include "Any governmental regulation, demand or requirement"). Accordingly, Mr. Hansen fails to state a

plausible breach of contract claim as to those flights. But Mr. Hansen's claim as to the remainder of his itinerary may proceed for the same reasons Mr. Buffer's does.[6]

Finally, Mr. Rudolph's claim fails in full, because, according to the complaint, Mr. Rudolph cancelled his flight before United did. R. 41 ¶¶ 15-17. Plaintiffs do not contend that the COC obligates United to offer a refund when a passenger cancels a non-refundable ticket first. But they argue that Mr. Rudolph nevertheless states a claim because United repudiated the agreement with Mr. Rudolph before he cancelled his plans.

Generally, "[w]hen one party to a contract repudiates his contractual duties before time for performance, the other party may elect to treat the contract as ended. In such cases the nonbreaching party is not required to tender performance or to comply with conditions precedent." *Bituminous Cas. Corp. v. Com. Union Ins. Co.*, 652 N.E.2d 1192, 1197 (Ill. App. Ct. 1995). But "Illinois law requires a repudiation be manifested clearly and unequivocally." *Truman L. Flatt & Sons Co., Inc. v. Schupf*, 649 N.E.2d 990, 994 (Ill. App. Ct. 1995). There is no repudiation "if a party does no more than make doubtful or indefinite statements that it will not perform." *Busse v. Paul Revere Life Ins. Co.*, 773 N.E.2d 779, 783-84 (Ill. App. Ct. 2003).

---

[6] United also argues that Mr. Hansen has sued the wrong party because he purchased his travel through Expedia, not United. But Expedia's Terms of Use expressly indicate that purchasers are bound by the "full terms and conditions" of the air carrier's COC. *See id.* at 47 ("If you have purchased an airfare, please ensure you read the full terms and conditions of carriage issued by the travel supplier, which can be found on the supplier's website. You agree to abide by the terms and conditions of purchase imposed by any supplier with whom you elect to deal . . . .").

Here, the complaint alleges only that United made "public announcements" of "cuts to its April and May 2020 flight schedules," and that it "was planning for . . . domestic bookings to decrease in the weeks to come." R. 41 ¶¶ 55-56. These are "indefinite statement[s]," not repudiation. Accordingly, Mr. Rudolph fails to state a claim for breach of the COC's terms.

***DOT Notices.*** United also argues that the DOT Notices referenced in the complaint and purporting to require refunds cannot bolster Plaintiffs' breach of contract claims because: (1) the notices themselves indicate that they are merely "guidance" that do not have the "force and effect of law," and are "not meant to bind the regulated entities in any way," R. 45 at 12 (citing R.45-1); and (2) they were not incorporated into the COC, *id.* at 12-13. Rather than respond to these critiques, Plaintiffs pivot, pointing instead to language in an April 25, 2011 DOT regulation ("2011 DOT Regulation") that they argue is incorporated into the COC. But the Court disagrees. The 2011 DOT Regulation states:

> Since at least the time of an Industry Letter of July 15, 1996 . . . the Department's Aviation Enforcement Office has advised carriers that refusing to refund a non-refundable fare when a flight is canceled and the passenger wishes to cancel is a violation of 49 U.S.C. 41712 (unfair or deceptive practices) and would subject a carrier to enforcement action.

*Enhancing Airline Passenger Protections*, 76 Fed. Reg. 23110-01 (Dep't of Transp. Apr. 25, 2011). And the COC states that "in the event of a conflict" between the COC's provisions and "laws, regulations, rules, and security directives imposed by governmental agencies, the latter shall prevail." R. 41, Ex. B at 16.

"The intent to incorporate another document into a contract must be clear and specific." *Volodarskiy v. Delta Air Lines, Inc.*, 2012 WL 5342709, at *3 (N.D. Ill. Oct. 29, 2012). Vague references will not do. *See Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 666 (7th Cir. 2002) ("mere reference to another . . . document is not sufficient to incorporate its terms into a contract"). Courts have found language similar to the COC's too general to effect incorporation. *See Daversa-Evdyriadis v. Norwegian Air Shuttle ASA*, 2020 WL 5625740, at *5 (C.D. Cal. Sept. 17, 2020) (contract of carriage indicating that where a conflict existed between its provisions and "applicable Tariffs and Conventions, the Tariffs and/or Conventions will always take precedence" did not incorporate DOT regulations regarding refund timing); *Volodarskiy*, 2012 WL 5342709 at *3 (contract of carriage provision indicating that where contract was contrary to "applicable laws, government regulations, or orders," the latter was insufficient to incorporate European regulation governing customer refunds). Plaintiffs point to no contrary authority, and the Court cannot find a reason to reach a different conclusion here.[7]

Finally, as stated, Plaintiffs have apparently abandoned their arguments regarding the DOT Notices. But no matter; for the same reasons applicable to the 2011 DOT Regulation, those notices do not factor into the evaluation of Plaintiffs' contract claims.

---

[7] Nor does the 2011 DOT Regulation create a private right of action. *See* 76 Fed. Reg. 23110-01 (refusing to refund non-refundable airfare when a flight is cancelled is a violation of 49 U.S.C. 41712 that may subject a carrier to an "enforcement action"); *see also Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 302 (1976) ("[I]ndividual consumers are not even entitled to initiate proceedings under § [41712]").

*United Airlines Holdings, Inc.* Finally, United contends that United Airlines Holdings, Inc. must be dismissed because it is not a party to the COC. Plaintiffs fail to respond, and thus have waived the argument. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011) ("a person waives an argument by failing to make it before the district court"). Accordingly, and because United's argument is sound, United Airlines Holdings, Inc. is dismissed with prejudice.

## III.  Conclusion

For the reasons stated, United's motion to stay Mr. Hansen's claim pending arbitration is denied. R. 52. United's motion to dismiss is: (1) granted without prejudice as to Mr. Rudolph's claim; (2) granted with prejudice as to Mr. Hansen's claim to the extent he seeks a refund for the portions of his itinerary that involved his arrival in, or departure from, Costa Rica; (3) granted with prejudice as to defendant United Airlines Holdings, Inc.; and (4) otherwise denied. R. 44. If Plaintiffs believe they can remedy the deficiencies identified in this opinion as to those aspects of the complaint that were not dismissed with prejudice, they may move to amend their complaint by March 5, 2021. Any such motion shall be accompanied by a brief of no more than ten pages explaining how the amendments cure the deficiencies identified here.

ENTERED:

_Thomas M Durkin_

_____

Honorable Thomas M. Durkin
United States District Judge

21

Dated: February 12, 2021