# **EXHIBIT 4**

# **(Redacted)**

```
                                              Page 1
 1           IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
 3   MARK HANSEN AND          §
     JASON BUFFER             §
 4   INDIVIDUALLY AND         §
     ON BEHALF OF OTHERS      §
 5   SIMILARLY SITUATED,      §
                              § NO. 1:20-CV-02142
 6       PLAINTIFFS,          §
                              § HONORABLE THOMAS M. DURKIN
 7   VS.                      §
                              § MAGISTRATE JUDGE
 8   UNITED AIRLINES, INC.,   § JEFFREY T. GILBERT
                              §
 9       DEFENDANT.           §
10   * * * * * * * * * * * * * * * * * * * * * * *
11                 ORAL DEPOSITION OF
12                 SEAN T. MALONE, PhD
13                   JUNE 6, 2023
14   * * * * * * * * * * * * * * * * * * * * * * *
15              ORAL DEPOSITION OF SEAN T. MALONE, PhD,
16   produced as a witness at the instance of the Defendant
17   and duly sworn, was taken in the above-styled and
18   numbered cause on the 6th day of June 2023, from 8:53
19   a.m. to 2:39 p.m., before MICHELLE CARVER, Certified
20   Shorthand Reporter, in and for the State of Texas,
21   reported by oral stenograph, at Akerman LLP, 112 East
22   Pecan Street, San Antonio, Texas, pursuant to the
23   Federal Rules of Civil Procedure and the provisions
24   stated on the record or attached hereto.
25
```

Page 2

1          APPEARANCES
2 FOR THE PLAINTIFFS:
3       DANIEL J. KUROWSKI
        HAGENS BERMAN SOBOL SHAPIRO LLP
4       455 North Cityfront Plaza Drive
        Suite 2410
5       Chicago, Illinois 60611
        dank@hbsslaw.com
6
7 FOR THE DEFENDANT:
8       SONDRA A. HEMERYCK
        RILEY SAFER HOLMES & CANCILA LLP
9       70 West Madison Street
        Suite 2900
10      Chicago, Illinois 60602
        shemeryck@rshc-law.com
11
12 ALSO PRESENT:
13      ELI LITOFF  (Appeared remotely)
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          EXHIBITS
2 NUMBER          DESCRIPTION          PAGE
3 Exhibit 1     Notice of Deposition ...............     7
4 Exhibit 2     Expert Report of Sean T. Malone, PhD     8
5 Exhibit 3     Rebuttal Report of Sean T. Malone, PhD     43
6 Exhibit 4     Consolidated Class Action Complaint     50
7 Exhibit 5     Rebuttal Expert Report of
              Michael J. Petron ..................     71
8
  Exhibit 6     Expert Report of Michael J. Petron     79
9
  Exhibit 7     Excel Spreadsheet ..................     85
10
  Exhibit 8     Excel Document -- Data of the Combined
11             Data Table by Michael J. Petron ....     87
12 Exhibit 9     Excel Document -- Excerpt of the
              Combined Data Table by
13             Michael J. Petron ..................     90
14 Exhibit 10     Jeff Christensen's Transcript ......     102
15 Exhibit 11     Report of Special Master No. 1 .....     155
16 Exhibit 12     Agreed Order for Data Collection
              and Analysis .......................     159
17
  Exhibit 13     Report of Special Master No. 3 .....     163
18
19
20
21
22
23
24
25

Page 3

1              INDEX
2                    PAGE
3 Appearances ...................................     2
4 Exhibits .....................................     4
5 SEAN T. MALONE, PhD
6     Examination by Ms. Hemeryck .............     5
7
8 Reporter's Certificate .......................     175
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          THE COURT REPORTER:  We are on the
2 record.  Today's date is Tuesday, June 6th, 2023.  The
3 time is 8:53 a.m.
4          Prior to going on the record, all
5 parties have agreed to waive the read on for the
6 Federal read on.
7          (Reading of FRCP 30(b)(5) waived)
8          (Witness was sworn)
9          SEAN T. MALONE, PhD,
10 having been first duly sworn/affirmed testified as
11 follows:
12              EXAMINATION
13 BY MS. HEMERYCK:
14     Q.  Good morning, Dr. Malone.
15     A.  Good morning.
16     Q.  Could you just, for the record, state your
17 full name and spell your last name.
18     A.  My name is Sean Malone.  My last name is
19 spelled M-A-L-O-N-E.
20     Q.  Okay.  Great.
21          And the first name is S-E-A-N, right?
22     A.  S-E-A-N, yes.
23     Q.  Probably should have asked you to spell that
24 one.
25          So I understand you have been deposed

2 (Pages 2 - 5)

Page 6

1 before?
2    A.  Yes.
3    Q.  How many times?
4    A.  I was deposed in one case.  It was scheduled
5 over two different dates.
6    Q.  Okay.  So you've done this before, but I'm
7 going to remind you a few of the ground rules just so
8 we're on the same page, okay?
9    A.  Okay.
10   Q.  Great.  So first one is you just took an
11 oath, the same oath you would take if you were
12 testifying in court.  Do you understand that?
13   A.  Yes.
14   Q.  Great.  You're doing a good job so far of
15 waiting for me to finish questions before you answer.
16 If we talk at the same time, the court reporter can't
17 take it all down.  So if you could wait for me, that
18 would be great.  I'll try to wait for you to answer.
19 Does that work?
20   A.  That works.
21   Q.  Terrific.  You also have to answer verbally
22 as you're doing.  No nods or shakes of the head or
23 shrugs of the shoulders, okay?
24   A.  Okay.
25   Q.  Great.  If you don't understand a question

Page 7

1 that I ask, please tell me.  I'll try to clarify it or
2 rephrase it.  If you answer it, I'm going to assume
3 you understood the question; is that fair?
4    A.  That's fair.
5    Q.  Okay.  Great.  We can take a break anytime
6 you want unless a question is pending, all right?
7    A.  Yes.
8    Q.  Okay.  And is there any medication you're on
9 that would prevent you from giving truthful testimony
10 today?
11   A.  No.
12   Q.  Is there any other reason you can't testify
13 truthfully today?
14   A.  No.
15   Q.  Okay.  All right.  So -- so the court
16 reporter has handed you what has been marked as Malone
17 Exhibit 1, which is, for the record, Notice of
18 Deposition of Sean T. Malone, PhD.
19       (Exhibit Number 1 marked)
20   Q.  Have you seen this document before?
21   A.  Yes.
22   Q.  And you understand you are testifying today
23 pursuant to the notice that is Exhibit 1?
24   A.  Yes.
25   Q.  And are you represented by counsel in this

Page 8

1 deposition?
2    A.  No, I am not represented.
3    Q.  You're not represented by counsel?
4    A.  I --
5    Q.  Okay.
6    A.  No.
7       MR. KUROWSKI:  I will be objecting on
8 behalf of plaintiffs, of course.
9       MS. HEMERYCK:  Wonderful.  Thank you.
10 Okay.  Great.
11   Q.  (BY MS. HEMERYCK)  So, Dr. Malone, the court
12 reporter has now handed you what has been marked as
13 Malone Exhibit 2.
14       (Exhibit Number 2 marked)
15   Q.  And for the record, I believe, but I would
16 ask you to confirm, this Exhibit 2 is your April
17 20 expert -- April 2023 expert report in this case
18 except it does not include Exhibit 2, which was your
19 Excel spreadsheet.
20       Can you confirm that?
21   A.  This appears to be complete -- a copy of my
22 April 20th report.
23   Q.  Except for that one exhibit?
24   A.  Uh-huh.  Yes.
25   Q.  Great.  So if you could turn to page 3,

Page 9

1 paragraph 1, it states that you are retained by Hagens
2 Berman Sobol Shapiro LLP and Cafferty Clobes
3 Meriwether & Sprengel LLP, right?
4    A.  That's correct.
5    Q.  So how did you come to be retained by those
6 two law firms for this matter?
7    A.  In April, I received an email from somebody
8 else at my company stating -- really forwarding the
9 interest from counsel in talking with us about this
10 case.
11   Q.  And your company is Analytic Focus?
12   A.  Yes.
13   Q.  And who was the person who emailed you?
14   A.  Dr. Charles Cowan emailed me.
15   Q.  Do you have any knowledge of why it is that
16 plaintiffs' counsel had reached out to Dr. Cowan?
17       MR. KUROWSKI:  Dr. Malone, to the
18 extent that it -- the answer requires you to reveal
19 communications that are protected under the Federal
20 Rules of Civil Procedure with counsel, I'm going to
21 instruct you not to answer the question.
22   Q.  (BY MS. HEMERYCK)  And can you answer the
23 question?
24   A.  I -- I don't know why.  I just received an
25 email.

3 (Pages 6 - 9)

1    Q.  So you never asked or spoke with Dr. Cowan
2  about why he had been contacted?
3    A.  No.  I didn't talk to him before our next
4  call concerning it.  Just the emails setting it up.
5    Q.  So after you received that email -- you said
6  it was sometime in April.  I assume that's April
7  of 2023?
8    A.  Yes.
9    Q.  Okay.  And do you have any better estimate?
10  Was it, you know, the first half of April?
11    A.  It would have been the first half of April,
12  yes.
13    Q.  Okay.  Do you know about how long it was
14  before the date of your April 20th report that you
15  were contacted?
16    A.  I know the initial call would have been
17  sometime before April 11th.
18    Q.  And who was on that initial call?
19    A.  That would have been from my firm myself,
20  Mauricio Vidaurre.
21    Q.  Definitely going to have to spell that one.
22    A.  The last name is V-I-D-A-U-R-R-E.  His first
23  name Mauricio, M-A-U-R-I-C-I-O.
24      I believe Dr. Charles Cowan was also on that
25  call.  That's all I recall from our side.  And then I

1  know Mr. Kurowski, Mr. Hagman, Mr. Kenney.  I believe
2  Mr. Sauder may have also have been on the call.  There
3  may have been others that I don't know.
4    Q.  Okay.  And this call occurred prior to your
5  retention?
6    A.  Yes.
7    Q.  And what, if anything, did Counsel tell you
8  about the case at that time?
9      MR. KUROWSKI:  Dr. Malone, I'm going to
10  instruct you not to answer the question to the extent
11  that it calls for communications between you, as the
12  expert, and counsel in this case.  If you can answer
13  the question without disclosing the substance of the
14  communication, then you may go ahead.  Otherwise, I'm
15  going to instruct you not to answer.
16      MS. HEMERYCK:  And just for the record,
17  I would note a couple of things.  He just said this
18  was prior to his retention; so I don't think it's
19  protected at that point.  In addition to that, under
20  Rule 26, we're entitled to discover any data or
21  information provided to the expert by Counsel.  So if
22  he provided any information -- if Counsel provided any
23  information about the case during that call, that
24  would be discoverable.
25      Are you still instructing him not to

1  answer?
2      MR. KUROWSKI:  I'm going to say that
3  under Rule 26 -- you slightly misstated it -- you're
4  entitled to understand communications regarding
5  compensation, facts, data, or assumptions plaintiffs'
6  counsel provided and on which Mr. -- Dr. Malone
7  considered in forming his opinions to be expressed.
8      If you want an answer, ask those
9  questions, by all means, go ahead.  And to the extent
10  that your answer includes that information, you may
11  provide that information.  But if it -- you are unable
12  to, I'm going to instruct you not to answer.
13    Q.  (BY MS. HEMERYCK)  All right.  So do you
14  need me to rephrase the question for you?
15    A.  If you could please, rephrase or repeat.
16    Q.  Okay.  So during this initial call, were you
17  provided any facts, data, or assumptions about the
18  case by counsel that you considered in forming your
19  opinions?
20    A.  I hadn't received any data about the case up
21  to that point until after the retention letter was
22  signed.  I believe the nature of the call is more
23  introductory.  I don't even -- I didn't know which
24  case it was at that point in time.  It didn't have a
25  complaint yet.

1    Q.  So the short answer, then, would be during
2  that call, counsel did not provide you any -- let's
3  break it up -- any facts about the case that you
4  considered in forming your opinions?
5    A.  I don't recall any of those facts.
6    Q.  Okay.  And did counsel provide you any
7  assumptions about the case that you considered in
8  forming your opinions?
9    A.  No.
10    Q.  And you said they hadn't provided you any
11  data about the case that you considered in forming
12  your opinions?
13    A.  I had no data from that initial call.
14    Q.  Okay.  So did you have a signed engagement
15  letter in this matter?
16    A.  Yes.
17    Q.  Do you know when that letter was signed?
18    A.  The letter was dated April 11th.
19    Q.  Okay.  So let's turn -- look at -- back to
20  Exhibit 2, which is your April 20 report.  Paragraph 2
21  states:  "I was asked to review data produced by
22  United Airlines in this matter, develop a methodology
23  capable of identifying class members based on that
24  data, and to implement the methodology to produce a
25  preliminary class size estimate."

4 (Pages 10 - 13)

1        Did I read that correctly?
2        A.   Yes.
3        Q.   And is that an accurate statement of what
4   you were retained to do in this case?
5        A.   Yes.
6        Q.   And how much are you getting paid for your
7   work in this case?  Or how much is your firm being
8   paid?
9        A.   My firm is being paid $450 per hour of my
10  time.
11       Q.   And is that your standard hourly rate?
12       A.   Yes.
13       Q.   Do you have a different rate for testimony?
14       A.   Not -- not that I'm aware of.  I generally
15  don't deal too much with the rates.  But typically, on
16  letters of engagement, it's $450.
17       Q.   And who is actually paying for your time in
18  this case?
19       A.   My function at Analytic Focus is kind of
20  outside of the accounting and bill -- receivables of
21  the firm.  I would have to assume it's whoever is on
22  the engagement letter.
23       Q.   And you've seen the engagement letter, I
24  assume?
25       A.   Uh-huh.

1        Q.   You have to say "yes."
2        A.   Yes.  Sorry.
3        Q.   And do you recall who the engagement letter
4   is with, and who --
5        A.   It's with -- in paragraph 1, Hagens Berman
6   Sobol Shapiro LLP and Cafferty Clobes Meriwether &
7   Sprengel LLP.
8        Q.   So is it your understanding that those two
9   firms are paying for your work in this case?
10       A.   That's my understanding.
11       Q.   Okay.  And how many hours have you worked on
12  this case to date, approximately?
13       A.   I don't have those records in front of me.
14  It would be hard for me to speculate.
15       Q.   Can you estimate?
16       A.   I would say it's likely in excess of
17  45 hours.
18       Q.   Did anyone assist you with the preparation
19  of your April 20th report?
20       A.   I would have had somebody at Analytic Focus
21  review my report for quality control.  We also have a
22  director of IT who sometimes assists with optimizing
23  database functions as we have servers to handle large
24  data.  So there's some administrative parts that I
25  would have had assistance with, but he wouldn't have

1   assisted with writing the report.
2        Q.   Okay.  So the actual analysis of the data
3   and the writing of the report, that was all done by
4   you?
5        A.   Yes.
6        Q.   Okay.  And you said that somebody at
7   Analytic Focus reviewed it for quality control.  Who
8   was that?
9        A.   That would have been Mauricio Vidaurre.
10       Q.   Got it.  Okay.
11            And then, for your rebuttal report on --
12  which I know we haven't marked yet, but did anyone
13  assist you in drafting your rebuttal report?
14       A.   Again, I would have had Mauricio Vidaurre
15  assisting with quality control on drafts, and that's
16  it.
17       Q.   Okay.  So we already talked about the
18  initial call and whether counsel provided you anything
19  during that call.  So now I want to ask the question
20  just more broadly, which is:  During your engagement
21  in this matter, had -- did plaintiffs' counsel tell
22  you to assume any facts for the purposes of your
23  opinions?
24       A.   They did provide me some instructions as to
25  what can be used to estimate the class size, and I

1   detail those in my report.
2        Q.   And would that be paragraph 18 of your
3   report where you detailed those assumptions?
4        A.   Yes.  It looks like it has some of the
5   instructions from counsel.
6        Q.   Would paragraph 19 be another paragraph that
7   details the instructions from counsel?
8        A.   Paragraph 19, yes.  So 18 is kind of an
9   overview of many of the instructions, and 19 and 20 --
10  and they continue on detailing some of -- each one
11  individually.
12       Q.   So just so I'm clear:  Like looking at
13  paragraph 20, it says:  "For purposes of this report, I
14  focused on identifying ticketed passengers whose
15  itineraries ultimately were canceled by United, i.e.,
16  a United-initiated change."
17            Right?
18       A.   Yes, it says that.
19       Q.   And are you saying that counsel instructed
20  you to use that field or that counsel instructed you
21  to focus on identifying ticketed passengers whose
22  itineraries ultimately were canceled by United?
23       A.   Counsel instructed me to, as I write in
24  paragraph 18, exclude -- excuse me -- exclude persons
25  who initiated the changes to their travel.

5 (Pages 14 - 17)

Page 18

1     And in paragraph 20, I further go on to give
2  you more context.  I also used the field
3  "customer-initiated change," which reflects whether or
4  not the customer-initiated changes in their itinerary
5  using binary values of zero or one.  So that, combined
6  with the United-initiated change, allows me to
7  complete the analysis with their instructions.
8     Q.  Well, we'll come back to that question.
9     But looking at paragraph 20, which talks
10 about your use of those two fields, the
11 customer-initiated change indicator field and the
12 ticket data and the UA-initiated change indicator in
13 the -- what you call "the ticket data."
14    Did counsel instruct you to use those fields
15 to accomplish this purpose?
16    A.  Counsel's instructions was simply to exclude
17 those.  I relied on the deposition of Jeffrey
18 Christensen to look at the field, for example,
19 customer-initiated change, to fulfill that
20 instruction.
21    Q.  Okay.  Other than the instructions that are
22 described in paragraphs 18, 19, and that first
23 sentence of paragraph 20, are there any other
24 assumptions that were provided to you by counsel?
25    A.  There may be.  For example, in paragraph 16,

Page 19

1  the decision to use the field flight scheduled on
2  departure date and the ticket data to choose the
3  flights that were canceled or that proxy variable for
4  canceled flights from Mr. Christensen.  I believe that
5  decision was come to with counsel as an assumption.
6     Q.  Any others?
7     A.  Not that I can recall at this moment.
8     Q.  So let's turn, if you could, to page 4 of
9  Exhibit 2, and I'm looking at the section titled
10 "Professional Qualifications and Compensation."
11    Do you see that?
12    A.  I do.
13    Q.  Okay.  So what do you consider to be your
14 particular areas of expertise?
15    A.  My areas of expertise are data analysis,
16 economics, finance, and statistics.
17    Q.  And which of those areas of expertise did
18 you bring to bear in forming your opinions in this
19 case?
20    A.  My expertise in data analysis and
21 statistics.
22    Q.  So you state in paragraph 6 of Exhibit 2
23 that you are an associate director of analytics at
24 Analytic Focus LLC.
25    A.  Yes.

Page 20

1     Q.  So what does it mean to be an associate
2  director of analytics?
3     A.  Associate director is just a level in the
4  hierarchy at Analytic Focus.  So there would be a
5  director position above, if it's filled, and
6  research -- senior research associates and other
7  associates immediately below in the hierarchy there.
8     Q.  Is there currently a director of analytics
9  at Analytic Focus?
10    A.  Not currently.
11    Q.  So is there anyone you would consider to be
12 your supervisor or superior?
13    A.  Yes.  Mauricio Vidaurre is a vice president
14 at Analytic Focus.
15    Q.  Okay.  So what do you do as an associate
16 director of analytics?
17    A.  Often, I am either leading or assisting in
18 consulting projects.  And those consulting projects
19 can range from financial subject matters, applying
20 statistical methods or economic analysis, or more
21 general data analysis to different assignments that we
22 receive from clients.
23    Q.  Is your work in that role exclusively
24 related to supporting expert testimony in litigation?
25    A.  It's not exclusive, but it's a large part.

Page 21

1     Q.  About what percentage would you say?
2     A.  It would be hard to say.  It's more than
3  75 percent.
4     Q.  And for the other, say, approximately
5  25 percent, what sort of consulting engagements --
6  and, you know, without naming any clients or
7  anything -- would you be involved in?
8     A.  It could be helping organizations optimize
9  their operations by examining data, giving them
10 insights into their data that they can use in some
11 way.
12    Q.  And is your hourly rate for that kind of
13 consulting work the same as your hourly rate in this
14 matter?
15    A.  I don't know.
16    Q.  So you have a bachelor's degree in financial
17 economics?
18    A.  Yes.
19    Q.  And you have a master's and a PhD in
20 finance?
21    A.  Yes.
22    Q.  And would you agree that your work in this
23 matter does not involve financial economics?
24       MR. KUROWSKI:  Objection.  Vague.
25    Q.  (BY MS. HEMERYCK)  You can answer.

6 (Pages 18 - 21)

Page 22

1     A. To the extent that it shares a common skill
2 set, it does.
3     Q. And what would be a common skill set?
4     A. Data analysis, financial economics involves
5 looking at databases of financial information whether
6 it's panel data, time series data, looking at the very
7 large datasets and running high-volume analyses. So
8 it shares a lot of common features and skills.
9     Q. And how about finance, which is what you
10 have a master's and PhD in? Does your work in this
11 matter involve finance, in your view?
12     A. Again, to the extent it shares common
13 skills.
14     Q. And which common skills?
15     A. Data analysis is a very valuable skill in
16 finance whether it's corporate finance, investments.
17 Both areas I have specialized in in the past.
18     Q. Got it. Sorry.
19     So could you turn to Exhibit 1 of your
20 April 20th report, which has been marked as Exhibit 2.
21     A. I'm there.
22     Q. So is Exhibit 1 to your April 20th, 2023,
23 report your current CV?
24     A. There has been a slight correction to it
25 since then, since April 20th.

Page 23

1     Q. Can you tell me what that is?
2     A. Sure. On page 2, there is a case listed for
3 previous testimony, and the case number was incorrect.
4     Q. Do you happen to have the correct case
5 number?
6     A. Yes. It was attached to my rebuttal report
7 in the -- one moment.
8     Q. Any other changes that were made to your CV
9 between the submission of your April 20th report and
10 your rebuttal report?
11     A. Not that I recall.
12     The correct case number is 2018–CA–13570–O.
13     Q. And it says you testified at trial
14 on April 11, 2023, right, in that case?
15     A. That's correct.
16     Q. What was the outcome of that trial?
17     A. I believe it's pending.
18     Q. So bench trial?
19     A. Yes.
20     Q. And so the parties are waiting for a ruling
21 from the court?
22     A. As of the last time I've seen. It may have
23 changed since.
24     Q. So the first paragraph on page 1 of your CV,
25 Exhibit 1 to your April 20 report, says your

Page 24

1 experience includes: supporting expert testimony in
2 litigation topics such as construction defects,
3 discriminatory mortgage lending, housing violations,
4 and securities.
5     Right?
6     A. That's correct.
7     Q. And none of those topics are involved in
8 this case, right?
9     MR. KUROWSKI: Objection. Vague.
10     You may go ahead.
11     A. To the extent that the same skill sets are
12 involved, yes. So construction defects involves data
13 analysis, discriminatory mortgage lending involves
14 data analysis of large datasets and looking at
15 individual consumer level data, and housing violations
16 and securities also involve data analysis to a large
17 degree.
18     Q. (BY MS. HEMERYCK) Okay. But let's -- my
19 actual question was -- and I'll break it down.
20     A. Sure.
21     Q. This case does not involve construction
22 defects, right?
23     A. No.
24     Q. This case does not involve discriminatory
25 mortgage lending?

Page 25

1     A. No.
2     Q. This case does not involve housing
3 violations?
4     A. No.
5     Q. This case does not involve securities?
6     A. I don't know about that. That seems to be a
7 legal issue. Mr. Petron has written in reports about
8 insurance, and insurance is a form of financial
9 security.
10     Q. You think insurance is at issue in this
11 case?
12     A. Mr. Petron has brought up insurance several
13 times.
14     Q. You're talking about trip insurance in
15 particular?
16     A. Yeah. I don't know that it's a major point
17 of my analysis, but it is a security.
18     Q. So your view would be trip insurance is a
19 security for purposes of this case?
20     A. It's a possible relationship.
21     Q. Okay. I assumed that -- well, let me ask.
22 So the cases you've worked on, other cases involving
23 securities, what kind of securities were involved?
24     A. Residential mortgage-backed securities.
25     Q. So not trip insurance?

7 (Pages 22 - 25)

Page 26

1   A.  Not trip insurance, specifically.  But
2 securities are schedules of cash flows, and payouts on
3 trip insurance are a cash flow.
4   Q.  Got it.  Okay.  So then in the second
5 paragraph of your CV, which is Exhibit 1 to your April
6 20th report, it states:  "Dr. Malone has a strong
7 background in data analysis and econometrics.  His
8 research has dealt with developing new event study
9 measures for volatility and measuring their
10 performance through Monte Carlo simulations."
11     So let's pause there.  Your work in this
12 case did not involve developing new event study
13 measures for volatility and measuring their
14 performance through Monte Carlo simulation, right?
15   A.  No.
16   Q.  Okay.  It says you also --
17     MR. KUROWSKI:  Sorry.
18     Just so we're clear:  You said "no" to
19 her question.  Her question was:  It did not involve
20 it?  Can you just clarify --
21     (Simultaneous speaking)
22   A.  I would like to clarify that, yes.  I didn't
23 catch the negative there.  My work did not involve
24 developing new event study measures for volatility in
25 measuring their performance through Monte Carlo

Page 27

1 simulation.
2     MR. KUROWSKI:  Thank you.
3     MS. HEMERYCK:  Thank you for the
4 clarification, Counsel, and I'll ask the next question
5 in a different way so we don't have that problem.
6   Q  (BY MS. HEMERYCK)  The next part of this
7 paragraph says that your research has included
8 "conducting fixed income event studies."
9     Did your work in this case involve
10 conducting fixed income event studies?
11   A.  I did not conduct fixed income event studies
12 in this case.
13   Q.  Okay.  The same paragraph of your CV also
14 says that your research has involved "developing and
15 analyzing long/short equity factor investment
16 strategies."
17     Did your work in this case involve
18 developing and analyzing long/short equity factor
19 investment strategies?
20   A.  It did not.
21   Q.  As the paragraph goes on to say that, in
22 addition, you have "coded credit default swap pricing
23 models."
24     Did your work in this case involve coding
25 credit default swap pricing models?

Page 28

1   A.  My work did not.
2   Q.  The paragraph goes on to say that you have
3 "conducted other empirical analyses using regression
4 analysis, time series models, and other statistical
5 tools."
6     We're going to leave out other statistical
7 tools because that's pretty broad.
8     Did your work in this case involve
9 conducting other empirical analyses using regression
10 analysis?
11   A.  I didn't do any regression analysis in this
12 case.
13   Q.  Did you do any time series modeling in this
14 case?
15   A.  I haven't done any time series modeling in
16 this case up to this point.
17   Q.  Okay.  And now we'll go to other statistical
18 tools.  What statistical tools did you use in this
19 case, if any?
20   A.  I used tab- -- like two-way tabulation to
21 count various occurrences in the data by applying some
22 objective criteria to the data.  I consider that an
23 application of statistical tools.
24   Q.  Any others?
25   A.  I -- generally, if you look at the --

Page 29

1 "interpret statistical tools" as tools to conduct
2 statistical analysis, I think the use of databases is
3 a statistical tool to that extent.
4   Q.  Okay.  Apart from your work on this case,
5 during your time at Analytic Focus, have you done any
6 work relating to the airline industry?
7   A.  Not that I can recall.
8   Q.  And how about at any other point in your
9 career prior to being at Analytic Focus?  Have you
10 done any work relating to the airline industry?
11   A.  Not that I recall.
12   Q.  Okay.  Apart from this case, have you ever
13 been asked to develop a methodology for identifying
14 members of a proposed class?
15   A.  I've been asked to come up with a method to
16 estimate the size of a class.
17   Q.  How many cases have you been asked to do
18 that?
19   A.  I have been engaged in one case doing that.
20   Q.  And what case is that?
21   A.  I believe it's titled Braswell v. Bow
22 Plumbing.
23   Q.  So Braswell, how would you spell that?
24   A.  I would have to look at it, but I believe it
25 is B-R-A-S-W-E-L-L.

8 (Pages 26 - 29)

Page 30

1    Q.  Versus what plumbing?
2    A.  Bow, B-O-W.
3    Q.  Do you know where that case is pending?
4    A.  It's in a district in Alabama.  I don't know
5 which.
6    Q.  Do you know if it's federal court?
7    A.  It's federal.
8    Q.  Okay.
9        MR. KUROWSKI:  And, Dr. Malone, with
10 respect to that matter, I just caution you to be
11 cognizant of any case protective orders --
12        THE WITNESS:  Yeah.
13        MR. KUROWSKI:  -- that may be in place
14 in that case as well as not to reveal the substance of
15 any attorney communications, including to the extent
16 you may or may not have been disclosed in that case.
17    Q.  (BY MS. HEMERYCK)  Are you a testifying
18 expert in that case or a consulting expert?
19    A.  I haven't testified to this point.
20    Q.  Are you expecting to be a testifying expert
21 or are you, for example, supporting someone else from
22 Analytic Focus who is the testifying expert?
23    A.  I would be expected to testify.
24    Q.  Okay.  Have you prepared a report -- or
25 strike that.

Page 31

1        Have you submitted a report in that case?
2    A.  I don't know if my report has been
3 submitted.
4    Q.  So it's in progress?
5    A.  It's in progress.
6    Q.  Can you just tell me, generally, what that
7 case is about?
8    A.  It's about defective plumbing materials.
9    Q.  And what's the nature of the proposed class?
10    A.  Purchasers of defective plumbing materials.
11    Q.  Plumbers or consumers?
12    A.  Consumers.
13        MR. KUROWSKI:  Objection.  Vague.
14    Q.  (BY MS. HEMERYCK)  Have you been retained by
15 the proposed class or by the defendant?
16    A.  I don't know if I can disclose that at this
17 time.
18    Q.  Any other cases, apart from this case and
19 the Braswell case, where you have been asked to
20 develop a methodology for identifying numbers for a
21 proposed class?
22    A.  No.
23    Q.  Have you ever been asked to offer an expert
24 opinion on whether a proposed class is ascertainable?
25        MR. KUROWSKI:  Objection.  Legal

Page 32

1 conclusion.
2        You may go ahead.
3    A.  Could you please repeat the question?
4    Q.  (BY MS. HEMERYCK)  Have you ever been asked
5 to offer an expert opinion on whether a proposed class
6 is ascertainable?
7        MR. KUROWSKI:  Same objection.
8    A.  I know that ascertainability of a class is a
9 legal issue and outside the scope of my assignment.
10    Q.  (BY MS. HEMERYCK)  Well, I understand
11 outside the scope of this case.  I'm just -- and I
12 understand that it's a legal issue.  I'm just asking,
13 have you ever, nevertheless, been asked to offer an
14 expert opinion on whether a proposed class is
15 ascertainable?
16    A.  No.
17    Q.  Okay.  And you said you are familiar with
18 the concept of ascertainability in the class action
19 context?
20    A.  A limited understanding of it.
21    Q.  What is your limited understanding?
22    A.  That class members must be reliably
23 discerned to some degree.
24    Q.  Anything else?
25    A.  That's it.

Page 33

1    Q.  Did that understanding affect or impact the
2 opinions you expressed in this case at all?
3        MR. KUROWSKI:  Objection.  Vague.
4    Q.  (BY MS. HEMERYCK)  You can answer.
5    A.  Could you clarify any "opinions" that you're
6 asking about?
7    Q.  Sure.  Well, I'm just asking about all your
8 opinions.  So -- and you said you have a limited
9 understanding of the concept of ascertainability in
10 the class action context, right?
11    A.  Yes.
12    Q.  And you told me what that limited
13 understanding is, right?
14    A.  Yes.
15    Q.  My question is:  Did your understanding of
16 the concept of ascertainability in the class action
17 context have any role in your opinions that you formed
18 in this case?
19    A.  I'd say that the role in my opinions is that
20 I understand that not every single class member must
21 be ascertained individually.  And so what I've found
22 and what Mr. Petron have found was -- we both found a
23 large number of individuals who are potentially class
24 members.
25    Q.  So what's the basis of your understanding

9 (Pages 30 - 33)

Page 34

1 that not every class member must be ascertained
2 individually?
3         MR. KUROWSKI: Objection. Legal
4 conclusion.
5         Also, Dr. Malone, to the extent that
6 the basis for your understanding comes from
7 communications with counsel, I'm going to instruct you
8 not to answer. To the extent you are able to answer
9 without revealing any such communications, you may go
10 ahead.
11     A. I can't answer that question.
12     Q. (BY MS. HEMERYCK) Did counsel ask you to
13 assume that not every class member must be ascertained
14 individually?
15     A. I can't answer that question.
16     Q. You understand that if they told you to
17 assume that, I'm entitled to discover that, right?
18         MR. KUROWSKI: Objection. Assuming he
19 relied on that assumption informing the opinions to be
20 expressed.
21         MS. HEMERYCK: And he already -- first
22 of all, it's not relied, it's considered. And he
23 already said that that played a role in his opinions.
24     A. I have come across this topic of
25 ascertainability of a class in a number of cases that

Page 35

1 I've worked on but haven't been engaged to provide an
2 opinion. I'm not the only testifying expert at
3 Analytic Focus; so I'm broadly familiar with some
4 legal topics that are applicable to class
5 certification and class actions.
6     Q. (BY MS. HEMERYCK) Have you -- so I asked
7 you before whether you have ever been asked to offer
8 an expert opinion on whether a proposed class is
9 ascertainable. So now I'm going to change it up a
10 little bit.
11         Have you ever been involved in a matter
12 where you were supporting another expert at Analytic
13 Focus who was asked to testify about whether a
14 proposed class is ascertainable?
15     A. I don't know that I have. Whether
16 ascertainability was the specific objective of anybody
17 at Analytic Focus testifying in any class action
18 matters, but it's just a topic that has come up as
19 part of looking at class action and class
20 methodologies.
21     Q. Okay. And so just so I'm clear so we get it
22 on the record, are you following Counsel's instruction
23 not to answer my question about whether counsel, in
24 this case, asked you to assume that not every class
25 member must be ascertained individually?

Page 36

1     A. I am telling you my basis for my
2 understanding -- my limited understanding of
3 ascertainability is my experience at Analytic Focus
4 and working with class-related matters.
5     Q. Okay. It doesn't really answer my question,
6 though.
7     A. Oh.
8     Q. So I do need a clear answer for the record,
9 in case I have to take it to the judge, which is --
10     A. I don't -- sorry. I'll let you finish or
11 rephrase.
12     Q. Right. Which is I asked you whether counsel
13 in this action instructed you to assume that not every
14 class member must be individually ascertained. And
15 you were, I believe, instructed not to answer that
16 question. So I'm asking are you going to follow that
17 instruction, or are you going to give me a yes or no
18 on whether counsel instructed you to make that
19 assumption?
20     A. I don't -- I rely on my knowledge of that
21 ascertainability. I don't recall any specific
22 instructions from counsel whether or not that was
23 their guidance.
24     Q. So going back to your understanding that not
25 every class member must be ascertained individually,

Page 37

1 do you have an understanding as to whether there is a
2 specific, for example, percentage threshold of
3 potential class members who have to be ascertainable?
4     A. I'm not aware of a threshold. That's
5 probably a legal issue that either -- be up to a trier
6 of fact or out of my expertise.
7     Q. One more question on the Braswell vs. Bow
8 Plumbing case.
9         Who was the law firm that retained you in
10 that case?
11         MR. KUROWSKI: Objection. Asked and
12 answered.
13         MS. HEMERYCK: No.
14         MR. KUROWSKI: Well, no.
15     A. I don't believe I can -- I'm not sure that I
16 can disclose that at this time.
17     Q. (BY MS. HEMERYCK) Was it either of the two
18 law firms that retained you in this case?
19     A. No.
20     Q. Were you retained for that matter before you
21 were retained for this matter?
22     A. Yes.
23     Q. So if you could, let's look at -- back to
24 your CV, which is Exhibit 1 to your April 20 report,
25 which has been marked as Exhibit 2. And on page 2,

10 (Pages 34 - 37)

Page 38

1 you list four publications.
2      Do you see that?
3  A.  Yes.
4  Q.  Have you published anything since the date
5 of this CV?
6  A.  No.  But I would like to clarify.
7  Q.  Okay.
8  A.  The second publication is kind of ambiguous.
9 It could be two.  They are slightly different.  One
10 was updated in a different year.  But I haven't
11 published anything since this CV was written.
12  Q.  Okay.  So is there anything about any of
13 those four publications that informed your work in
14 this case?
15      MR. KUROWSKI:  Objection.  Vague.
16  A.  I wouldn't say there are any facts that I
17 relied on, but the methodologies used in some of these
18 are methodologies similar to what I would have used in
19 this case, using -- or, rather, applying objective
20 filters to the data.  So, for example, I would have
21 done that in the third listing and the fourth listing.
22  Q.  (BY MS. HEMERYCK)  So that would be the
23 article called "Innovations in Financial Risk," right?
24  A.  Yes.
25  Q.  That was your dissertation?

Page 39

1  A.  Yes.
2  Q.  And then the article "Were Bank CEOs
3 Overpaid?"
4  A.  Yes.
5  Q.  And you said in both of those, you would
6 have used objective filters to analyze data?
7  A.  That's correct.  So I would start with a
8 large dataset, typically financial data in both of
9 these.  The first one, "Innovations in Financial
10 Risk," had several large datasets.  The second one
11 would have had a large dataset.  And in order to get
12 down to the example of concern, I would apply
13 objective filters to the data.
14  Q.  And then, once you had applied those filters
15 to get down to the sample of concern, you would -- you
16 would do some kind of analysis of the sample?
17  A.  Yeah.  I would conduct some statistical
18 analysis beyond that.
19  Q.  So are bank CEOs overpaid?
20  A.  This was relating to a -- this was published
21 in 2012.  So this was during the financial crisis, and
22 we found for the Alpha or excess performance for
23 investors, they were paid a lot more than other
24 industries.
25  Q.  Any chance you're going to redo that

Page 40

1 analysis now in the year of our Lord, 2023?
2  A.  I believe there's a low probability of me
3 redoing that this year.
4  Q.  I don't know.  I think it would be
5 fascinating.
6      All right.  And then you list -- as we
7 previously noted, you list one case under previous
8 testimony, which is Grande Vista of Orlando
9 Condominium Association, Inc., and Marriott Resorts
10 Hospitality Corporation vs. Rick Singh, right?
11  A.  Yes.
12  Q.  What was that case about?
13  A.  That was an ad valorem property tax matter,
14 and I was engaged, initially, as a rebuttal witness.
15 A property appraiser had conducted an analysis where
16 he looked at a large set of real estate transactions
17 and applied several filters to get down to a set and
18 conducted a statistical analysis.  And that's the
19 nature of the case.
20  Q.  So you were basically responding to his
21 analysis of these real estate transactions?
22  A.  I also conducted another analysis looking at
23 the quality of market efficiency between the two
24 markets.  One where there's developer-to-owner
25 timeshare sales and the owner-to-owner timeshare

Page 41

1 resale markets.  So also an economic opinion, too.
2  Q.  So basically, there was kind of a data
3 analytics/statistical opinion, and then there was an
4 economic opinion?
5  A.  Yes.
6  Q.  So apart from the Grande Vista case that
7 you -- or Grande Vista case that you reference in your
8 CV and the Bow vs. -- or, sorry, the Braswell vs. Bow
9 Plumbing case and this case, apart from those three,
10 have you ever been retained as a testifying expert in
11 any other cases?
12  A.  I've been retained, but haven't testified as
13 a case may have settled.
14  Q.  And just very briefly, what is that case
15 about?
16  A.  It was about the methodology of rating the
17 credit of mortgage-backed securities.  So it was a
18 data and economic analysis.
19  Q.  Any others?
20  A.  Not that I can recall at this moment.
21  Q.  Has any court ever precluded you from
22 testifying as an expert?
23  A.  No.
24  Q.  I think you also have, in your role --
25 strike all that.

11 (Pages 38 - 41)

Page 42

1    In your role at Analytic Focus, you have
2  also supported other individuals who were testifying
3  experts, right?
4    A.  That's correct.
5    Q.  And in any of those engagements, has any
6  court precluded the testifying expert you were
7  supporting from testifying?
8    A.  Yes.  I wasn't the only support staff,
9  but...
10    Q.  And what was that case?
11    A.  I believe it would have been County of Cook
12  v. Bank of America.
13    Q.  What did that case involve?
14    A.  That involved discriminatory lending.
15    Q.  Was that in the Northern District of
16  Illinois, federal court?
17    A.  I believe so.
18    Q.  I think I actually know that case.
19    Who was the testifying expert who was
20  precluded from testifying in that case?
21    A.  Dr. Charles Cowan.
22    MS. HEMERYCK:  Good time for a quick
23  five-minute break.
24    THE COURT REPORTER:  We are off the
25  record.  The time is 9:51 a.m.

Page 43

1    (Off the record)
2    THE COURT REPORTER:  We are back on the
3  record.  The time is 9:58 a.m.
4    Q.  (BY MS. HEMERYCK)  All right.  So,
5  Dr. Malone, looking again at Malone Exhibit 2, does
6  Malone Exhibit 2 contain a complete statement of your
7  opinions in this case?
8    A.  It contains a statement of my opinions as of
9  April 20th, 2023.
10    Q.  Dr. Malone, the court reporter has handed
11  you what's been marked as Malone Exhibit 3.
12    (Exhibit Number 3 marked)
13    Q.  Can you confirm that Malone Exhibit 3 is a
14  complete and accurate copy of your rebuttal report in
15  this case, including both exhibits actually?
16    A.  This appears to be a complete copy of my
17  May 22nd rebuttal report.
18    Q.  So do Malone Exhibit 2 and Malone Exhibit 3
19  together contain a complete statement of your opinions
20  in this case?
21    A.  I would say that these two exhibits contain
22  a -- complete statements of my opinions up to this
23  date.
24    Q.  And do Malone Exhibit 2 and Malone Exhibit 3
25  together also contain a complete statement of the

Page 44

1  bases and reasons for those opinions?
2    A.  I believe it does.
3    Q.  Do Exhibits 2 and Exhibits 3 together
4  contain all exhibits that you will use to summarize or
5  support your opinions in this case?
6    A.  No.
7    Q.  So there are additional exhibits that you
8  plan to use to summarize or support your opinions in
9  this case?
10    A.  As we stated, Exhibit 2 is incomplete.
11    Q.  Ah, yes.  Thank you.
12    All right.  So -- and just so that's clear,
13  so Exhibit 2 -- too many Exhibit 2s -- Exhibit 2 --
14  Malone Deposition Exhibit 2 does not include
15  Exhibit 2, which was your spreadsheet to the report,
16  right?
17    A.  That's correct.
18    Q.  Okay.  Apart from that, do Malone Exhibits 2
19  and 3 together contain all exhibits that you will use
20  to summarize or support your opinions?
21    A.  It's complete up to this date.  But I
22  don't -- while I don't have any outstanding tasks, I
23  may be given more assignments by counsel.
24    Q.  Okay.  So looking again at Exhibit -- Malone
25  Exhibit 2, your April 20, 2023, report, specifically

Page 45

1  pointing to paragraph 2, the first sentence states:
2  "I was asked to review data produced by United
3  Airlines in this matter, develop a methodology capable
4  of identifying class members based on that data, and
5  to implement the methodology to produce a preliminary
6  class size estimate."
7    So is that -- and I think I might have
8  already asked you, but is that an accurate description
9  of your assignment?
10    A.  For this report, yes.
11    Q.  For the April 20 report?
12    A.  That's correct.
13    Q.  Let's take a look at Malone Exhibit 3.  So
14  looking at Malone Exhibit 3, paragraph 3 repeats the
15  sentence I just read, correct, about -- about what you
16  were asked to do?
17    A.  In part, yes.
18    Q.  And then, you also say in paragraph 4 of
19  Malone Exhibit 3:  "I was asked to review the expert
20  report of Michael J. Petron, which was issued on
21  April 20, '23, the Petron report."
22    Right?
23    A.  That's correct.
24    Q.  Okay.  So that was an additional thing that
25  you were asked to do by counsel?

12 (Pages 42 - 45)

1    A.  Yes.
2    Q.  So going back again to Malone Exhibit 2, why
3  did you use the word "preliminary" in the sentence
4  where you said you were asked to:  "implement the
5  methodology to produce a preliminary class size
6  estimate"?
7    A.  As I understand from my experience and by
8  looking at the stage of this case, the data produced
9  by parties in litigation changes.  And so as the data
10  may change, the availability of data may change, my
11  class size estimates can change, and the assumptions
12  within my data filtering methodology can be adapted to
13  refine the class size estimate.
14    Q.  Were you asked by plaintiffs' counsel to
15  assume that additional data would be produced by the
16  parties in this case?
17    A.  I don't know that I relied on any
18  instructions from counsel to assume that there would
19  be more data.  I relied more on my experience in cases
20  and on the testimony of Jeff Christensen that
21  suggested that there was more data.
22    Q.  But you have -- you are just essentially
23  speculating that more data may be produced in this
24  case, right?
25        MR. KUROWSKI:  Objection.  Vague.

1    A.  I am not aware of any other data that's been
2  produced or provided to me from United that I could
3  currently add to my methodology and the objective
4  filters that I currently have.  But I am relying on
5  Mr. Christensen's testimony that does appear to
6  support that there is more data owned by or accessible
7  by United Airlines.
8    Q.  (BY MS. HEMERYCK)  Are you aware that fact
9  discovery in this case is closed?
10    A.  I think the legal timeline of this case is
11  something I'm not highly informed on.
12    Q.  So you don't have any basis to believe that
13  regardless of whether there's additional data that
14  exists that any such data is going to be produced in
15  this case in the future?
16    A.  I wouldn't know that.  I was asked to
17  develop a methodology of -- capable of identifying
18  class members based on United Airlines data.  And so
19  to the extent that United Airlines may have other
20  data, my methodology and opinions can include that.
21    Q.  Well, actually, what your report says is --
22  looking again at paragraph 2 of Malone Exhibit 2, it
23  says you were:  "asked to review data produced by
24  United Airlines in this matter and develop a
25  methodology capable of identifying class members based

1  on that data."
2        Right?
3    A.  Yes.
4    Q.  Okay.  So looking at paragraph 3 of
5  Exhibit 2, your April 20th report, you state:  "In
6  preparing this report, I reviewed the following
7  resources."
8        Do you see that?
9    A.  I do.
10    Q.  Why did you use the word "reviewed" here?
11    A.  These are all documents that I received.  I
12  would have opened, read to at least some extent, not
13  all the extent, because a lot of these files are
14  really large data files, and it's humanly impossible
15  to read all of them.  So there are things that I
16  reviewed as to what their contents are.
17    Q.  Are you aware that the Federal Rules of
18  Civil Procedure require you to disclose any data or
19  information that you considered?  Are you aware of
20  that?
21    A.  I've seen that rule.
22    Q.  Does "reviewed" mean something different
23  than considered in your mind?
24    A.  I'm not aware of any legal definitions of
25  what may be the difference, but these are the files

1  and documents that I used to form my opinions.
2    Q.  So if I asked you to list all the data and
3  information that you considered in forming your
4  opinions, would the list be any different than what
5  you've got in paragraph 3 of Malone Exhibit 2?
6    A.  I don't believe so.  So, for example, I
7  don't rely on the flight files, which is the third
8  data point.  I generate my estimates based on the
9  refund files and ticket files; however, since I had
10  this data and reviewed it, I included it to comply
11  with Rule 26.
12    Q.  Was there -- is there any data that you
13  received from plaintiffs' counsel that is not listed
14  in paragraph 3?
15    A.  At the time of this report, I don't believe
16  I received any other data.
17    Q.  And subsequent to this -- to the data in
18  Exhibit 2, did you receive any other data from
19  plaintiffs' counsel?
20    A.  I did.  For example, I received a backup
21  file, a data file from Mr. Pet- -- is it Petron?
22    Q.  It is.
23    A.  Mr. Petron.
24    Q.  Anything else?
25    A.  Not specifically that I recall.

13 (Pages 46 - 49)

Page 50

1    Q.  So looking at paragraph 3 of Malone
2  Exhibit 2, one of the documents that it says you
3  reviewed was the Consolidated Class Action Complaint,
4  right?
5    A.  That's correct.
6    Q.  And the court reporter has handed you -- the
7  court reporter has handed you what has been marked as
8  Malone Exhibit 4, which is the Consolidated Class
9  Action Complaint in this case.
10        (Exhibit Number 4 marked)
11    Q.  Is that the document you reviewed as far as
12  you can tell?
13    A.  As far I can tell -- as far as I can tell,
14  yes.
15    Q.  And for what purpose did you review that
16  document, Exhibit 4?
17    A.  To understand the general nature of the
18  complaints and to get a class definition.
19    Q.  Anything else?
20    A.  I used the case citations to format my
21  report.
22    Q.  So then the third bullet point down, says --
23  this is what you just referred to as the "flight
24  files," right?  Dates, Confidential United 000610 to
25  Confidential United 000613; is that right?

Page 51

1    A.  That's correct.
2    Q.  Okay.  And I believe you just said you
3  reviewed that data but did not utilize it in your
4  methodology.
5    A.  That's correct.
6    Q.  And then the next bullet point, Bates United
7  000574 to United 000581 (the "Refund Files").  For
8  what purposes did you consider that data?
9    A.  So this data, to some extent, contained
10  refund transactions, and so I used some of the data
11  within this file to exclude some coupons in one of my
12  filters.
13    Q.  And I think specifically you used this --
14  you used that data to exclude persons who paid for
15  their tickets with nonmonetary forms of payment; is
16  that right?
17    A.  That was one of the exclusions.
18    Q.  And did you also use that data to exclude
19  United employees?
20    A.  Yes.  To the extent that those fields were
21  properly accounted for in the data, yes.
22    Q.  Okay.  Any other use you made of that data?
23    A.  Just the nonmonetary forms of payment and
24  employees.
25    Q.  And in the next bullet point -- we're back

Page 52

1  on paragraph 3 again -- you identified Bates United
2  078664 to United 078673 (the "Ticket Files"), right?
3    A.  That's correct.
4    Q.  And is that the data that Mike Petron's
5  April 20, 2023, report refers to as the "Ad Hoc
6  Itinerary and Refund Data"?
7    A.  I would have to double-check that in his
8  report, but that sounds familiar.
9    Q.  Okay.  So you do not list in paragraph 3 the
10  data that is referred to in Mike Petron's April 20,
11  2023, report as the "Close-in-Time Cancellation Data,"
12  right?
13    A.  That's correct.
14    Q.  Okay.
15        MS. HEMERYCK:  And for the record, I
16  believe that was Confidential, space, United, space,
17  000592.
18    Q.  (BY MS. HEMERYCK)  So why did you not
19  consider that data in -- for your assignment in this
20  case?
21    A.  I don't recall that I received that file.  I
22  would have to -- without having all the emails in
23  front of me, I would have to double-check that I don't
24  have it.  But I don't recall receiving it or reviewing
25  it.

Page 53

1    Q.  After you received Mike Petron's
2  April 2023 report where he did utilize that data, did
3  you ask for that data to be provided by plaintiffs'
4  counsel?
5    A.  I asked for Mr. Petron's data that he
6  provided as his backup as that would include that
7  information.
8    Q.  Okay.  So looking again at paragraph 3 of
9  Malone Exhibit 2, you also do not list United's
10  Contract of Carriage, right?
11    A.  I don't.
12    Q.  Okay.  Did you ever review the Contract of
13  Carriage?
14    A.  I believe Mr. Petron excerpted some of the
15  Contract of Carriage.  But other than that, the scope
16  of my assignment was not to evaluate the Contract of
17  Carriage, but rather the -- an estimate of that class
18  definition.
19    Q.  Okay.  And just to be clear:  So you
20  understand that -- because you've seen the class
21  action complaint, that plaintiffs in this case are
22  asserting a claim that United breached the Contract of
23  Carriage?
24    A.  I recall seeing that in the complaint.
25    Q.  Okay.  But for purposes of your opinions in

14 (Pages 50 - 53)

Page 54

1 this case, you did not need to have an understanding
2 of what the Contract of Carriage actually provides; is
3 that right?
4         MR. KUROWSKI: Objection. Vague.
5         You may go ahead.
6     A.  I -- I only had to estimate the size of the
7 class, and the class was defined as it is in
8 paragraph 1, which doesn't mention a Contract of
9 Carriage.
10    Q.  (BY MS. HEMERYCK) So you didn't have to
11 consider for purposes of your assignment -- no,
12 that's -- scratch.
13        Okay.  So if we could go to Malone
14 Exhibit 3, which is your rebuttal expert report dated
15 May 22, 2023.  And so I'm looking at paragraph 5 where
16 you list additional resources that you reviewed for
17 purposes of the rebuttal report, right?
18    A.  That's correct.
19    Q.  And you have two bullet points.  The first
20 one is Petron, space, Report, space, Combined.txt.
21 And is that the backup file you were referring to?
22    A.  Yes.
23    Q.  Okay.  And then you also incorporate by
24 reference all the resources you referred to in your
25 April 20 report, right?

Page 55

1     A.  Correct.
2     Q.  So you attached to this report Malone
3 Exhibit 3, as Exhibit 2, some filings from a case
4 called Jacob Healey vs. Louisville Metro Government,
5 right?
6     A.  That's correct.
7     Q.  But you didn't list those documents as
8 resources reviewed, right?
9     A.  I explicitly attached them.
10    Q.  So you didn't think you needed to list them
11 because they were attached?
12    A.  I didn't -- yeah, I didn't list them because
13 they were attached.
14    Q.  In forming your opinions in this case,
15 either for your April 20, 2023, report or your May 22,
16 2023, rebuttal report, did you consider any
17 information specific to Plaintiff Jason Buffer?
18    A.  I'm sorry.  Could you repeat your question?
19        MS. HEMERYCK:  Yeah, could you read it
20 back?
21        (Requested question was read)
22    A.  I didn't locate any information specific to
23 Plaintiff Buffer for either of the reports you stated.
24    Q.  (BY MS. HEMERYCK)  And the same question
25 for -- in forming the opinions expressed in either

Page 56

1 your April 20, 2023, report or your May 22, 2023,
2 rebuttal report, did you consider any information
3 specific to Plaintiff Mark Hansen?
4     A.  I don't believe I considered anything
5 specific to Mark Hansen.
6         I -- I would like to clarify:  I did read
7 Mr. Petron's criticism, and I addressed it in
8 paragraph 36 and that may have been related to
9 Plaintiff Buffer in addressing...
10    Q.  And when you say "paragraph 36," you mean
11 of --
12    A.  My --
13    Q.  -- your rebuttal report?
14    A.  My report.
15    Q.  Okay.  Rebuttal report?
16    A.  My rebuttal report, yes.
17    Q.  Okay.  Was there any information that you
18 requested from plaintiffs' counsel that you did not
19 receive?
20    A.  Yes.
21    Q.  What was that?
22    A.  After Mr. Petron had issued his report, I
23 asked for all the facts and bases that he relied on
24 within his private conversations with Mr. Christensen.
25    Q.  And what was the response?

Page 57

1     A.  That those weren't available to me.
2     Q.  And how did you know that he had
3 conversations with Mr. Christensen?
4     A.  He cites it in his reports.
5     Q.  And in his reports where he cites it --
6 strike that.
7         So looking again -- oops, sorry about
8 that -- at Malone Exhibit 2, and I am looking at
9 paragraph 4, you state that based upon the data you
10 reviewed and certain assumptions you describe in your
11 report, you developed the methodology that estimates
12 the number of class members, arriving at a preliminary
13 estimate of 219,286 class members, correct?
14    A.  That's correct.
15    Q.  And then you describe that methodology
16 starting at paragraph 15, right? -- of Exhibit 2?
17    A.  That's correct.
18    Q.  And you state in paragraph 15, the first
19 sentence:  "To estimate the number of class members, I
20 adopted the definition of the proposed class."
21        Right?
22    A.  Yes.
23    Q.  And then you quote the definition of the
24 proposed class that is in the Consolidated Class
25 Action Complaint?

15 (Pages 54 - 57)

Page 58

1  A.  Yes.

2  Q.  And so that's clear in the record, what you

3  have in paragraph 15 is:  "The complaint defined the

4  class as, quote, all persons in the United States that

5  purchased tickets for travel on United Airlines

6  flights scheduled to operate to, from, or within the

7  United States from March 1, 2020, to the date of class

8  certification and who were not issued a refund for

9  canceled and/or significantly changed flights on which

10  the passenger did not travel."

11       Is that right?

12  A.  That's correct.

13  Q.  And so the definition I just read, which is

14  set forth in paragraph 15 of Malone Exhibit 2,

15  includes both passengers whose flights were canceled

16  and passengers whose flights were significantly

17  changed, right?

18  A.  That's correct.

19  Q.  And then, in paragraph 16 of Malone

20  Exhibit 2, you describe how you identified tickets

21  where the flight was canceled, right?

22  A.  That's correct.

23  Q.  You did not make any attempt in developing

24  your opinions that are set forth in Malone Exhibit 2

25  to identify tickets where the flight was significantly

Page 59

1  changed but not canceled; is that right?

2  A.  I wouldn't say that.

3  Q.  So show me where in your report you describe

4  your methodology for identifying tickets where the

5  flight was significantly changed but not canceled?

6  A.  So it's -- it's still in paragraph 16.  Now,

7  while it's a proxy for cancellation if a -- the field

8  "flight sched on depart date" is a 1, that could mean

9  that they were able to get on the flight the next day,

10  which may be a significant delay.  So it doesn't

11  necessarily exclude everybody who may have had a

12  significant delay, but their flight wasn't canceled.

13       So I wouldn't say that I didn't make any

14  attempt, but I do focus on the cancellations at the

15  instruction of counsel.

16  Q.  So I think -- let me make sure I understood

17  this.  I think you just said that if the value in the

18  field of flight schedule on departure date is a 1,

19  that could indicate a significant change but not a

20  cancellation; is that right?

21  A.  I'm sorry.  The -- I want to clarify that

22  the flight schedule on departure date is zero,

23  indicates that on that day there wasn't a flight

24  between the origin and destination airports.  But

25  under that case, it could include a flight that was

Page 60

1  delayed until the next day, which I would consider

2  possibly a significant delay.

3  Q.  And apart from whatever that subset of

4  flights is, flights that have a value in the flight

5  schedule on departure date of zero that might indicate

6  the passenger traveled the next day as opposed to not

7  traveling at all.  Apart from those, you didn't make

8  any effort to identify flights that were significantly

9  delayed but not canceled, right? -- or significantly

10  changed but not canceled?

11  A.  That's correct.  As I answered earlier, that

12  was one of the additional instructions from counsel

13  was to focus on this variable and cancellations as

14  it's what's best known and available in the data.

15  It's an objective criteria.

16  Q.  So is it your understanding that whether a

17  flight was significantly changed is not an objective

18  criteria?

19       MR. KUROWSKI:  Objection.  Vague.

20       Go ahead.

21  A.  That's not my understanding.  It can be an

22  objective criteria, but the data must be produced or

23  evaluated further with additional information to

24  evaluate that objective criteria.

25  Q.  (BY MS. HEMERYCK)  So was it your conclusion

Page 61

1  that with the data that was produced by United that

2  was provided to you, you could not identify flights

3  that were significantly changed but not canceled apart

4  from that subset of those with the zero in flight

5  schedule on departure date that you previously

6  mentioned?

7  A.  I didn't draw the conclusion that it wasn't

8  possible.  It was a decision and instruction from

9  counsel to focus on these cancellations.

10  Q.  Okay.  Could you just point me where in your

11  report that is marked as Exhibit 2, you identify the

12  instruction from counsel to focus just on

13  cancellations?

14  A.  The instruction, as I answered in your

15  question earlier, it was to focus on this field that

16  proxies for cancellations, and it also incorporates

17  some significant delays as well.  But I don't have a

18  sentence in this report that states that other than my

19  testimony today.

20  Q.  So looking at paragraph 18 of Malone

21  Exhibit 2, you state:  "On the guidance of counsel, I

22  further restricted this definition..." -- being the

23  class definition, right?

24  A.  That's correct.

25  Q.  -- "to certain things." -- and Number 2 is:

16 (Pages 58 - 61)

Page 62

1 "to exclude persons who initiated the changes to their
2 travel."
3        Do you see that?
4    A.  I do.
5    Q.  And is it your understanding that the reason
6 for that restriction is because customers who cancel
7 their own bookings are not eligible for a refund under
8 the Contract of Carriage?
9        MR. KUROWSKI:  Objection.  Legal
10 conclusion.
11       You may go ahead.
12   A.  My understanding of this came from the
13 deposition of Mr. Christensen and then the instruction
14 that we should be excluding persons who initiated the
15 changes.  And that's -- the changes in the itinerary
16 is the same way that Mr. Christensen described the
17 variable customer-initiated change.
18       My understanding was also to -- that this
19 should be incorporated with the United-initiated
20 change variable to focusing on those that were
21 ultimately canceled by United Airlines.
22       There wasn't an explicit definition within
23 Christensen's testimony that it indicated
24 cancellation.
25   Q.  (BY MS. HEMERYCK)  I don't think that really

Page 63

1 answered my question; so let me try another way.
2        Do you have an understanding of why you were
3 instructed to restrict the definition of the class to
4 persons who -- to exclude persons who initiated the
5 changes to their travel?
6    A.  (No verbal response.)
7        I mean, Jeff Christensen did not instruct
8 you to do that, right?
9    A.  No.
10   Q.  Okay.  So that's what I'm trying to
11 understand.  Do you have an understanding of why
12 counsel instructed you to restrict the definition in
13 order to exclude persons who initiated the changes to
14 their travel?
15       MR. KUROWSKI:  Dr. Malone, to the
16 extent your understanding of "why" calls you to
17 disclose the substance of communications with
18 attorneys and yourself, except to the extent it
19 relates to facts, data, or assumptions provided to you
20 and that you relied on in forming the opinions to be
21 expressed, I'm going to instruct you not to answer.
22 To the extent you can answer without divulging the
23 protected communications, you may go ahead.
24   A.  I can answer this to an extent that in
25 paragraph 20 when I describe how I implement this, I

Page 64

1 described the purpose of it was to focus on
2 identifying ticketed passengers whose itineraries were
3 ultimately canceled by United.  And by implementing
4 the customer-initiated change indicator that only
5 narrows the number of people within the class, I find
6 to be a conservative assumption under any scenario.
7        To the extent of why past that, I can't
8 answer.
9    Q.  (BY MS. HEMERYCK)  Okay.  Did you understand
10 your assignment here to be to narrow the persons
11 potentially eligible for the class to make it as
12 conservative as possible?
13   A.  Not to be as conservative as possible, but
14 to -- if you're given a set of choices being engaged
15 by the plaintiff, I wouldn't want my reputation to be
16 one that's misleading a trier of fact, biased towards
17 whom I'm engaged by.
18   Q.  So you were okay with developing a
19 methodology that would knowingly exclude from the
20 class people who actually meet the criteria --
21       MR. KUROWSKI:  Objection --
22   Q.  (BY MR. HEMERYCK)  -- but who can't be
23 identified as such by your methodology?
24       MR. KUROWSKI:  Objection.  Vague, legal
25 conclusion.

Page 65

1    A.  My methodology is that of applying objective
2 filters to the data produced by United.  And I
3 understand, from Mr. Christensen's testimony, that
4 there's likely data that United possesses or has
5 access to that would allow me to refine the
6 assumptions implemented within my methodology to
7 either look at, for example, delays or things as --
8 I'm sorry -- features in the data that would indicate
9 if a customer canceled their itinerary, which would
10 allow my estimate of the class size to more accurately
11 reflect the true class size.
12       But given the data that was produced up to
13 this point, this was a conservative assumption to come
14 up with a preliminary estimate.
15   Q.  (BY MS. HEMERYCK)  Just to be clear:  You
16 decided what filters to use, right?
17   A.  Ultimately, yes.  I signed this report.
18   Q.  Did you read any of the court orders in this
19 case?
20   A.  I don't recall if I read any specifically.
21 I would have -- once we had an initial discussion, I
22 probably would have researched the case and probably
23 gone and read it, looked up the complaint at least to
24 see some initial details about it.  I don't know that
25 I saw or read any court orders.

17 (Pages 62 - 65)

Page 66

1   Q.   And just specifically, did you read the
2   court's order where it ruled on the motion to dismiss
3   that was filed by United?
4   A.   No.  I don't recall reading that.
5   Q.   Are you aware that there was, earlier in
6   this case, a plaintiff named Jacob Rudolph?
7   A.   I am aware because I saw the citation with
8   Rudolph in it at some point.
9   Q.   And are you aware that the court dismissed
10  the claims asserted by Jacob Rudolph?
11  A.   Not explicitly until now.
12  Q.   And so I assume that you are also not aware
13  of why his claims were dismissed?
14  A.   No.
15  Q.   Okay.  So let's talk about the methodology
16  you used to try to identify tickets where the flight
17  was canceled, which is in paragraph, again, 16 of
18  Malone Exhibit 2.
19      Are you there?
20  A.   I am.
21  Q.   And just so we're clear:  Although you've
22  said in this deposition that this methodology might
23  also encompass some tickets that were significantly
24  delayed, what you said in your report was: "To
25  identify tickets where the flight was canceled, I used

Page 67

1   the field flight schedule on departure date in the
2   ticket data."
3       Right?
4   A.   The sentence does say that.
5   Q.   Right.  And you didn't say anything there
6   about using that field to identify tickets where the
7   flight was significantly changed, right?
8   A.   I'm sorry.  Could you repeat that?
9   Q.   You didn't say anything in that sentence
10  about using that field to identify flights that were
11  significantly changed, right?
12      MR. KUROWSKI:  Objection.  Vague.
13  A.   Not in that sentence.
14  Q.   (BY MS. HEMERYCK)  Okay.  And then in
15  paragraph 23, if you could turn to that, sir.  Again,
16  this is paragraph 23 of Malone Exhibit 2.
17      In that paragraph you explain how you used
18  the field flight scheduled on departure date to
19  identify tickets where the flight was canceled, right?
20  A.   That's correct.
21  Q.   Right.  And what you say is that you used
22  that field.  And the way you used that field is that
23  you filtered the ticket data to only include records
24  where all of the following is true and one of those
25  bullet points is the field flight scheduled on

Page 68

1   departure date is zero, right?
2   A.   Yes.
3   Q.   Okay.  So going back now to paragraph 16, if
4   you could.  And in the second-to-last sentence of
5   paragraph 16, you state:  "My use of this field..."
6   which is the flight scheduled on departure date field,
7   right?
8   A.   Yes.
9   Q.   "My use of this field assumes that if a
10  customer's flight was canceled, that they would be
11  rebooked onto another flight between the same airports
12  on the same day," right? -- "if such flight existed"?
13  A.   Correct.
14  Q.   Okay.  So what is the basis for that
15  assumption?
16  A.   The basis for that is the description of
17  this field given by Christensen as to whether or not a
18  flight operated between the same airports on the same
19  day.  And so if they were rebooked onto a different
20  airport or on a different day, it may not be reflected
21  the same way.
22  Q.   So just to be clear:  You understand that a
23  customer whose flight was canceled could be rebooked
24  by United using different routing that would get them
25  to their alternate destination, right? -- I'm sorry --

Page 69

1   that would get them to their destination?
2   A.   It's possible through different routing.  It
3   wouldn't be their original destination.
4   Q.   Well, it might not be the destination on the
5   particular -- well, no, it would be -- strike all
6   that.
7       So if someone was scheduled to fly from
8   Newark to Denver direct, okay?  Are you with me?
9   A.   Yes.
10  Q.   Okay.  And for whatever reason, all of the
11  flights between Newark and Denver were canceled that
12  day, so there is a zero in the field for the coupon
13  relating to the Newark to Denver flight.
14      Are you okay with me so far?
15  A.   Okay.
16  Q.   Okay.  You understand that passenger could
17  still be flown, say, from Newark to Chicago to Denver,
18  right?
19      MR. KUROWSKI:  Objection.  Foundation.
20      Go ahead.
21  A.   I understand that, given your hypothetical
22  situation here.
23  Q.   (BY MS. HEMERYCK)  Right.  So the person's
24  destination is Denver, and they still get to Denver in
25  my scenario, right?

18 (Pages 66 - 69)

Page 70

1    A.    Possibly, if they rebooked them, yeah.
2    Q.    Right.  And so in that scenario, you could
3  have a zero in the flight scheduled on departure date
4  field but the customer is rebooked through different
5  rerouting to the final destination, right?
6    A.    That's correct.
7    Q.    So your assumption that anytime a passenger
8  has -- that anytime a passenger's flight is canceled,
9  they would be rebooked on another fight between the
10  same airports on the same day is not correct, is it?
11         MR. KUROWSKI:  Objection.  Vague.
12         Go ahead.
13    A.    It's an operational assumption that can
14  explain a typical scenario.  It may not explain every
15  hypothetical case.
16    Q.    (BY MS. HEMERYCK)  To your knowledge, did
17  Jeff Christensen testify that if a customer's flight
18  between two cities was canceled and there -- they
19  would be rebooked on another flight between the same
20  airports on the same day?
21    A.    (No verbal response.)
22    Q.    Did he say that?
23    A.    I don't think he testified to that
24  particular assumption.
25    Q.    Okay.  Dr. Malone, the court reporter has

Page 71

1  handed you what has been marked as Malone Exhibit 5,
2  which is the rebuttal expert report of Michael Petron
3  dated May 22, 2023.
4         (Exhibit Number 5 marked)
5    Q.    Do you see that?
6    A.    Yes.
7    Q.    Okay.  So I want to direct your attention to
8  paragraph 20 on page 11 of Malone Exhibit 5.
9         So in the middle of paragraph 20, Mr. Petron
10  states:  "This field..." -- and he's referring to the
11  flight scheduled on departure date field, right?
12    A.    Correct.
13    Q.    He said:  "This field does not reliably
14  identify customers whose itineraries were canceled;
15  however, because a flight scheduled on departure date
16  value zero does not necessarily mean the customer was
17  not transported or offered transportation to their
18  destination.  Specifically, this field does not
19  consider that United could protect the passenger's
20  travel and reroute them on a new itinerary."
21         Do you see that?
22    A.    I do.
23    Q.    Do you have any basis to dispute those
24  statements by Mr. Petron?
25    A.    I think it ignores the fact that I also

Page 72

1  filter on coupon statuses where the coupon status must
2  be Unused-FFC or Unused-Open.  If that ticket or that
3  coupon had been exchanged to secure new travel through
4  a new route, it would show as used, even if the flight
5  schedule departure date was zero.
6         So my methodology already accounts for this
7  to the extent that Mr. Christensen testified.
8  Mr. Petron states that with his private conversations
9  with Jeff Christensen that they're not always updated
10  to the new flight path.  He didn't support that.
11  That's a statement that I only have him to rely on
12  for.  He hasn't provided any facts that state that,
13  and so my methodology already accounts for this issue
14  you're raising.
15    Q.    So you have mentioned conversations that
16  Mr. Petron had with Jeff Christensen a number of times
17  in deposition.  And so this -- again, the paragraph 20
18  that we just were looking at, there would be an
19  example here, right?
20    A.    Yes.
21    Q.    And Footnote 28 states:  "Conversations with
22  Jeff Christensen, director of distribution at United."
23         Correct?  That's the footnote?  That's what
24  you're talking about?
25    A.    That's correct.

Page 73

1    Q.    And that footnote is cited as support for a
2  specific statement:  "It is my understanding that the
3  coupons in the ad hoc data would not always be updated
4  to include the new flight path."
5         So the text itself there discloses what
6  information it was that Mr. Petron obtained from these
7  conversations that he is relying on in this report,
8  right?
9         MR. KUROWSKI:  Objection.  Foundation.
10         Go ahead.
11    A.    If that's true, it contradicts
12  Mr. Christensen's testimony.  So, for example,
13  page 147 of the Christensen deposition, he is asked
14  how is that different from exchanged, and he's
15  referring to coupon statuses.
16         Mr. Christensen responds:  "They have not
17  applied the value of this coupon towards anything, and
18  so exchange means that they've gone through the
19  process with securing new travel and that they've
20  taken the value of this coupon and put it towards
21  their new trip."
22         And so, in that case, if he's had other
23  conversations that contradict Mr. Christensen's
24  testimony, if I have the choice to rely on
25  Mr. Petron's coffee with Mr. Christensen or sworn

Page 74

1 testimony in a court proceeding, I'm going to rely on
2 the sworn court testimony.
3 Q. (BY MS. HEMERYCK) So you think that if
4 United protects a passenger whose flight was canceled
5 by rerouting them, that's an exchange?
6 A. An exchange --
7 MR. KUROWSKI: Objection. Vague.
8 You may go ahead.
9 A. "An exchange..." -- I'm quoting
10 Mr. Christensen -- ".. means that they've gone through
11 the process with securing new travel and they've taken
12 the value of this coupon and put it towards their new
13 trip."
14 Q. (BY MS. HEMERYCK) "They" being the
15 customer?
16 A. I would have to speculate what
17 Mr. Christensen's knowledge is there.
18 Q. And just so my question is clear -- because
19 all you did was read me back Mr. Christensen's
20 testimony. Your belief is that the coupon status of
21 "exchanged" means -- strike that.
22 Your belief is that if United protects a
23 passenger whose flight was canceled by rerouting them,
24 that that would have a coupon status of exchanged?
25 MR. KUROWSKI: Objection. Vague.

Page 75

1 Go ahead.
2 A. No. It wouldn't have a coupon status of
3 Unused-FFC or Unused-Open.
4 Q. Okay. But it wouldn't
5 necessarily have a status of exchanged, right?
6 A. No, not necessarily. I wouldn't know
7 exactly what it -- maybe, but my filter only considers
8 coupons that are UNUSED-FFC or UNUSED-OPEN.
9 Q. I'm just trying to understand why you think
10 that Mr. Christensen's testimony, which is about the
11 coupon status of exchanged, is in any way inconsistent
12 with the statement that where United protects a
13 passenger by rerouting them, the coupons might not be
14 updated to include the new flight path?
15 MR. KUROWSKI: Vague.
16 foundation.
17 Go ahead.
18 A. I don't see anything in Christensen's
19 testimony that states that they wouldn't be updated or
20 that the coupon status would show that it's either
21 unused or Unused-FFC or Unused-OPEN.
22 Q. (BY MS. HEMERYCK) You're aware that
23 Mr. Christensen was deposed in this case for
24 seven hours, right?
25 A. I don't know how long Mr. Christensen was

Page 76

1 deposed.
2 Q. Well, you obviously have the transcript,
3 right?
4 A. I do have the transcript.
5 Q. Right, and the transcript is -- let's see.
6 The transcript is 263 pages. I'll represent to you.
7 So plaintiff's counsel certainly could have
8 asked Mr. Christensen whether -- when United protects
9 a passenger, right? -- by rebooking them or rerouting
10 them, whether the coupon status always updates, right?
11 They could have asked that.
12 MR. KUROWSKI: Objection. Vague,
13 speculation.
14 A. They could ask any question they wanted. I
15 think that's a legal decision.
16 MR. KUROWSKI: We've been going for
17 about another hour.
18 MS. HEMERYCK: Sure.
19 MR. KUROWSKI: Short break?
20 MS. HEMERYCK: Sure.
21 THE COURT REPORTER: We are off the
22 record. The time is 10:59 a.m.
23 (Off the record)
24 THE COURT REPORTER: We are back on the
25 record. The time is 11:06 a.m.

Page 77

1 Q. (BY MS. HEMERYCK) So, Dr. Malone, let's
2 talk for a minute about the "Refund Policy" field in
3 the ticket data.
4 Do you recall that field?
5 A. I do.
6 Q. Okay. And your methodology does not utilize
7 that field, right?
8 A. No. It does not --
9 Q. Okay.
10 A. -- place any filters specifically on that
11 field.
12 Q. Okay. But you have an understanding of what
13 that field represents, right?
14 A. I believe there was an internal refund
15 policy at United.
16 Q. Well, let me just be clear. So in the
17 values -- the two potential values in that field are
18 refundable and eligible for ticket credit -- for
19 travel credit, right?
20 A. Yes.
21 Q. Okay. And you understand that a value of
22 eligible for travel credit in the refund policy field
23 means the customer's travel was neither disrupted by
24 more than two hours, nor canceled by United without
25 protection, right?

20 (Pages 74 - 77)

Page 78

1    A.  I don't know if that's a complete
2 understanding of it from Mr. Petron's report.  He said
3 there may be exceptions to that in the data.
4    Q.  So there is some unknown number of records
5 where it has eligible for travel credit, but it may
6 not -- that may not be accurate because United systems
7 weren't able to populate that data, right? -- for
8 those records?  That's what you're talking about?
9    A.  I don't know the reason, but they may have
10 been canceled by United.
11    Q.  Right.  So --
12    A.  Or significantly delayed.
13    Q.  Right.  But just to be clear:  What Jeff
14 Christensen testified was intended by those two
15 values.  Eligible for travel credit is intended to
16 represent records where the coupon -- the customer's
17 travel was neither disrupted by more than two hours
18 nor canceled by United without protection, right?
19        MR. KUROWSKI:  Objection.  Foundation.
20    A.  I'd have to look into Mr. Christensen's
21 definition again.  It is -- in order to answer that or
22 I'd have to take that as a representation.
23        MS. HEMERYCK:  Let's mark this one.
24    Q.  (BY MS. HEMERYCK)  So, Dr. Malone, I've
25 handed you what's been marked as Malone Exhibit 6,

Page 79

1 which is the expert report of Michael Petron dated
2 April 20th, 2023.
3        (Exhibit Number 6 marked)
4    Q.  Okay.  Are you with me?
5    A.  I'm with you.
6    Q.  All right.  If you could turn to page 19 of
7 that document, Malone Exhibit 6.
8    A.  Okay.
9    Q.  Okay.  And if you look at little
10 subparagraph M on that page, this is where Mr. Petron
11 describes the two values that may appear in the
12 "Refund Policy" field, right?
13    A.  Yes.
14    Q.  And he states:  "Is refundable or eligible
15 for travel credit."
16        Right?
17    A.  That's correct.
18    Q.  And you agree with that.  That's what you
19 saw in the data?
20    A.  Yes.
21    Q.  And he states:  "Refundable means that
22 United changed the customer's itinerary by two or more
23 hours or canceled it with no protection."
24        Do you see that?
25    A.  I do see that.

Page 80

1    Q.  Okay.  And you did not, in your rebuttal
2 report, dispute that statement, right?
3    A.  I didn't dispute that in my report.
4    Q.  Okay.  And further down, he states that:
5 "Eligible for travel credit generally means that
6 United did not change the customer's itinerary by two
7 or more hours or cancel it with no protection,
8 although that value is also the default for certain
9 itineraries."
10        Right?
11    A.  That's not complete.  It's for:  "...default
12 itineraries (such as Plaintiff Buffer's) where the
13 refund eligibility data could not be captured by
14 United systems, as discussed in paragraph 51."
15        And paragraph 51 talks about further --
16 again, conversations with Jeff Christensen.
17    Q.  Understood.  And what I'm asking you is does
18 he state here in paragraph M that "Eligible for travel
19 credit" generally means that United did not change the
20 customer's itinerary by two or more hours or cancel it
21 with no protection with certain exceptions that he
22 then goes on to discuss?
23    A.  Yes.  With those exceptions, yes.
24    Q.  Okay.  So using those definitions of those
25 two values for the refund policy field and putting

Page 81

1 aside itinerary such as Plaintiff Buffer's where the
2 refund eligibility data could not be captured by
3 United systems, eligible for travel credit in the
4 refund policy field could mean that the customer's
5 travel was not disrupted at all, right?
6    A.  It could mean that.
7    Q.  Or it could mean that it was disrupted but
8 by some amount less than two hours?
9    A.  It could mean that.  Maybe it could also
10 mean a cancellation.  And so my methodology is
11 adaptable to further data that United may possess or
12 have access to to determine whether or not those
13 flights were significantly disrupted or canceled.
14    Q.  And I know you like to make your little
15 speech about more data, more data, more data, but here
16 was my question.  Let's see if I can just get a
17 straight answer to it.
18        It could mean eligible travel -- it could
19 mean that the customer's travel was disrupted by less
20 than two hours, right?
21        MR. KUROWSKI:  Objection.
22 Argumentative.
23    Q.  (BY MS. HEMERYCK)  It could mean that,
24 right?
25    A.  I said yes --

21 (Pages 78 - 81)

Page 82

1    Q.  Yes.
2    A.  -- it could mean as well as canceled.
3    Q.  And it could mean that the customer had a
4  canceled flight, but they are protected, meaning
5  United was able to transport them to their
6  destination, right?  It could mean that.
7    A.  It could.
8    Q.  And it could mean that the customer
9  voluntarily canceled their itinerary.  So there was a
10  schedule change, but they're not eligible for travel
11  credit because they actually canceled their itinerary.
12    A.  That could be a situation where it may say,
13  "Eligible for travel credit."
14    Q.  Okay.  Great.
15      So now I want you to go back again to Malone
16  Exhibit 5, which is Mr. Petron's rebuttal report.
17      Do you have that in front of you?
18    A.  I do.
19    Q.  ███████████████████████████
20  ██████████████████████████
21  ████████████████████████████████
22  ████████████████████████████████
23  ████████████████████████
24      Do you see that?
25    A.  I do see that.

Page 83

1    Q.  █████████████████████████████
2  ████████████████████████
3  ██████████████████████████
4    A.  I don't have a reason to disagree with that.
5    Q.  Okay.  Now, have you done any analysis of
6  the coupon statuses of records in the ticket data
7  where the flight scheduled on departure date has a
8  value of zero, but the refund policy value is eligible
9  for travel credit?
10    A.  I haven't come up with specific counts, and
11  my analysis would be limited to those that passed the
12  filter of having either Unused-FFC or Unused-Open in
13  the coupon statuses.
14    Q.  █████████████████████████████
15  ████████████████████████████████████
16  ██████████████████████████████████
17  ██████████████████████████████
18  ███████████████████████
19      MR. KUROWSKI:  Objection.  Foundation.
20      MS. HEMERYCK:  I'm asking if he's
21  aware.
22    A.  No.  That's an oddly specific number to be
23  aware of, given that I also apply other filters in my
24  analysis.  So I would have had to do a lot of
25  iterations to come to that exact number.

Page 84

1    Q.  (BY MS. HEMERYCK)  Okay.  Even if you don't
2  know the exact number, are you aware that the ticket
3  data does, in fact, include coupons where the flight
4  scheduled on departure date has a value of zero, the
5  refund policy value is eligible for travel credit, and
6  there's a coupon status of Unused-FFC?
7      MR. KUROWSKI:  Objection.  Foundation.
8    A.  I am aware that that could be the case.
9    Q.  (BY MS. HEMERYCK)  And just to be clear:
10  Your understanding is the status of Unused-FFC means
11  the passengers associated with those coupons did not
12  travel on the ticket to which the coupons related,
13  right?
14    A.  They haven't used the value of that -- that
15  travel yet.
16    Q.  They haven't traveled on those and they
17  haven't exchanged the value, right?
18    A.  Yes.
19    Q.  Okay.  And so your methodology would include
20  those customers in the proposed class, right?
21    A.  A portion of those.  You neglected to
22  mention the other filters that I would apply.  You
23  only mentioned three criteria.  I apply more than
24  that.
25    Q.  Okay.  Because you apply the

Page 85

1  customer-initiated change indicator and the
2  UA-initiated change indicator?
3    A.  Yes.  In addition, the issue date indicator
4  and I also exclude nonmonetary payments in -- from the
5  refund data and transactions from employees.  So to
6  the extent that they also pass all of those criteria,
7  they would be included until there's further data that
8  can exclude them, because they may have canceled their
9  flight prior.
10    Q.  Okay.  All right.  We're going to try this
11  now.  All right.
12      MS. HEMERYCK:  Yes, of course, it's not
13  going to work.  Oh, it worked.  Amazing.
14    Q.  (BY MS. HEMERYCK)  Okay.  So I am now
15  sharing on the screen a native Excel.  We're going to
16  mark this virtually, I guess, as Exhibit 7 -- Malone
17  Exhibit 7.
18      (Exhibit Number 7 identified)
19    Q.  Dr. Malone, do you recognize Malone
20  Exhibit 7 up on the screen as the Excel spreadsheet
21  that is Exhibit 2 to your April 20th report?
22    A.  It appears to be that.
23    Q.  And just to be clear:  Exhibit 2 to your
24  April 20 report, which now has been marked as Malone
25  Exhibit 7, is the list of record locators that are

22 (Pages 82 - 85)



Page 86

1 included in your preliminary estimate of the class
2 size, right?
3    A.  That's correct.
4    Q.  ███████████████████
5 █████████████████████
6 ████████████████
7 ████████████████████
8 ██████████████████████
9 ██████████████████████
10 ████████████
11    A.  ███████
12    Q.  ██████████
13 ██████████████████████
14 ██████████████████████████
15 ████████████████████████
16 ████████████████████████
17 █████████████████████████
18    A.  ████
19 ████████████████████
20 ██████████████████████
21 ████████████
22 ████████████████████
23 █████████████████████
24    Q.  ████████████████████████
25 █████████████████████

Page 87

1    A.  It appears to be.
2    Q.  Okay.  All right.  I'm going to push my luck
3 and try one more.
4 ███████████████████████████
5 ██████████████████████████████
6 ████████████
7    A.  Yes.
8    Q.  Okay.  So now I am putting up on the
9 screen -- this is an Excel document, native Excel.
10 We're going to call this one Exhibit 8 -- hold on a
11 second.
12        (Exhibit Number 8 identified)
13    Q.  ████████████████████████
14 ███████████████████████████████
15 ██████████████████████████████
16 ████████████████
17        And do you see those three numbers I just
18 read up there on the screen on Exhibit 8?
19    A.  I do.
20    Q.  Okay.  And scrolling across, looking at the
21 refund policy columns, all of these columns have
22 eligible for travel credit as the refund policy value,
23 right?
24    A.  That's correct.
25    Q.  And they all also have a zero in the flight

Page 88

1 scheduled on departure date column, right?
2    A.  Yes.
3    Q.  Okay.  And they all also have a coupon
4 status of Unused-FFC, right?
5    A.  Yes.
6    Q.  Okay.  And as you have already seen, all
7 these record locators are in your exhibit to your
8 class estimate, right?
9    A.  Yes.
10    Q.  Okay.  Now, the fact that these coupons that
11 we're looking at in Exhibit 8 have a refund policy of
12 eligible for travel credit means either those
13 customers either canceled their bookings themselves or
14 United offered to reaccommodate them to their
15 destination, but they apparently chose not to accept
16 it because they didn't travel.
17        Do you agree with that?
18    A.  No.
19    Q.  Okay.  So what else could it mean besides
20 those two things?
21    A.  It could be one of the situations that
22 Mr. Petron -- or described that United didn't have the
23 data to populate it and defaulted.
24    Q.  Okay.  And apart from that, any other
25 explanations other than they either canceled their

Page 89

1 bookings themselves or they were offered
2 reaccommodation and declined it?
3    A.  Not that I'm aware of.
4    Q.  Okay.  So I want to go back now to Malone
5 Exhibit 2, which is your -- no, Malone Exhibit 3,
6 which is -- no, sorry.  Malone Exhibit 2, your April
7 20th report.
8        Okay.  And looking specifically at
9 paragraph 16.
10    A.  I'm there.
11    Q.  All right.  And just to get us all on the
12 same page, this is, again, a paragraph where you're
13 talking about your use of the field flight scheduled
14 on departure date in the ticket data, right?
15    A.  Yes.
16    Q.  Okay.  And you state in the second --
17 third-to-last sentence:  "My use of this field assumes
18 that if a customer's flight was canceled that they
19 would be rebooked onto another flight between the same
20 airports on the same day if such flight existed."
21        And then in the next sentence you say:
22 "However, this may not occur if those alternative
23 flights have no available tickets."
24        Right?
25    A.  Correct.

23 (Pages 86 - 89)

Page 90

1    Q.  So you recognize that by excluding
2 coupons -- excluding from your preliminary class size
3 estimate coupons that had a value of 1 in the flight
4 scheduled on departure date field, you are excluding
5 some unknown number of customers who were, in fact,
6 canceled without protection, right?
7    A.  Yes.
8        MS. HEMERYCK:  My computer is going to
9 be uncooperative.
10    Q.  (BY MS. HEMERYCK)  Okay.  So I'm going to
11 try to share my screen again.
12       Okay.  So, Dr. Malone, do you see the Excel
13 spreadsheet that I put up on the big screen at the
14 front of the room now?
15    A.  Yes, I see it.
16    Q.  Okay.  And hopefully this looks familiar.
17 I'll represent to you this is an excerpt, not the
18 whole thing, of the Stout combined data table that
19 Mr. Petron provided.
20       Does it look familiar?
21    A.  The formatting looks familiar.
22    Q.  Okay.  Great.  And we'll call this Exhibit 9
23 for the record.
24       (Exhibit Number 9 identified)
25    Q.  So I want to use this just to look at an

Page 91

1 example of the phenomenon we were just discussing.
2 ████████████████████████████████████████████
3 ████████████████████████████████████████████
4 ████████████████████████████████████████████
5 ███████████████████████████████.
6       Do you see that?
7    A.  I see that.
8    Q.  Okay.  And if you look across, you have two
9 passengers, right? -- Passenger 1 and Passenger 2?
10    A.  Yes.
11    Q.  And they were traveling from Chicago to
12 San Francisco on November 25, 2020, returning on
13 December 6, 2020.
14       Do you see that?
15    A.  That looks to be the case.
16    Q.  Okay.  Now, all eight of these coupons have
17 a refund policy value of refundable, right?
18    A.  Yes.
19    Q.  Okay.  And going across, four of those
20 coupons have a status of used-exchanged under "Coupon
21 Status Simple".
22    A.  Yes, four of them do.
23    Q.  Right.  And four of them have a Coupon
24 Status Simple of canceled, not refunded, right?
25    A.  Yes.

Page 92

1    Q.  Okay.  And the four that say "canceled, not
2 refunded" have a coupon status of Unused-FFC, right?
3    A.  That's correct.
4    Q.  So according to the data we see in
5 Exhibit 9, those four coupons -- the flights
6 associated with those four coupons were canceled and
7 the passengers did not use the value.  They did not
8 travel on those coupons, right?
9    A.  Those four coupons, yes.
10    Q.  Okay.  But the value for all eight of these
11 coupons in the flight scheduled on departure date is
12 1, right?  Column Q.
13    A.  Yes.  Column Q is 1 for all of those.
14    Q.  Okay.  And so your methodology excludes the
15 customers associated with these records from the
16 potential class, right?
17    A.  (No verbal response.)
18    Q.  And we can confirm that, we'll just -- we'll
19 go back to -- I think this was Exhibit 7.  Yeah, we'll
20 go back to Exhibit 7.  All right.  And we'll take a
21 look.
22 ████████████████████████████████████
23 ████████████████████████████████████
24    A.  █████████████████████████████
25    Q.  ██████████████████████

Page 93

1 ██████████████████████████████████████████
2 ██████████████████████████████████████████
3 ██████████████████████████████████████
4    A.  I wasn't finished reviewing the spreadsheet
5 you had up before.
6    Q.  Oh, okay.  We can go back to it.
7    A.  Thank you.
8    Q.  There you go.  So back to Exhibit 9.
9    A.  Yeah.  I'm sorry.  Were you asking me if the
10 customers associated with these are excluded?
11    Q.  ███████████████████████████████████
12 ████████████████████████████████████████
13 ███████████████████████████████████████
14 ████████████████████████████████████████
15 █████████████
16    A.  To the extent that there was never another
17 record locator associated with these customers where
18 it would meet the criteria for all my filters, these
19 particular coupons would not be included in my
20 estimate.
21    Q.  Okay.  So let's go to paragraph 17 of Malone
22 Exhibit 2, if we could.  So in paragraph 17, you
23 state:  "To identify tickets where the purchaser was
24 not issued a refund or where the purchaser has not
25 used the value of their ticket for other travel, you



Page 94

1 use the field coupon status in the ticket data."
2      Do you see that?
3 A. Yes.
4 Q. Okay. And specifically, you filtered the
5 data, as explained in paragraph 23 of Malone
6 Exhibit 2, to limit it to coupons with a coupon status
7 of Unused-FFC or Unused-Open; is that right?
8 A. That's correct.
9 Q. So you did not include records that have a
10 coupon status of used, right?
11 A. The coupons that would say "coupon status of
12 used" would not be counted.
13 Q. Do you still have in front of you -- I think
14 it's Malone Exhibit 5, which is the rebuttal report of
15 Mr. Petron?
16 A. I do.
17 Q. Okay. If you could go to that. And I want
18 to direct you in particular to Rebuttal Figure 4 at
19 the top of page 23.
20      Are you there, Dr. Malone?
21 A. I'm there.
22 Q. Okay. So looking at Rebuttal Figure 4,
23 Mr. Petron identified from the OAG data, which I think
24 you referred to as the "flight files"?
25 A. I believe so.

Page 95

1 Q. ████████████████████████████████
2 ████████████████████████████████████
3 ████████████████████████████████████
4 ████████████████████████████████████
5 ████████████████████████████████████
6 ██████████████████
7 A. ████████████████.
8 Q. ████████████████████████████
9 ████████████████████████████████
10 ████████████████████████████████████
11 ████████████████████████████████████
12 ██████████████████████████
13 A. ██████████████████████████
14 Q. ████████████████████████████
15 A. ████████████████████████████
16 ████████████████████████████
17 Q. ██████████████████████████████
18 ████████████████████████████████
19 ████████████████████████
20 ████████████████████████████████████
21 A. ██
22 Q. ██████████████████████████
23 ████████████████████████████████████
24 ████████████████████████████
25 A. ██████

Page 96

1 Q. And so there are only three coupon statuses
2 that had the word "canceled" in coupon status simple.
3 And you can actually find them if you have
4 Mr. Petron's April 20th report, which I think is
5 Exhibit 6.
6 A. I have it.
7      MR. KUROWSKI: Objection. Foundation.
8 Q. (BY MS. HEMERYCK) If you look on
9 paragraph 24 -- I'm sorry -- page 24 of Malone
10 Exhibit 6.
11      Do you see he lists the coupon status fields
12 there?
13 A. I do.
14 Q. Okay. In Figure 2.
15      I mean, you looked at this -- this data,
16 right?
17 A. Yes.
18 Q. Okay. And I'm not asking you to confirm his
19 counts, but those -- the coupon statuses that are
20 listed here, those are all the coupon statuses in the
21 data, right?
22 A. I believe so.
23 Q. Okay. And there are only three coupon
24 statuses that have the word "canceled" in the coupon
25 status simple, right?

Page 97

1 A. Yes.
2 Q. They are canceled-refunded, canceled-not
3 refunded, and canceled-not -- well, I'm sorry. Let's
4 try that again.
5      They are -- I've got to do this a different
6 way.
7      So they are coupon status of refunded, which
8 has a coupon status simple of canceled-refunded,
9 right?
10 A. Correct.
11 Q. Okay. And just flipping back to Rebuttal
12 Figure 4 on page 23 --
13 A. Yeah.
14 Q. -- of Malone Exhibit 5. Yeah, if you want
15 to have those both in front of you at the same time as
16 we do this.
17 A. Sure.
18 Q. Okay. Rebuttal Figure 4 is limited to
19 nonrefunded tickets, right?
20 A. Yes.
21 Q. Right. So that -- that coupon status of
22 refunded, which has a coupon status simple of
23 canceled-refunded, those are already excluded from
24 Rebuttal Figure 4 according to Mr. Petron, right?
25 A. Yes.

25 (Pages 94 - 97)

Page 98

1    Q. Okay. And so that leaves two more coupon
2  statuses that have the word "canceled" in them. One
3  is Unused-FFC canceled not refunded, and the other is
4  Unused-Open canceled not refunded, right?
5    A. That's correct.
6    Q. Okay. So that line that says -- in Rebuttal
7  Figure 4 that says "ad hoc data, canceled coupon
8  status simple" would include Unused-FFC and
9  Unused-Open, right?
10    A. Yes.
11    Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮▮▮
19    A. ▮▮
20    Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 99

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2    A. Yes.
3    Q. And, again, that would be the same four
4  coupon statuses we just talked about: used,
5  exchanged, check, and unavail?
6    A. Yes.
7    Q. Okay. So now if you can go -- let's flip
8  over a page in Malone Exhibit 5 to -- oh, no, that's
9  the same page. Bottom of the page, paragraph 50.
10    MR. KUROWSKI: Do you mean Petron
11  Exhibit 5?
12    MS. HEMERYCK: Yes -- well, no, it's
13  Malone Exhibit 5. It's Petron's report. All the depo
14  exhibits, I am calling "Malone Exhibit Number."
15    A. Petron's rebuttal report?
16    Q. (BY MS. HEMERYCK) Yes. Petron's rebuttal
17  report I think is Malone Exhibit 5. So we were
18  looking at page 23 which has Rebuttal Figure 4 at the
19  top. Further down at the bottom of that page is
20  paragraph 50.
21    Do you see that?
22    A. Yes.
23    Q. Great. And then it carries over to page 24.
24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 100

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3    A. Okay.
4    Q. Okay. So my question for you, Dr. Malone,
5  is: How do you explain a coupon status of used when
6  we know that the associated flight -- flights
7  associated with that coupon was canceled?
8    MR. KUROWSKI: Objection. Foundation.
9    Go ahead.
10    A. I believe tickets can remain open and be
11  used for other travel. So that's one possibility.
12    Q. (BY MS. HEMERYCK) Wouldn't that have a
13  status of Unused-Open?
14    A. Unused open implies that it hasn't been
15  used.
16    Q. Right. I guess what I'm trying to
17  understand is: You have excluded or not included in
18  your estimate of the class size all coupons that have
19  a status of used, right?
20    A. Yes.
21    Q. And you did that because you're assuming
22  that the customer used that coupon or its value for
23  travel, right?
24    A. Used that in exchange for another coupon,
25  which could be used for travel. Whether or not that

Page 101

1  coupon was able to be used or if it was subject to be
2  part of the class is another question.
3    Q. I'm sorry. Could you repeat that again,
4  sir?
5    A. So --
6    Q. Or read it back? Because I didn't
7  understand that.
8    A. Do you want me to repeat it?
9    Q. Sure.
10    A. So used -- if a ticket was not used, they
11  could use it on another flight. So there's a
12  possibility that there's another coupon related to
13  this that would not be excluded.
14    Q. Now, you read Jeff Christensen's deposition
15  testimony, right?
16    A. I did read it.
17    Q. And you recall that Mr. Christensen
18  testified that a value of used doesn't necessarily
19  mean the customer traveled, right?
20    MR. KUROWSKI: Objection. Foundation.
21    A. I recall something of that nature. I don't
22  recall his whole testimony right now.
23    Q. (BY MS. HEMERYCK) Do you recall he
24  testified, for example, that a used could indicate a
25  split and divide? Do you recall that?

26 (Pages 98 - 101)

Page 102

1    MR. KUROWSKI: Objection. Foundation,
2 vague.
3    A. I remember him describing to some degree a
4 split and divide.
5    Q. (BY MS. HEMERYCK) Okay. And you recall him
6 testifying that where there's a split and divide, the
7 data does not disclose what the customer actually did
8 with the coupon after it was split and divided?
9    MR. KUROWSKI: Objection. Foundation,
10 vague.
11    Q. (BY MS. HEMERYCK) Well, let me make it
12 easier for you.
13    So, Dr. Malone, the court reporter has
14 handed you what's been marked as Malone Exhibit 10,
15 which is a condensed printout of the transcript of the
16 deposition of Jeff Christensen in this case.
17    (Exhibit Number 10 marked)
18    Q. Do you recognize Malone Exhibit 10?
19    A. I do.
20    Q. And if you could turn to page 151 of the
21 transcript. You will see there are four pages per
22 paper page. Okay. And beginning at page 151, line 5,
23 the question was: "Understood. And then, finally,
24 what I think is probably the easiest column value,
25 which is used. So does that just mean the ticket was

Page 103

1 used?"
2    And then Mr. Christensen's answer was: "It
3 does. There's some scenarios we've got to touch on
4 real briefly. The preponderance or most of the time
5 they could. They used the value of the ticket. They
6 took their trip. The ticket is or the coupon..." --
7 it says "issued," but it was corrected in the errata
8 to "...is used."
9    Do you see that?
10    A. I see that.
11    Q. Okay. Mr. Christensen went on: "There are
12 some scenarios where our system doesn't really know
13 whether or not it's been used. It's given a status
14 and most of the time the status would mean used, but
15 we don't 100 percent know. And so, let's get into two
16 scenarios."
17    Line 18: "One of the 260 statuses we have
18 is" -- it says "checking," but it was corrected to
19 checked in.
20    "The customers check in for their flight.
21 That's the last thing we see from our data. And when
22 you check in for a flight, usually you get on the
23 flight. And so we're making a leap here, that trip,
24 that coupon was indeed used here. So that's one
25 scenario.

Page 104

1    "A second scenario is actually one of the
2 ticket statuses is divided and so, as we talked early
3 on in this particular dataset, we do split and
4 divides. The ticket status is updated to divided and
5 that's the end of it. I don't know whether or not
6 they flew. I don't have any additional information
7 other than the last thing we saw happen here was there
8 was a split and divide.
9    "So, again, we believe these customers to
10 have traveled. Most of the time they have. With the
11 case of a split and divide, it's a lot. It's
12 oftentimes about upgrades, but those show..." -- and
13 then we deleted the word "the" in the errata --
14 ".. here."
15    Do you see all that?
16    A. I do see that.
17    Q. ████████████████████████
18 █████████████████████████████████
19 █████████████████████████████████
20 ████████████████████████████████
21 ████████████████████████████
22 ████████████████████████████████
23    A. That's assuming that when that's split and
24 divided that there's not another coupon created that's
25 associated with that purchaser or a record locator

Page 105

1 that's associated with that purchaser that could pick
2 them up, if indeed, they didn't travel.
3    Q. Right. And -- no, strike that.
4    And you can't tell that from the data,
5 right?
6    A. It's difficult to because the passenger
7 names were redacted and other identifying information
8 that United may have wasn't included.
9    Q. So you would do it by passenger name?
10    A. That's one way that it could be done. It
11 could also be done by emails of who's purchased or
12 received receipts from the transaction with United,
13 but a passenger name is one way. It doesn't
14 necessarily even have to be linked, because if there
15 are two different coupons, it will pick up the
16 passenger where it's appropriate and not pick them up
17 where it isn't.
18    Q. Now, you also excluded, using your
19 methodology, records with a coupon status of unavail,
20 right?
21    A. Yes.
22    Q. And what was your basis for excluding
23 coupons of that status?
24    A. The basis was the testimony of Jeff
25 Christensen.

27 (Pages 102 - 105)

Page 106

1    Q.  And specifically, what testimony are you
2  talking about?
3    A.  Page 145 to 146 of Mr. Christensen's
4  testimony.
5    Q.  Okay.  And --
6       (Simultaneous speaking)
7    Q.  Go ahead.  I'm sorry.
8    A.  Specifically, the question was: "Is it
9  shorthand" -- is shorthand -- I'm sorry.  I'm assuming
10  a correction there.
11      "Is it shorthand for unavailable in this
12  context, essentially that there's no further action
13  that United would need to take on the ticket?  Either
14  you can't see the data or, what you said, insurance
15  comes and pays the claim and then United doesn't have
16  to do anything with it.  Is that accurate or am I
17  missing something?
18      "Typically, that would be true."
19      So I didn't include them because it sounds
20  like the typical case for unavailable is something's
21  been done where United's not responsible for a refund.
22    Q.  So did you read the rest of the testimony on
23  page 146 after what you just read to me?  Did you read
24  that before?
25    A.  Yes.

Page 107

1    Q.  Okay.  So just for the record, after the
2  response that you just -- the question that you just
3  read, Mr. Christensen was asked: "Are there any
4  instances you can think of where that wouldn't be
5  true?"
6       And he answered: "We could run into an
7  instance where they're on another carrier, and, in
8  fact, the other carrier didn't provide transportation.
9  And the customer wanted a refund and was eligible for
10  a refund, and we could provide one.  Or they didn't
11  fly and they have credit, and they want to apply that
12  credit toward the new ticket.  There are some
13  instances where, that the coupon may not be resolved,
14  may not, they may not have used the value."
15      Do you see that?
16    A.  Yes.
17    Q.  And going back to paragraph 145,
18  Mr. Christensen started his explanation of "unavail"
19  by stating: "It's kind of a miscellaneous bucket."
20      Right?
21    A.  Correct.
22    Q.  So based on Mr. Christensen's testimony that
23  I just read that came after the question and answer
24  you read, there could be instances where a customer
25  who has a status of unavail is, in fact, eligible for

Page 108

1  a refund, right?
2    A.  I think -- and beyond that, they could
3  provide one and that falls under the -- his previous
4  answer that they don't have to do anything with it.
5  It sounds like a closed issue.  Or if they didn't fly
6  and they have credit and they want to apply that
7  credit towards a new ticket, that's -- that would
8  be -- sounds similar to a used of the flight credit
9  also somebody who I wouldn't incorporate under my
10  methodology.  Now, that last -- in line 19 and 20,
11  that: "There may -- there are some instances where
12  that coupon may not be resolved, may not, they may not
13  have used the value."  That does say that there could
14  be some scenario where that's the case.
15    Q.  All right.
16      MS. HEMERYCK:  Should we do a quick
17  break for lunch now since the food is here?
18      Okay, great.
19      THE COURT REPORTER:  We are off the
20  record.  The time is 12:04 p.m.
21      (Off the record)
22      THE COURT REPORTER:  We are back on the
23  record.  The time is 12:29 p.m.
24    Q.  (BY MS. HEMERYCK)  So, Dr. Malone, still
25  looking at Malone Exhibit 2, which is your April

Page 109

1  20th report, I want to -- strike that part.
2       So in your April 20 report, you attempted,
3  per counsels' guidance as you stated in paragraph 18
4  of the report, to exclude persons who initiated the
5  changes to their travel, right?
6    A.  Yes.
7    Q.  Okay.  And specifically, you attempted to do
8  this by using the customer-initiated change field and
9  the United-initiated change indicator field?
10    A.  Yes.
11    Q.  And so you, as set forth in paragraph 23,
12  excluded records where the value in the
13  customer-initiated change field was 1?
14    A.  Yes.
15    Q.  And you also used the United-initiated
16  change indicator field by excluding records where the
17  value in that field was zero, right?
18    A.  Yes.
19    Q.  Now, you read the deposition of Jeff
20  Christensen as we've established, right?
21    A.  Yes.
22    Q.  So you are aware that Mr. Christensen
23  testified that: "A cancellation of a reservation by a
24  customer would not be a modification of the
25  reservation and would, therefore, not be captured by

Page 110

1 the customer-initiated change field."
2     Right?
3        MR. KUROWSKI: Objection. Foundation.
4     A. I saw in his testimony a long hypothetical
5 scenario where he states that even if a customer
6 cancels, it may be reflected as a zero in
7 customer-initiated change.
8     Q. (BY MS. HEMERYCK) Well, let's look at his
9 testimony, and it's on page 161 of the transcript.
10     And on paragraph -- starting at line 14 of
11 page 161 he states: "The key part of it is change.
12 Did they change their trip? So if they had a trip
13 scheduled and they just canceled it and took a flight
14 credit, that would show as zero."
15     Do you see that?
16     A. I see that.
17     Q. Okay. So cancellation is not a change in
18 the itinerary according to -- that would be captured
19 by this field according to Mr. Christensen, correct?
20     A. That appears to be the case.
21     Q. Okay. But that's, nevertheless, the way you
22 used the field, right? You assumed that a zero in the
23 customer-initiated -- I'm sorry -- that a 1 in the
24 customary-initiated change field meant that the
25 customer canceled and that a zero in that field meant

Page 111

1 the customer did not cancel, right?
2     A. In paragraph 20 of my report, I say that:
3 "I understand that the field customer-initiated change
4 indicator in the ticket data reflects whether or not
5 the customer initiated the changes in their itinerary
6 using the binary values of zero or 1."
7     Above that I say: "I focused on identifying
8 ticketed passengers whose itineraries ultimately were
9 canceled by United."
10     So I don't see that that's in conflict.
11     Q. Well, you said in the last sentence of
12 that -- or second-to-last sentence of that
13 paragraph 20 that you just read that: "A value of
14 zero in the customary-initiated change indicator field
15 indicates that a customer did not initiate the
16 changes."
17     Right?
18     A. Yes.
19     Q. And you said: "I used this field to exclude
20 persons who initiated the changes to their travel."
21     Right?
22     A. Yes.
23     Q. And the changes you were talking about, in
24 particular, were cancellations, because you were
25 focusing on cancellations, right?

Page 112

1     A. I was focusing on ticketed passengers whose
2 itineraries were ultimately canceled by United, who
3 didn't make changes themselves.
4     Q. So if a cancellation of a booking is not a
5 modification, as Mr. Christensen testified, and,
6 therefore, would not be reflected as a modification in
7 the customer-initiated change field, why would you
8 assume that the cancellation of a booking by United
9 would be reflected in the United-initiated change
10 field?
11     A. I believe the United-initiated change field
12 was clearly defined in Christensen's testimony as
13 being a cancellation by United -- I'm sorry -- a
14 change by United.
15     Q. A change but not necessarily cancellation,
16 right?
17        MR. KUROWSKI: Objection. Foundation.
18     A. Well, that would require that the -- that
19 we're also considering another filter that I applied,
20 which is the flight change --
21     Q. (BY MS. HEMERYCK) The flight scheduled on
22 departure date?
23     A. -- flight scheduled on departure date too.
24     Q. Okay. Well, we're not --
25     A. So all of those have to be -- we can't look

Page 113

1 at them one at a time because my filters apply them
2 simultaneously.
3     Q. But let's just stick with this filter for
4 now, okay? This field that you identified in
5 paragraph 20 as the field you used to identify whether
6 the itinerary was canceled by United or by the
7 passenger, right?
8     A. I used it to identify if it was ultimately
9 canceled by United using this field. And for it to be
10 canceled, it must also fit the other conditions as
11 well.
12     Q. Okay. But we can agree that, based on
13 Mr. Christensen's testimony, a value of 1 in the --
14 UA-initiated change field cannot be -- is not reliable
15 to identify itineraries that United canceled, right?
16        MR. KUROWSKI: Objection. Vague, legal
17 conclusion, reliability.
18     A. I need to take a moment to review something,
19 please.
20     So when I consider both the testimony of
21 Christensen starting on page 161 and the flight
22 scheduled on departure date variable, together they
23 can initiate a -- inform us whether or not United
24 decided not to operate a flight. So on 161, line 19,
25 we have a question: "Okay. And same general

29 (Pages 110 - 113)

Page 114

1  scenario, but if United canceled the flight for any
2  reason, that would then populate in column T" -- I'm
3  sorry -- "in the T column as a 1; is that correct?"
4      The answer by Mr. Christensen: "So the
5  customer had a flight scheduled, United decided not to
6  operate or, you know, they didn't have service to the
7  city on the date, or whatever it might've been, yes.
8  We would see United go in and our systems would try to
9  get them rebooked somewhere, and we should add a 1,
10 United making a change to that trip."
11     So the flight scheduled departure date also
12 is covered in his testimony as another variable that
13 we had to consider at the same time. We can't just
14 look at that variable by itself as you're asking me
15 to.
16     Q.  (BY MS. HEMERYCK)  Okay.  But just to be
17 clear:  Paragraph 20, you're not -- you are only
18 talking about the fields of customer-initiated change
19 indicator and UA-initiated change indicator, right?
20     A.  Well, I'm writing a report describing the
21 conditions that have to be fit where all the following
22 are true.  And that marginal condition, when added to
23 the flight scheduled on departure date, tells me those
24 itineraries that were ultimately canceled by United.
25     Q.  Dr. Malone, paragraph 20 does not refer to

Page 115

1  the flight scheduled on departure date field, right?
2      A.  No.  But it's part of a section describing
3  my methodology where the criteria I use is combined
4  with that.
5      Q.  It's not mentioned under the heading
6  "Exclusion Based on Cause of Travel Changes," is it?
7      A.  It's not under that heading, no.
8      Q.  Right.  I'd also note that, as the report is
9  written, you primarily, looking at paragraph 20,
10 relied on the customer-initiated change indicator
11 field to exclude coupons based on the cause of travel
12 changes, and you only cited the UA-initiated change
13 indicator in a footnote, right?
14     MR. KUROWSKI:  Objection.  Vague,
15 compound.
16     A.  I'm sorry.  What's the question you would
17 like me to answer?
18     MS. HEMERYCK:  Can you read it back?
19     (Requested question was read)
20     Q.  (BY MS. HEMERYCK)  Let me rephrase the
21 question.
22     So under the heading "Exclusion Based on
23 Cause of Travel Changes," we have paragraph 20, right?
24     A.  Yes.
25     Q.  And in the body of that paragraph, you talk

Page 116

1  about using the field customer-initiated change
2  indicator, right?
3      A.  Yes.  Among others.
4      Q.  No.  Actually, that's the only one that's
5  referred to in the body of that paragraph, right?
6      A.  The body that -- yeah.
7      Q.  Okay.
8      A.  In the body of the text.
9      Q.  Yes.  And then you have a Footnote 16, where
10 you say:  "I also use the field UA-initiated change
11 indicator to further exclude changes that were not
12 initiated by United Airlines.  I did this by only
13 including records where 'UA INIT CHG IND' was 1."
14     Right?
15     A.  That's true.
16     Q.  Okay.  So you relied first on the
17 customer-initiated change indicator field and then you
18 used the UA-initiated change indicator field to
19 further exclude changes, right?  That's what you
20 wrote?
21     A.  That's what I wrote.  Operationally, they
22 have to both -- neither has more importance than the
23 other in the database operations I wrote.
24     Q.  Now, you referred to -- you referred also in
25 your testimony, though, again, not in paragraph 20 of

Page 117

1  your report, to the flight scheduled on departure date
2  field, right?
3      A.  I have.
4      Q.  And you stated that you can use the
5  combination of the values in the UA-initiated change
6  indicator field and the -- a zero in the flight
7  scheduled on departure date field to determine whether
8  or not the customer's booking was canceled by United
9  or the customer, right?
10     A.  That would indicate whether it was
11 ultimately canceled by United.
12     Q.  Where -- whether what was ultimately
13 canceled?
14     A.  Whether the flight that they were -- had on
15 their itinerary was ultimately canceled by United or
16 not.  A combination of those two.
17     Q.  So you can tell -- I understand that you
18 could tell from the combination of those two whether
19 United canceled the flight reflected in the coupon,
20 right?
21     A.  Yes.
22     Q.  But you can't determine from the combination
23 of those two data fields whether the itinerary was
24 canceled, right?
25     A.  Are you talking about the itinerary being

30 (Pages 114 - 117)

Page 118

1 canceled by the customer?
2     Q.   I'm just talking about the itinerary being
3 canceled, period.
4     A.   I don't know exactly how to answer that
5 question, but what I can say is that it would indicate
6 that the flight on the coupon was canceled ultimately
7 by United --
8     Q.   And --
9         (Simultaneous speaking)
10     A.   -- the whole itinerary.
11     Q.   And you don't know -- you can't tell from
12 these data fields whether the customer may have
13 canceled their itinerary before United canceled that
14 flight?
15     A.   No, I can't.  And it's very possible that
16 they didn't.  It's possible that they did, and that's
17 why they're included in my estimate of the class.  And
18 until United produces other data that could tell me
19 whether or not the customer canceled their itinerary
20 or not, I can't pull them out.
21     Q.   And you don't have any idea what that other
22 data would be, do you?
23     A.   No.  But under the course of regular
24 business, I assume that if I were to book a trip with
25 United and cancel it, that they are recording that

Page 119

1 somewhere to know to not allow me to go through
2 security, not allow me to check in for a flight.  It
3 would be a security risk if that data were out there.
4         So it's hard for me to comprehend that
5 United Airlines doesn't know if a customer canceled
6 their flight or not.
7     Q.   Okay.  So --
8         (Simultaneous speaking)
9     Q.   So your assumption is that United has the
10 ability to run some -- you know, to look at its data
11 and its specific passenger record for Sean T. Malone
12 and his particular booking and ascertain what
13 ultimately happened with that booking, right?  That's
14 your assumption?
15     A.   Yes.  It may not be in this data produced,
16 but that's my assumption.
17     Q.   Okay.  And that you also cannot tell from
18 even the combination of the flight scheduled on
19 departure date field and the UA-initiated change
20 indicator field whether when a particular flight
21 associated with a coupon was canceled the customer was
22 offered rerouting by United and said, No, thanks.  I
23 don't want to take the trip after all.  I'll just take
24 the travel credit.  You can't tell that, right?
25         MR. KUROWSKI:  Objection.  Foundation.

Page 120

1         Go ahead.
2     A.   From my knowledge of the data, I don't think
3 that I can tell that with what's been produced.  I
4 don't know what customers were offered or what they
5 denied.
6     Q.   (BY MS. HEMERYCK)  Now, you understand that
7 the ticket data that was produced to you that you
8 reviewed included information about Plaintiff Jason
9 Buffer's itinerary, right?
10     A.   I was aware of that from Petron's report
11 that looked at data from Plaintiff Buffer's records.
12     Q.   Okay.  And the information about Plaintiff
13 Jason Buffer's itinerary that's contained in the
14 ticket data confirms that the customer-initiated
15 change field and the United-initiated change field
16 cannot be used to accurately determine who canceled an
17 itinerary, doesn't it?
18     A.   I don't know that I agree with that.
19     Q.   Okay.  Well, let's look at that data.
20         MS. HEMERYCK:  Might have to put it
21 back up.
22     Q.   (BY MS. HEMERYCK)  Okay.  So I've put it up
23 on the screen, just might be a little bit easier to
24 see.  But if you turn in Malone Exhibit -- I believe
25 it's Malone Exhibit 6, which is the April 20 expert

Page 121

1 report of Michael Petron.
2     A.   Okay.
3     Q.   And if you turn specifically to Exhibit 5A,
4 that -- that exhibit shows the ad hoc itinerary and
5 refund data detail for Plaintiff Jason Buffer's
6 itinerary, right?
7     A.   Yes.
8     Q.   Okay.  And you understand that Plaintiff
9 Buffer did not cancel his own booking, right?
10     A.   I understand that, yes.
11     Q.   Okay.  Do you understand his flights were
12 canceled by the operating carrier?
13     A.   I believe I understand it was Swiss Air.
14     Q.   Yeah.  But if you look at Exhibit 5A of
15 Mr. Petron's April 20 report, you will see that for
16 all four of the coupons shown here for Mr. Buffer it
17 shows a 1 under customer-initiated change indicator
18 and a zero under United-initiated change indicator,
19 right?
20     A.   That's correct.
21     Q.   So by your methodology, the 1 under
22 customer-initiated change indicator would have
23 excluded Plaintiff Buffer from your estimated class,
24 right?
25     A.   My methodology looks at both of these,

31 (Pages 118 - 121)

Page 122

1 including the UA-initiated change indicator. Here
2 it's marked as zero, but I believe the possible
3 explanation for this is -- lies in Jeff Christensen's
4 testimony since United was a plating carrier for
5 Plaintiff Buffer's tickets or itinerary.
6 Mr. Christensen testified that United would be the
7 responsible party or what they call "the plating
8 carrier." And so the fact that he didn't label a
9 flight that was canceled by Swiss Air when United was
10 the plating carrier appears to be a mistake and
11 exactly the type of data that United appears to have
12 but didn't produce correctly in this case.
13     Q.  So let's see if we can try to get my actual
14 question answered.
15         MS. HEMERYCK:  Can you read my
16 question, please?
17         MR. KUROWSKI:  Objection.
18 Argumentative.
19         (Requested question was read)
20     Q.  (BY MS. HEMERYCK) Can you answer that
21 question?
22     A.  Yes.  So my methodology is taking data
23 produced by United and uses this definition
24 United-initiated change where changes were initiated
25 by United Airlines.  But here, that's not really the

Page 123

1 case, because Swiss Air was operating this flight, but
2 it appears that United Airlines was a plating carrier
3 and responsible.  So that means that this should be a
4 1.
5     Q.  Let's try it one more time because you still
6 haven't answered my question.  And I understand you
7 want to give your little speech.  That's great, but I
8 would like an answer to my question.
9         My question is:  The fact that there is a 1
10 in the customer-initiated change indicator field for
11 all four of the Plaintiff Buffer coupons means that
12 using your methodology Plaintiff Buffer would be
13 excluded from the class, right?
14         MR. KUROWSKI:  Objection.
15 Argumentative, asked and answered.
16     A.  I realize --
17         MR. KUROWSKI:  Hold on.
18         Asked and answered.
19         You may go ahead.
20     A.  I realize you're asking about the
21 customer-initiated change and not UA-initiated change,
22 but those are interrelated because it looks at which
23 change occurred first.  And so if United-initiated
24 change occurred before as it's -- whether it were 1s
25 here under Plaintiff Buffer's case, those would likely

Page 124

1 be zero.  And then correctly applying my methodology,
2 he may not be excluded using just those two fields.
3     Q.  (BY MS. HEMERYCK) Okay.  Let's look again
4 at paragraph 20.
5     A.  Sure.
6     Q.  Paragraph 20, the text of paragraph 20,
7 second sentence:  "I understand that the field
8 customer-initiated change indicator in the ticket data
9 reflects whether or not the customer initiated the
10 changes in their itinerary using the binary values of
11 zero or 1."
12         That's what your report says, right?
13     A.  Yes.
14     Q.  And then the next sentence:  "A value of 1
15 indicates a customer initiated the changes."
16         That's what your report says, right?
17     A.  Yes.  "The changes" are talking about the
18 change -- the critical changes which would be the
19 first changes here.
20     Q.  That's not exactly what it says --
21     A.  You can't --
22     Q.  -- here in your report, is it?
23     A.  You can't have both of these as equal to 1.
24     Q.  All right.  Can I read the next sentence,
25 please?

Page 125

1     A.  Sure.
2     Q.  The next sentence in your report says:  "A
3 value of zero indicates that a customer did not
4 initiate the changes."
5         Right?
6     A.  Yes.
7     Q.  "I used this field," singular, "to exclude
8 persons who initiated the changes to their travel."
9         That's what you wrote, right?
10     A.  Yes.
11     Q.  So a value of 1 in the customer initiated
12 change indicator field means the person is excluded
13 from your estimated class, right?
14     A.  This particular reservation would be
15 excluded from my preliminary estimates, and it may
16 change if the UA-initiated change indicator were to
17 change as well.
18         My methodology isn't specific to this set of
19 data.  It's specific to what these fields are to
20 represent and applying those filters to the correct
21 most up-to-date data that's -- that's available.
22     Q.  And just to be clear:  You didn't actually
23 look in the ticket data for the information relating
24 to Plaintiff Buffer when you were preparing either of
25 your reports, did you?

32 (Pages 122 - 125)

Page 126

1    A.   Only to the extent that Mr. Petron cited it
2  as an example for, I believe, unavail field.
3    Q.   Okay.  So in your -- and that would have
4  been after your opening report, right?
5    A.   Yes.
6    Q.   So at least for purposes of your April 20th
7  report where you were developing your methodology, you
8  did not look in the ticket data at the information
9  relating to Plaintiff Buffer, right?
10    A.   I did not.
11    Q.   That information was certainly available to
12  you, wasn't it?
13    A.   I didn't ask for it because it wasn't -- it
14  was outside the scope of my assignment to estimate the
15  preliminary class size and to develop a method to
16  identify class members.  I wasn't asked to identify
17  Plaintiff Buffer's data.
18    Q.   And just so the record is clear:  You also,
19  in arriving at the opinions reflected in your
20  April 20th report, did not look in the ticket data at
21  the information relating to Plaintiff Mark Hansen,
22  right?
23    A.   I did not.
24    Q.   So let's look at paragraph 24 of
25  Exhibit 5 -- no, sorry.  I lied.  Malone Exhibit 2.

Page 127

1  We're still on your April 20th report.  So paragraph
2  24, let me know when you're there.
3    A.   I'm there.
4    Q.   All right.  You state in paragraph 24:  "I
5  estimated the number of class members based on a
6  unique number of record locators associated with the
7  tickets that meet the criteria described above."
8         Right?
9    A.   Yes.
10    Q.   Okay.  And you applied the methodology that
11  you describe in your April 20th report at the coupon
12  level, right?
13    A.   Yes.
14    Q.   Okay.  How did you determine the unique
15  number of record locators?
16    A.   I used the SQL keyword "SELECT DISTINCT."
17    Q.   Say it again.
18    A.   I used the SQL keyword "SELECT DISTINCT."
19    Q.   Can you explain that in plain English?
20    A.   I asked it to find a unique list of record
21  locators.
22    Q.   That were associated with the coupons that
23  were left after you did all your filtering?
24    A.   Correct.
25    Q.   How did you handle record locators that had

Page 128

1  a mix of coupon statuses?  So, for example, if you had
2  a record locator that included some coupons of the
3  status of exchanged and some coupons of the status
4  Unused-FFC?
5         Assuming the ones that said "Unused-FFC" met
6  the other criteria for included?
7    A.   Yeah.  So if any of the coupons in that
8  record locator met all the criteria, that record
9  locator would be counted.
10    Q.   Now, you suggest -- turn to -- scratch that.
11         Turn to paragraph 26 of your April 20th
12  report, which is Malone Exhibit 2.
13    A.   Okay.
14    Q.   Okay.  Now, you suggest in this paragraph,
15  paragraph 26, that the departure and arrival airport
16  codes in the ticket data could be used to exclude
17  itineraries or portions of itineraries on which
18  passengers departing for the United States would have
19  been prohibited from traveling due to travel
20  restrictions in place at that time, right?
21    A.   That's correct.
22    Q.   Did you suggest that?
23    A.   I suggested that that could allow for other
24  filtering.
25    Q.   Okay.  Did you make any attempt to do that?

Page 129

1    A.   No.  It was outside the scope of my
2  assignment.  It wasn't -- either the instructions or
3  the class definition.
4    Q.   Are you aware of any documentation that's
5  been produced in this case regarding travel
6  restrictions that would allow you to engage in that
7  exercise?
8    A.   I am not aware of any that have been
9  produced.  I certainly haven't been provided any.
10    Q.   Did you ask plaintiffs' counsel for
11  documentation regarding border closures or other
12  travel restrictions?
13    A.   No.
14    Q.   So basically you're speculating in
15  paragraph 26 that this additional filtering could be
16  done, but you don't actually know, right?
17         MR. KUROWSKI:  Objection.  Vague.
18    A.   It wouldn't be a large -- a terribly large
19  supplemental dataset to do this.  Really, we're just
20  looking at the period of time.  So we're looking at
21  dates and countries where travel would be restricted.
22  So it's not really a large dataset that would need to
23  be compiled whether it was produced or could be
24  produced or whether it's something that could be
25  obtained independently through the State Department,

33 (Pages 126 - 129)

1 for example, or another government agency, seems like
2 it could definitely be possible. So, I mean, it's an
3 informed opinion that it is possible to do.
4    Q. (BY MS. HEMERYCK) So adding that
5 restriction to exclude itineraries or portions of
6 itineraries on which passengers departed from the
7 United States would have been prohibited from
8 traveling due to travel restrictions in place at the
9 time, doing that would result in excluding Plaintiff
10 Hansen from the proposed class, wouldn't it?
11    A. I don't know.
12    Q. Well, let's take a look. Can you -- just a
13 minute. I think we are going to need the screen.
14        So if you could go to -- I think it's Malone
15 Exhibit 5. It's either 5 or 6, the expert report of
16 Michael Petron, not the rebuttal report.
17        MR. KUROWSKI: 5?
18        MS. HEMERYCK: Yeah, it's 6, Malone
19 Exhibit 6, and we're going to go to Exhibit 5B. I'm
20 also going to show it on the screen because this one
21 is a little bit hard to see.
22    Q. (BY MS. HEMERYCK) Let me know when you're
23 there.
24    A. I'm sorry. This is Exhibit 5?
25    Q. Malone Exhibit 6.

1    A. Oh, it's Exhibit 6, sorry.
2    Q. That's okay. I think I was a little
3 unclear.
4    A. And which exhibit in that report?
5    Q. 5B.
6    A. Thank you.
7    Q. So for the record, Exhibit B is an excerpt
8 from the -- what you refer to as "the Ticket Data" and
9 what Mr. Petron refers to as "the Ad Hoc Itinerary and
10 Refund Data" that shows the detail for Plaintiff Mark
11 Hansen's itinerary.
12        Do you see that?
13    A. I do.
14    Q. Okay. And do you see it includes five
15 coupons, right?
16    A. Yes.
17    Q. And now two of those coupons -- and I can
18 make this a little bit easier to see on the screen
19 here. At least I think I can.
20        Okay. Two of those coupons, the one in the
21 first row and the one in the last row, have a value in
22 the flight scheduled on departure date column of 1,
23 right?
24    A. That's correct.
25    Q. And so those two coupons, they would be

1 excluded by your methodology because you had to
2 have -- one of the criteria to be included is you have
3 to have a zero in that column, right?
4    A. Yeah.
5    Q. And so that leaves three coupons. One is
6 the flight from DEN, which is Denver, to YVR, which is
7 Vancouver, Canada, on April 5, 2020, right?
8    A. Okay.
9    Q. Then there is a coupon for travel from IAH,
10 which is Houston, Texas, to Liberia, Costa Rica, which
11 is LIR on March 29, 2020, right?
12    A. Okay.
13    Q. And then the next coupon, which is the
14 coupon for travel from Liberia, Costa Rica, to Houston
15 on April 4, 2020.
16        Do you see that?
17    A. Yes.
18    Q. And now are you aware that the judge in this
19 case has already recognized that Hansen would have
20 been prohibited from traveling between the US and
21 Costa Rica on March 29 and April 4 because of Costa
22 Rica's border closure?
23    A. I am not aware of that decision.
24    Q. Okay. I represent to you that he has. So
25 accept that representation for this purpose.

1        And so that leaves just the coupon for
2 travel from Denver to Vancouver on April 5, 2020, if
3 you accept my representation, right?
4    A. Yes.
5    Q. And are you aware that on March 20, 2020,
6 Canada banned all nonessential travel to Canada from
7 the United States?
8    A. I am not aware of that specific date.
9    Q. Okay. But if that were the case, then the
10 portion of Plaintiff Hansen's itinerary that had him
11 flying from Denver to Vancouver on April 5, 2020, so
12 flying from the United States to Canada, would also be
13 excluded by the restriction you suggest in
14 paragraph 26, wouldn't it?
15        MR. KUROWSKI: Objection. Vague,
16 foundation.
17    A. I think if you assume several things. Of
18 course, I'm accepting those representations. Two that
19 the class definitions refined to exclude these
20 individuals, yes, I could refine my methodology that
21 would result in these particular cases that would not
22 be included.
23    Q. (BY MS. HEMERYCK) Okay. So at long last,
24 Dr. Malone, we are going to get to your rebuttal
25 report.

34 (Pages 130 - 133)

Page 134

1    A.  Okay.
2    Q.  So go to Malone Exhibit 3.
3        MS. HEMERYCK:  I'm going to stop
4  sharing here.  Okay.
5    Q.  (BY MS. HEMERYCK)  So I'm starting with
6  paragraph 6, on page -- it doesn't have a page number
7  for some reason.  Paragraph 6 of your rebuttal report.
8    A.  I am there.
9    Q.  Okay.  Great.
10       So in Bullet 2 of paragraph 6 of Malone
11  Exhibit 3, you state: "Mr. Petron has described
12  methods that can be applied to the data to reasonably
13  determine if the majority of coupons purchased by
14  potential class members are eligible for refunds."
15       Do you see that?
16   A.  Yes.
17   Q.  Okay.  So did Mr. Petron describe a method
18  that could be applied to the produced datasets to
19  determine -- for customers who had a canceled or
20  significantly changed flight -- the reason why the
21  flight was canceled or significantly changed?
22   A.  I don't believe he described the reason why
23  the flights were canceled or significantly delayed --
24  changed.
25   Q.  Did Mr. Petron describe a method that could

Page 135

1  be applied to the produced datasets to determine
2  whether a customer who has not received a refund
3  requested one?
4    A.  No.  He only uses the refund policy as
5  refundable, which would indicate that they weren't the
6  one who initiated it, but not whether or not they
7  requested a refund.
8    Q.  Okay.  Did Mr. Petron describe a method that
9  could be applied to the produced datasets to determine
10  whether a customer who had a canceled flight but where
11  the status of the associated coupon is used-used
12  actually traveled?
13   A.  I'm sorry.  Could you repeat that?  It
14  just --
15   Q.  I can.
16   A.  Thank you.
17   Q.  It was a little long.  Let me try it again.
18   A.  Yeah.
19   Q.  Okay.  Did Mr. Petron describe a method that
20  could be applied to the produced datasets to determine
21  whether a customer who had a canceled flight but where
22  the coupon status associated with that flight is
23  used-used actually traveled?
24   A.  I think I disagree because the coupon status
25  used-used means that that value was used for travel at

Page 136

1  some point.  It may have been used for a -- associated
2  to a different coupon, but that different coupon may
3  be associated with the same purchaser or passenger.
4  So by not eliminating the used-used doesn't
5  necessarily -- used-used doesn't mean that they
6  traveled on that flight, but it doesn't mean that they
7  didn't exchange it for something else as in the split
8  and divide we talked about earlier.
9    Q.  Mr. Petron didn't describe a method in
10  either of his reports that could be applied to the
11  produced datasets for determining what happened, for
12  example, with a split and divide, right?
13   A.  I don't think he explicitly described a
14  method to determine what happened with the split and
15  divide, no.
16   Q.  Did Mr. Petron describe a method that could
17  be applied to the produced datasets to determine, for
18  customers who had an advanced schedule change that
19  disrupted their travel by two or more hours, the
20  actual difference in the departure date and time
21  between the original itinerary and the changed
22  itinerary?
23   A.  Not the actual difference.
24   Q.  So can you look now -- still in Malone
25  Exhibit 3, could you look at paragraph 9?

Page 137

1    A.  Yes.
2    Q.  Okay.  In the first sentence of that
3  paragraph you state:  "As part of my responsibility at
4  Analytic Focus, LLC, I regularly deal with both the
5  creation and analysis of databases."
6        Right?
7    A.  Correct.
8    Q.  And you go on to say:  "Often, when we
9  create databases, there are individual records that
10  must be manually reviewed."
11       Right?
12   A.  That's correct.
13   Q.  And then in the next paragraph, 10, you give
14  an example, right?
15       Specifically, you refer to the Healey vs.
16  Jefferson County Kentucky Louisville Metro Government
17  case in the Western District of Kentucky?
18   A.  Specifically, that's -- that's an example of
19  creating a process that can create systematic
20  efficient reliable manual reviews.  It's evidence of
21  that being accepted.
22   Q.  Okay.  That case did involve or does involve
23  individual records that must be manually reviewed,
24  right?
25   A.  Yes.

Page 138

1  Q. Okay. Are there other examples you've
2 worked on, other matters you've worked on, litigation
3 matters specifically that involved the creation of a
4 database using -- or based on individual records that
5 must be manually reviewed?
6  A. Yes.
7  Q. Can you give me an example other than the
8 Healey case?
9  A. Sure. It's the case in Exhibit 1 to Malone
10 Exhibit 3.
11  Q. Oh, Grande --
12  A. Grande Vista.
13  Q. Grande Vista, okay. And what types of
14 records are being -- individual records are being
15 manually reviewed in the Grande Vista case?
16  A. Deeds to real estate transactions. And I
17 created a database resulting from that manual review.
18  Q. Got it. How many records are involved in
19 the Grande Vista manual review of deeds to real estate
20 transactions?
21  A. That particular one was a small sample of
22 500.
23  Q. Was that the total population, or was it a
24 sample of a larger population?
25  A. It was a sample of sales for a timeshare

Page 139

1 resort, and the sample was based on time period.
2  Q. And what was the purpose of that review and
3 creation of a database?
4  A. It was to review each deed and apply an
5 objective criteria as to -- to answer a question and
6 that was done for each deed in the 500.
7  Q. Was the purpose to estimate a size of a
8 potential class?
9  A. Not in that case.
10  Q. Okay. I assume, then, it's also true that
11 that review was not for the purpose of identifying
12 members of a class or a potential class?
13  A. No, that's a correct assumption.
14  Q. Okay. There were a lot of negatives in that
15 question.
16   In the next sentence, you state: "We
17 develop different procedures..." -- I'm sorry. I'm
18 back in paragraph 9. In the next sentence of
19 paragraph 9, you state: "We develop different
20 procedures used for reviewing individual records in
21 our in-house data collection software."
22   Right?
23  A. Yes.
24  Q. Can you tell me a little more about what you
25 mean by -- what are the different kinds of procedures?

Page 140

1 What are examples of the different kinds of
2 procedures?
3  A. So for -- in the example I just gave you for
4 the Grande Vista matter, what was at issue was whether
5 or not a specific entity was involved in the brokerage
6 of the real estate asset and so there were two
7 objective criteria.
8   One was evaluating whether or not the
9 addresses of both the buyers and sellers were
10 addresses associated with that entity. And then the
11 second was the -- whether the return to or the
12 completed by was associated with that entity.
13   So that process was to basically provide
14 instructions to the reviewer what exactly to look for
15 and how to objectively determine whether or not it
16 fits that criteria or not. And that's a result of
17 what was input into the database.
18   And another case that is described in
19 paragraph 10, the process is different because that
20 matter involves a county Department of Corrections.
21 And so we're extracting data from different types of
22 records, whether they're jail records or emails or
23 court orders. And depending on what exact objective
24 criteria must be applied to each set, there will be a
25 different process for the reviewers to know what to

Page 141

1 look for and how to evaluate it. So it's very case
2 specific.
3  Q. So you've used a couple of times the word
4 "reviewers" in talking about these procedures.
5 "Reviewers" here are people, right?
6  A. Yes.
7  Q. Right. So actual human beings who are
8 tasked with manually reviewing individual records and
9 identifying the particular data points that the
10 training, for example, tells them to look for, right?
11  A. Yes.
12  Q. Okay. So in the Grande Vista case, how many
13 reviewers were involved in reviewing that sample of
14 500 real estate transaction -- real estate deeds?
15  A. In that particular case, it was just me.
16  Q. Okay.
17  A. A compressed time frame.
18  Q. How about in Healey? How many people are
19 involved in reviewing those records?
20  A. I'd say in excess of five.
21  Q. Are they all employees of Analytic Focus?
22  A. Generally, yes.
23  Q. Have you ever developed a manual review
24 process like this where outside contract reviewers
25 were used?

36 (Pages 138 - 141)

Page 142

1    A.  I don't believe in the matter we're working
2 on right now that we've used contracts.  I say
3 generally because we had turnovers, so they're not all
4 employed by Analytic Focus currently.
5    Q.  So some of them were and then they have left
6 Analytic Focus, but they're still acting as reviewers?
7    A.  No.
8    Q.  Okay.  So once they leave, then --
9    A.  Yeah.
10   Q.  Okay.
11   A.  We have reviewers that are no longer
12 employees.
13   Q.  Got it.  Okay.  So they're former reviewers,
14 basically?
15   A.  Yeah.
16   Q.  Okay.  All right.  So let's talk about the
17 Healey case.
18      What's your role in that work?
19   A.  I'm not a testifying expert, but I am
20 supporting the work of Dr. Cowan.  Dr. Cowan and
21 Analytic Focus, as shown in Exhibit 2 to this
22 particular exhibit here, have been appointed a role to
23 create this database on behalf of both parties in this
24 particular case.  So I work a lot in creating some of
25 these processes, creating some of the processes for

Page 143

1 quality control and making sure the inputs by
2 reviewers are accurate and reliable.  So broadly I
3 have some oversight but not the ultimate oversight in
4 this project.
5    Q.  Okay.  So let's look at paragraph 32 of
6 Malone Exhibit 3.
7      So you state in this paragraph:  "I am on a
8 small team responsible for, one, designing training
9 materials to manually review scans of paper documents
10 and email attachments; two, designing custom data
11 entry software to collect (and ensure accuracy of)
12 data points relevant to class membership into a
13 database; and, three, to combine and analyze the
14 collected data and export the results into another
15 database used to determine class membership in a class
16 action being litigated in the Western District of
17 Kentucky."
18      Do you see that?
19   A.  I do.
20   Q.  And that case in the Western District of
21 Kentucky is the Healey vs. Jefferson County Kentucky
22 Louisville Metro government, right?
23   A.  That's correct.
24   Q.  Okay.  And in paragraph 33 of your rebuttal
25 report, you offer an opinion that:  "The method being

Page 144

1 used in the Healey case could be used in this case to
2 review emails sent to the United refunds team and
3 determine if the individual requested a refund for an
4 unused ticket."
5      Right?
6    A.  It's kind of beyond the Healey case.  It's
7 more my experience in reviewing -- creating databases
8 that are reliable from a manual review of documents,
9 so it's broader than that.
10      The Healey case is just an example where
11 plaintiffs and defendants have agreed that the job we
12 do at Analytic Focus produces something reliable for
13 class membership.
14   Q.  Okay.  But your opinion in paragraph 33 is
15 based, in part, on your experience in the Healey case,
16 right?
17   A.  In part.
18   Q.  So going back to paragraph 32, you reference
19 "Training materials to manually review scans of paper
20 documents and email attachments," right?
21   A.  Yes.
22   Q.  Were you involved in designing those
23 training materials?
24   A.  For some of the processes.
25   Q.  Which processes?

Page 145

1    A.  So for this particular matter, there was a
2 number of them depending on what types of information
3 are being extracted from documents.  So there might be
4 a process for a certain type of court order.  There
5 might be a different process for looking at the
6 reports the jail prints out before they release an
7 individual.  There might be a different process for
8 reviewing emails.
9      And so there's a number of them, and it's
10 highly dependent on the data specific to the case that
11 it's being applied to.  So here in Healey v. Metro.
12   Q.  And do you know which of the training
13 materials for which process you specifically were
14 involved in designing?
15   A.  Most of the training materials would have
16 been assigned further in the past.  I don't know --
17 recall exactly which forms I would have been the lead
18 one drafting.
19   Q.  Okay.  But you're familiar with all the
20 training materials?
21   A.  Broadly.
22   Q.  Okay.  And has the manual review in the
23 Healey case using those training materials started?
24   A.  The manual review has started, but it's not
25 complete.

37 (Pages 142 - 145)

Page 146

1    Q.   When did it start?
2    A.   It's hard to say.  It's before 2023, though.
3  I don't recall the date.
4    Q.   Do the different training materials for the
5  different categories of documents in the Healey case
6  instruct the reviewers to follow like different steps
7  depending on the nature of the particular documents
8  being reviewed?
9    A.   Yes.  There would be kind of like in a sense
10  decision trees.  You're seeing whether or not a
11  document contains this piece of information.  If it
12  doesn't, you're checking for something else.  That
13  process was created in a way to get to that objective
14  criteria at the end.
15    Q.   And I assume these are -- these training
16  materials are written materials?
17    A.   Some of them for really simple collections
18  may just be basically a screen share of walking
19  through the software and instructing the reviewers on
20  what to look for.  So it doesn't necessarily need to
21  be written.
22    Q.   And how about for the more complicated --
23  the decision trees?
24    A.   I imagine for the more complicated one,
25  there would probably be a working document prior to

Page 147

1  the review that would show for jail records how to
2  determine why somebody is getting out of jail.
3    Q.   How many documents -- and I'm using
4  "documents" broadly here to include electronic
5  records, paper.  How many documents are involved in
6  the Healey manual review?
7    A.   Once we start considering electronic
8  documents like emails, we're talking well over
9  a million.  As far as paper scans, scans of paper,
10  some files can exceed 100 pages for an inmate; so, you
11  know, we're looking in the hundreds of thousands of
12  pages of paper, upon hundreds of thousands of emails.
13  It's a significant amount.
14    Q.   And any idea of what percentage of that
15  total has been reviewed today?
16    A.   All of the paper files have been reviewed,
17  and some cases, multiple times.  The emails generally
18  have been reviewed, however not finalized.  It's still
19  an ongoing review because of kind of the efficiencies
20  we add into knowing exactly which emails we should be
21  looking at in the first place.  So to the extent that
22  we've reviewed the relevant emails at least in some
23  iterations, it's been a good iteration of review so
24  far.
25    However, the reports and everything and the

Page 148

1  full review is still pending and incomplete.
2    Q.   You said that all -- that some paper files
3  have been reviewed more than once.  Why would that be?
4    A.   So we want the conclusions that the
5  reviewers are making to be accurate.  We don't want
6  them looking at a hundred-page document and trying to
7  pull 50 pieces of information out of it.
8    So a process may tell them to find a number
9  of pages within that, say, hundred-page document that
10  are going to be the relevant ones and extract a single
11  set of information from that so they can maintain
12  their focus and accuracy.  That's one reason.  So they
13  may look at the same document twice for two different
14  objectives.
15    Also, we conduct quality control.  So that
16  allows us to ensure that the reviewers are inputting
17  reliable information.  So quality control can be done
18  a couple of different ways generally, not just related
19  to this -- this case.
20    But using methodologies like this, we could
21  either have two reviewers look at the same file and
22  see if they come to the same conclusion.  And if not,
23  kind of elevate the priority of another review.  Or we
24  can continuously sample the work of reviewers and see
25  if it matches that of a more supervisory reviewer and

Page 149

1  that way we make sure the reliability is there for the
2  work they're doing.
3    Q.   So I take it from something you said a few
4  minutes ago that the reviewers -- there's an actual
5  training session where the reviewers are trained,
6  right?
7    A.   Yeah.  So for -- say there is a relatively
8  simple process like collecting contact information,
9  right?  Probably one of the more simple processes.
10  Maybe there's a photo with a label that has the
11  contact information on it, but it's too messy, the
12  scans aren't high quality so it can't be automatically
13  read.  So it would simply be the fields that they're
14  to collect, where to find that label, and what to do
15  if they couldn't find that label.
16    And so it would be that step and that could
17  be gone over to them either in a screen share, in a
18  conference room with a screen share, or any other
19  methods for that training.  We can also allow them to
20  train by giving them a set of documents where we know
21  the results and allow them to work on them to make
22  sure that they understand the processes that have
23  given to them for that particular case.
24    Q.   All right.  So I want to make sure that I
25  have this accurately.

38 (Pages 146 - 149)

Page 150

1  So if I understand what you're saying, when
2  these reviewers are trained, they're not simply given
3  like, Here's your written instructions. Go do this.
4  There's some actual interaction that happens where
5  they are receiving instruction from another human
6  being, whether in person or virtually, on how to do
7  the review; is that right?
8  A. They're receiving instruction and
9  oftentimes, they're evaluated after that instruction
10 to see if they're performing it correctly.
11 Q. Do the reviewers have an opportunity to ask
12 questions?
13 A. Yes.
14 Q. And who are the questions directed to? Are
15 they directed to you or...
16 A. They would generally be to kind of more of a
17 supervisory reviewer.
18 Q. So going back to paragraph 32 of Malone
19 Exhibit 3, the second item in that paragraph says: "I
20 am a small team responsible for, Number 2, designing
21 custom data entry software to collect (and ensure
22 accuracy of) data points relevant to class membership
23 into a database."
24   Do you see that?
25 A. Yes.

Page 151

1  Q. Okay. Are the people who are entering the
2  data points that have been collected into a database
3  the same people who are doing the review?
4  A. In part. So when they conduct their review,
5  that goes into a -- into a database directly. But
6  before it's combined or analyzed for the final
7  analysis, those records will either be filtered out,
8  because they fail quality control tests or other
9  reasons.
10   So the reviewer's input doesn't go directly
11 to the analysis. It goes into a database and then
12 that database is filtered down to what will be used
13 for the analysis. So in a sense but not completely.
14 Q. I think I understood that. Okay.
15   And, again, paragraph 32 also states that
16 this small team that you're on is responsible for:
17 "Number 3, combining and analyzing the collected data
18 and exporting the results into another database used
19 to determine class membership in the Healey case."
20   Right?
21 A. Yes.
22 Q. Okay.
23   MR. KUROWSKI: We've been going for
24 over an hour at this point. You know, whenever is a
25 good time for another break.

Page 152

1    MS. HEMERYCK: Yeah, this is fine. We
2  can take a break now.
3    MR. KUROWSKI: Okay. Thank you.
4    THE COURT REPORTER: We are off the
5  record. The time is 1:42 p.m.
6    (Off the record)
7    THE COURT REPORTER: We are back on the
8  record. The time is 1:47 p.m.
9  Q. (BY MS. HEMERYCK) Okay. So looking again
10 at paragraph 32 of Malone Exhibit 3, the third item
11 there states that: "The small team..." -- I think we
12 already read this. I'll do it again for context.
13   The small team that you're a part of is
14 responsible for combining and analyzing the collected
15 data and exporting the results into another database
16 used to determine class membership in the Healey class
17 action, right?
18 A. Yes.
19 Q. So I take it from some of your earlier
20 testimony that that process of combining and analyzing
21 the collected data and exporting the results into
22 another database is still in process?
23 A. Yes. And some of that, again, includes --
24 we were talking to -- in the last question about
25 combining these different collected data and analyzing

Page 153

1  it includes a quality control piece to make sure only
2  the reliable results go in.
3  Q. Okay. And so once that combining and
4  analyzing process is done, then does it get exported
5  into another database, or is it sort of all happening
6  simultaneously?
7  A. It could be exported into another database
8  or exported as just maybe a CSV file that could be
9  used in the manner that we've used them in this case.
10 Q. And so has the data that's being collected
11 and reviewed manually and analyzed in the Healey case
12 been used yet to determine membership in either of the
13 two subclasses that were certified there?
14 A. No. It's only been agreed that they'll use
15 it for that purpose.
16 Q. So I want to look now at the rebuttal
17 report -- I'm sorry -- Malone Exhibit 3 and
18 specifically Exhibit 2 to Malone Exhibit 3.
19   MS. HEMERYCK: And for the record,
20 Exhibit 2 to Malone Exhibit 3 is a 13-page document
21 that consists of -- from the Healey case specifically
22 that consists of "Report and Special Master Number 2,
23 Joint Proposed Recommendation to the Special Master,
24 Agreed Order for Data Collection and Analysis, and
25 Minimum Required Information or Data Points to be

39 (Pages 150 - 153)

Page 154

1 Extracted From the Relevant Documents."
2     Q.    (BY MS. HEMERYCK)  So, Dr. Malone --
3          MS. HEMERYCK:  Oh, sorry, Eli.
4     Q.    (BY MS. HEMERYCK)  Dr. Malone, this group of
5 filings from the Healey case that's attached as
6 Exhibit 2 to your rebuttal report, Malone Exhibit 3,
7 where did it come from?
8     A.    It looks like this came either from Pacer or
9 another repository for federal court filings.
10     Q.    So did you go onto Pacer and pull this
11 document to attach to your report?
12     A.    I don't know if we had to pull this or if it
13 was sent to us by counsel.  I see Dr. Cowan had signed
14 one of these documents that's included.  So one way or
15 another, we had it.
16     Q.    So Analytic Focus had this document?
17     A.    Yes.
18     Q.    Okay.  It didn't -- wasn't provided to you,
19 for example, by plaintiffs' counsel in this case?
20     A.    No.
21     Q.    Okay.  So either somebody went onto Pacer to
22 get it or it was already in Analytic Focus's files?
23     A.    Yeah.
24     Q.    And have you seen other filings -- court
25 filings from the Healey case?

Page 155

1     A.    I would have seen some of the other special
2 master reports.
3     Q.    Have you ever personally met with the
4 special master?
5     A.    I haven't personally, no.
6     Q.    Okay.
7          MS. HEMERYCK:  Is that 11?
8          THE COURT REPORTER:  Yes.
9     A.    Thank you.
10     Q.    (BY MS. HEMERYCK)  So, Dr. Malone, the court
11 reporter has handed you what's been marked as Malone
12 Exhibit 11, which is labeled "Report and Special
13 Master Number 1" from the Healey case, right?
14          (Exhibit Number 11 marked)
15     A.    Yes.
16     Q.    Okay.  And this -- according to the header
17 at the top of the page, this was filed with the court
18 on July 28th, 2022, right?
19     A.    Yeah.
20     Q.    And in the middle of the first paragraph on
21 page 2, if you could turn to that.
22     A.    Uh-huh.
23     Q.    It states that:  "Pursuant to agreement on
24 June 15, 2022, Dr. Cowan" --
25     A.    That's correct.

Page 156

1     Q.    -- "submitted his initial draft report
2 entitled, 'Methods of Review and Analysis of Release
3 Times for Inmates in Louisville.'"
4          Right?
5     A.    That's correct.
6     Q.    And I assume you are familiar with that
7 report?
8     A.    I'm familiar with it.
9     Q.    Were you involved in drafting it?
10     A.    I would have done minimal review of the
11 drafts.
12     Q.    Were you involved in developing the methods
13 of review and analysis that are described in that
14 report?
15     A.    Some of them.
16     Q.    In fact, that's what paragraph 32 of Malone
17 Exhibit 3 is talking about, right? -- the development
18 of the methods of review and analysis for the Healey
19 case?
20     A.    Not necessarily.  Some of these other --
21 these analyses that I may have been involved in were
22 simulation analysis and statistical analysis as well.
23 Maybe some of them, the methods of review and I think
24 it was a pretty similar description of what I've given
25 you today.

Page 157

1     Q.    So if you -- since we're still on Malone --
2 we went back to Malone Exhibit 3, could you go back to
3 Exhibit 2 again?  So Exhibit 2 to Malone Exhibit 3.
4     A.    Okay.
5     Q.    Okay.  And on that Report of Special Master
6 Number 2, that paragraph that starts at the very
7 bottom of page 1, it says:  "On August 10, the
8 undersigned met with counsel for the parties and with
9 Dr. Charles D. Cowan..."
10          Right?
11          Do you see that?
12     A.    I'm sorry.  Paragraph -- the end of
13 paragraph two or...
14     Q.    It's -- so it's the first page of Exhibit 2,
15 the paragraph that starts at the very bottom of page 1
16 and carries over to page 2.
17     A.    Thank you.
18     Q.    And so just so the record is clear, that
19 paragraph says:  "On October 10, 2020, the
20 undersigned" -- which is the special master, right?
21     A.    Yes.
22     Q.    "...met with counsel for the parties and
23 with Dr. Charles D. Cowan."
24          Right?
25     A.    Yes.

40 (Pages 154 - 157)

Page 158

1     Q.   And it goes on from there, but it refers to
2  that meeting.  Agreed?
3     A.   That is correct.
4     Q.   Okay.  And then at the top of page 2, this
5  paragraph goes on to say:  "The purpose of this
6  meeting was to receive a presentation and review of
7  Dr. Cowan's qualifications and professional experience
8  and his ongoing collection methodology and analysis of
9  data covering possible overdetention of inmates at the
10 Louisville Metro Detention Center for the period 2016
11 to present."
12        Right?
13    A.   Yes.
14    Q.   How did Dr. Cowan present his, quote,
15 ongoing collection methodology and analysis of data,
16 unquote?
17    A.   I don't know.
18    Q.   Did you have any involvement in, for
19 example, developing materials for Dr. Cowan to use to
20 present his ongoing collection methodology and
21 analysis of data at this meeting?
22    A.   I don't recall if I helped prepare any
23 materials for this August 10th meeting.
24    Q.   Have you ever seen any materials that were
25 prepared for this presentation at this meeting by

Page 159

1  Dr. Cowan?
2     A.   I don't know what was presented at this
3  meeting.
4     Q.   So still in Exhibit 2 to Malone Exhibit 3,
5  can you turn to the document within Exhibit 2 that has
6  a number at the top, Document 125–2?
7     A.   Okay.
8     Q.   And Document 125-2 is the parties proposed
9  "Agreed Order for Data Collection and Analysis" in the
10 Healey case, right?
11    A.   Yes.
12    Q.   And you understand that the proposed agreed
13 order was, in fact, entered as an order by the court,
14 right?
15    A.   I believe so, yes.
16    Q.   Okay.
17        MS. HEMERYCK:  We'll go ahead and mark
18 that just for the record.
19        THE COURT REPORTER:  Here you go.
20    A.   Thank you.
21    Q.   (BY MS. HEMERYCK)  Dr. Malone, the court
22 reporter has handed you what has been marked as Malone
23 Exhibit 12, which is a document from the Healey case
24 that has Document 126 in the header, right?
25        (Exhibit Number 12 marked)

Page 160

1     A.   Yes.
2     Q.   And Malone Exhibit 12 is the "Agreed Order
3  for Data Collection and Analysis," right?
4     A.   That's correct.
5     Q.   And if you go to page 5, there's actually
6  the signature and seal of the district judge entering
7  the agreed order as an order of the court, right?
8     A.   Yes.
9     Q.   Okay.  So on the first page of Malone
10 Exhibit 12, paragraph Number 1, the order states:
11 "Analytic" -- that's Analytic Focus, right?
12    A.   Yes.
13    Q.   So "Analytic, under the supervision of
14 Dr. Cowan, the parties, and the special master shall
15 extract the information from all available and
16 relevant documents to answer the, quote, Data Points,
17 unquote, attached hereto as Exhibit 1 (the work)."
18        Right?  Do you see that?
19    A.   Yes.
20    Q.   Okay.  Now, the agreed order, for whatever
21 reason, doesn't actually attach the data points, does
22 it?
23    A.   (No verbal response.)
24    Q.   So it's not attached to UCF 126, right?
25    A.   I can't see here that it is.

Page 161

1     Q.   And I promise you I went to Pacer and
2  checked.  But if you go to -- right to, as you are
3  doing Exhibit 2 of Malone Exhibit 3, the
4  Document 125-3, that actually has the data points,
5  right?
6     A.   That's correct.
7     Q.   Okay.  So then further down in paragraph 1,
8  on Document 126, the order granted by the court,
9  there's a sentence that reads:  "The processes and
10 procedures to extract, analyze, and present such data,
11 including a sample period determination will be
12 disclosed to and discussed with the parties and the
13 special master beforehand for their review and written
14 approval."
15        Right?
16    A.   Yes.
17    Q.   Okay.  And now as we just discussed, the
18 data points, although not attached to the agreed order
19 as signed by the court, they are attached to the
20 parties proposed agreed order that is included in
21 Exhibit 2 of Malone Exhibit 3, right?
22    A.   Correct.
23    Q.   And that document, which has Document 125–3
24 at the top on the header, lists the minimum required
25 information or data points to be extracted, but it

41 (Pages 158 - 161)

Page 162

1 does not describe the processes and procedures that
2 will be used to extract, analyze, and present the
3 data, right?
4     A.  That's correct.
5     Q.  So have those processes and procedures been
6 disclosed to the parties and the special master as
7 required by paragraph 1 of Malone Exhibit 12?
8     A.  They may have been discussed at that
9 August 10th meeting or another meeting that I wasn't
10 privy to.
11     Q.  Okay.  But you have been involved, as you
12 state in paragraph 32 of your rebuttal report, in
13 particular in designing and implementing those
14 processes and procedures, right?
15     A.  Yes.
16     Q.  Now paragraph 2 of Malone Exhibit 12, first
17 sentence states:  "Dr. Cowan shall report in writing
18 to the parties and the special master the progress of
19 their work in intervals of no more than 30 days."
20        Right?
21     A.  That states that, yes.
22     Q.  Have you been involved in preparing or
23 assisting in preparing any reports by Dr. Cowan to the
24 parties and the special master?
25     A.  I know at some point there was an interim

Page 163

1 report that presented some preliminary findings but
2 was subject to completion of the review.
3     Q.  And were you involved in preparing that
4 report?
5     A.  I would have prepared some of the data for
6 it or analyses.
7     Q.  All right.  So, Dr. Malone, the court
8 reporter has handed you what's been marked as Malone
9 Exhibit 13, which is Document 127 from the Healey
10 case, and it's the Report of Special Master Number 3,
11 right?
12        (Exhibit Number 13 marked)
13     A.  Yes.
14     Q.  And you see that was filed with the court on
15 December 4, '22, according to the header at the top?
16     A.  Yes.
17     Q.  Okay.  And the second paragraph on the first
18 page of Malone Exhibit 13 states:  "The special master
19 and the parties have received a progress report from
20 Dr. Cowan pursuant to the Agreed Order for Data
21 Collection and Analysis with respect to Analytic
22 Focus, LLCs, ongoing collection and analysis of data."
23        Is that the interim report you were
24 referencing?
25     A.  I don't believe so.

Page 164

1     Q.  I'm sorry.  Yeah?
2     A.  I don't believe so.
3     Q.  You don't believe so?  Do you think there
4 was a different report?
5     A.  Yes, I believe it would be an interim report
6 that's referenced on page 2.
7     Q.  Okay.  This is the bottom of page 2, where
8 it says:  "An interim report is expected in the first
9 or second week of January."
10     A.  Yes.
11     Q.  That's what you're referring to?
12        Okay.  So the report that is referenced
13 in -- on the first page of Malone Exhibit 13, the
14 progress report, did you provide any information for
15 that progress report?
16     A.  I don't recall exactly what that was; so I
17 can't really answer what it contained or if I worked
18 on any of it.
19     Q.  I'm sorry.  Could -- I didn't hear part of
20 that.
21     A.  I don't recall what that progress report
22 was; so I can't answer as to whether I helped create
23 any of it.
24     Q.  Okay.  I assume that progress report exists
25 in Analytic Focus's files, right?

Page 165

1        MR. KUROWSKI:  Objection.  Foundation.
2     A.  It would probably exist in Dr. Cowan's
3 files.  It may be as simple as an email that he sent
4 saying that we're making progress.
5     Q.  (BY MS. HEMERYCK)  But you don't actually
6 remember what this progress report looked like?
7     A.  No, I don't remember.
8     Q.  Okay.  If you look at the first paragraph at
9 the top of page 2 of Malone Exhibit 13, it refers to
10 the review of the sample months of documents, right?
11     A.  Yes.
12     Q.  And does that refresh your recollection at
13 all as to what was in this progress report that was
14 provided?
15     A.  This paragraph states that he's -- that the
16 report states that he has made substantial progress in
17 the review but that the review of data for the sample
18 months is continuing.  So it doesn't sound like there
19 were any real results in that progress report.
20     Q.  All right.  So let -- understand.
21 Appreciate that.  And I -- and you're obviously
22 reading from the document, right?
23     A.  Yes.
24     Q.  So my question is:  Does reading from the
25 document what you just read refresh your recollection

42 (Pages 162 - 165)

1 at all as to what was in the progress report or
2 whether you worked on it or whether you contributed to
3 it?
4    A. No.
5    Q. Okay. How many months of data are included
6 in these sample months of documents?
7    A. I believe they're categorized in four
8 months.
9    Q. And how many months are included in the
10 total population? What's the total time frame?
11    A. I believe it starts somewhere in the year
12 2016 to present.
13    And my previous answer was a little vague
14 and categorized as months because it's a little bit
15 more complicated than that. They're categorized in
16 months. There's two definitions of either when
17 inmates were booked or when inmates were released.
18 And so that requires review of documents well beyond
19 four months, actually documents basically between 2016
20 and 2021 at that point.
21    So while the sample covers four months, the
22 documents being reviewed was well in excess of that.
23    Q. How many records are included -- or
24 documents are included in the sample months?
25    A. It's in excess of 10,000 releases. And each

1 release generally has between 10 and 40 pages in a
2 file and probably several hundred thousand emails
3 during that time period relevant to those releases.
4    Q. Can you estimate what percentage of the
5 total population of documents that are eventually
6 going to be reviewed is included in the sample months?
7    A. For the corresponding time period, the vast
8 majority of the emails are included; however, the four
9 months would scale up to the -- roughly, scale up to
10 the time period covered between 2016 and 2021.
11    Q. But I'm just looking for percent --
12    A. Yeah.
13    Q. -- so percentage of the document population
14 that is covered by the sample month, the percentage of
15 the total population?
16    A. So if you allow me just to simplify.
17    Q. Please.
18    A. If we say five years, 60 months roughly. So
19 four out of 60.
20    Q. Okay. Has Analytic Focus completed its
21 review and analysis of the four-month sample period
22 documents?
23    A. It's not been completed. There's still some
24 reviews being conducted to finalize the analysis.
25    Q. So looking again at Malone Exhibit 3, I want

1 to go to paragraph 17 here. No, I think that's a
2 typo.
3    All right. I figured it out. It's actually
4 Malone Exhibit 2. Well, I'll have to figure it out.
5 We'll have to come back to it. I don't know where it
6 is. Okay.
7    All right. So let's go to paragraph 28 of
8 your rebuttal report, Malone Exhibit 3.
9    So in paragraphs 28 through 33 of Malone
10 Exhibit 3, you offer an opinion that United has
11 additional data that may determine whether passengers
12 requested a refund, right?
13    A. That they potentially have this data.
14    Q. All right. I mean, that's actually the
15 heading that you have above paragraph 28, right?
16    A. Yeah.
17    Q. And you reference in paragraph 29, refund
18 requests submitted by customers via a form on United's
19 website, right?
20    A. Yes.
21    Q. And then in paragraph 30, you reference
22 emails, right?
23    A. Yes.
24    Q. So let's assume for the moment that you're
25 correct and that it would be possible to use emails

1 and stored data from website requests to identify
2 customers who requested refunds. Again, just assuming
3 for purposes of this question.
4    Would you agree that only customers who
5 could be identified from these United records as
6 having made a refund request would be eligible for the
7 proposed class?
8    MR. KUROWSKI: Objection. Legal
9 conclusion.
10    A. I think that's outside the scope of my
11 expertise.
12    Q. (BY MS. HEMERYCK) So you don't have an
13 opinion one way or the other on that?
14    A. I don't.
15    Q. So -- so if identification from this
16 additional United data that you believe exists of
17 persons who requested refunds isn't going to be used
18 to determine membership in the class, what would be
19 the point of doing it?
20    MR. KUROWSKI: Objection. Vague.
21    A. I don't know that I agree with your
22 characterization that it won't be used, just not -- I
23 don't have an opinion whether or not it should be
24 used, but if instructions were to -- from counsel were
25 to change to me to exclude them for -- for that legal

43 (Pages 166 - 169)

Page 170

1 conclusion, I could use it to narrow down the class.
2     MS. HEMERYCK: Okay. I have a couple
3 of follow-ups, but I want to figure out where I was --
4 where that paragraph was missing. So can we take a
5 break and I'll...
6     MR. KUROWSKI: Yes.
7     MS. HEMERYCK: Thanks.
8     THE COURT REPORTER: We are off the
9 record. The time is 2:21 p.m.
10     (Off the record)
11     THE COURT REPORTER: We are back on the
12 record. The time is 2:33 p.m.
13     Q.  (BY MS. HEMERYCK) All right. So,
14 Dr. Malone, it was, in fact, Malone Exhibit 3 that I
15 was looking at. So you can -- can you go to Malone
16 Exhibit 3? I'm looking at paragraph 17.
17     Are you there?
18     A.  I am there.
19     Q.  Okay. I'm looking at the very last clause
20 of the last sentence of paragraph 17 where you state:
21 "The record locators can be used to identify the
22 purchaser of the particular itinerary."
23     Do you see that?
24     A.  Yes.
25     Q.  So you don't dispute that the ticket data

Page 171

1 does not include information that identifies the
2 purchaser of a ticket, right?
3     A.  The ticket data, it doesn't. But the level
4 of the record locator should match the level of the
5 purchaser, typically.
6     Q.  I mean, what's the basis for your statement
7 that: "The record locators can be used to identify
8 the purchaser"?
9     A.  Sure. So, for example, if the purchaser
10 conducted its transaction directly with United, as I
11 have in the past purchased a ticket from United as a
12 purchaser, I received a receipt to my email from
13 United. So they then took my email data, which could
14 be used to identify me or contact me individually as
15 opposed to anybody else who might be on that same
16 itinerary if I booked it for other people as well.
17     What this paragraph is getting at is the
18 record level -- I'm sorry -- the record locator level
19 is much more appropriate for accounting for issues,
20 the size and the class, because coupons are -- there's
21 a coupon for every leg. There is a coupon for per
22 passenger leg essentially; so that makes uncertainties
23 in the data look a lot larger than they may really be
24 when we're talking about whether an individual
25 purchaser may be eligible for the class or not.

Page 172

1     Q.  You don't have any knowledge at all about
2 what purchaser data actually exists or how it might be
3 stored, if at all, in United systems, do you?
4     A.  I don't know how it might be stored. I know
5 that they have business reasons to store purchaser
6 data, for example, emailing receipts. I don't know to
7 the extent of how many records that they may have that
8 for. If it's only for certain types of transactions,
9 but I understand they have business reasons to have
10 this data.
11     Q.  You understand that approximately 40 percent
12 of tickets purchased from United or tickets issued by
13 United during this period were purchased through a
14 travel agency, right?
15     A.  I don't know the exact number, but I know
16 that a portion -- a significant portion of them are
17 purchased through a travel agency.
18     Q.  And do you have any information about what
19 purchaser data -- record locator specific purchaser
20 data may exist in United systems for tickets purchased
21 from a -- through a travel agency?
22     A.  I don't know the specific data, but it's
23 still required to have the passenger names. And
24 generally this methodology won't capture every
25 hypothetical scenario, but generally somebody who's

Page 173

1 purchased to travel is often on an itinerary as the
2 passenger. So by looking at the record locator, I'm
3 not estimating multiple purchasers when there's
4 several people on the itinerary, but only narrowing it
5 down to one purchaser. So as far as finding an
6 estimate of class size, record locators is the most
7 appropriate data field at this point.
8     Q.  And you keep saying that, but that's not the
9 question I'm asking you. I'm asking you about the
10 ability to use record locators to identify purchasers
11 which is what the -- the term the class uses, right?
12 The class uses "purchaser" as your class?
13     A.  Sure. So you might have the opposite where
14 you have purchasers inputting their record locators in
15 order to prove whether or not they should be
16 considered part of the class at some point. But I
17 don't know what data other than the passenger names
18 associated with the record locators may exist.
19     Q.  Okay.
20     MS. HEMERYCK: That is all the
21 questions I have. So I turn the witness over to you,
22 Mr. Kurowski.
23     MR. KUROWSKI: Thank you, Dr. Malone,
24 for your time. I have no further questions for you.
25     Under the protective order, just so you

44 (Pages 170 - 173)

Page 174

1 know, it should be designated confidential.

2         THE COURT REPORTER: Thank you.

3         If there is nothing further --

4         MS. HEMERYCK: Nothing further. We

5 will -- we will read it -- well, you get to say

6 actually whether you will read and sign.

7         MR. KUROWSKI: Yes. We will read and

8 sign, which I indicated before.

9         THE COURT REPORTER: Thank you.

10         We are off the record. The time is

11 2:39 p.m.

12         (End of testimony at 2:39)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 175

1     IN THE UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF ILLINOIS

2         EASTERN DIVISION   §

3 MARK HANSEN AND   §
   JASON BUFFER      §

4 INDIVIDUALLY AND    §
   ON BEHALF OF OTHERS   §

5 SIMILARLY SITUATED,    §
        § NO 1:20-CV-02142

6    PLAINTIFFS,      §
        § HONORABLE THOMAS M DURKIN

7 VS            §
        § MAGISTRATE JUDGE

8 UNITED AIRLINES, INC ,   § JEFFREY T GILBERT

9   DEFENDANT       §

10

11      REPORTER'S CERTIFICATION
      ORAL DEPOSITION OF

12      SEAN T MALONE, PhD
      JUNE 6, 2023

13

14      I, MICHELLE CARVER, Certified Shorthand
Reporter in and for the State of Texas, hereby certify

15 to the following:

16      That the witness, SEAN T MALONE, PhD,
was duly sworn by the officer and that the transcript

17 of the oral deposition is a true record of the
testimony given by the witness;

18

     I further certify that pursuant to FRCP

19 Rule 30(f)(1) that the signature of the deponent:

20     __X__ was requested by the deponent or
a party before the completion of the deposition, and

21 that the signature is to be before any notary public
and returned within 30 days from date of receipt of

22 the transcript. If returned, the attached Changes and
Signature Page contains any changes and the reasons

23 therefor;

24      _____ was waived by the deponent or a
party before the completion of the deposition

25

Page 176

1      I further certify that I am neither
counsel for, related to, nor employed by any of the

2 parties or attorneys in the action in which this
proceeding was taken and further that I am not

3 financially or otherwise interested in the outcome of
the action.

4

      Further certification requirements

5 pursuant to Rule 203 TRCP will be certified to after
they have occurred.

6

7

8      Certified to me this 22nd
day of June, 2023.

9

10

11

12

13         MICHELLE CARVER, TEXAS CSR 11870
      Expiration Date: 2-28-2025

14       Veritext Legal Solutions
      Firm Registration No. 571

15       300 Throckmorton Street
      Suite 1600

16       Fort Worth, Texas 76102

17

18

19

20

21

22

23

24

25

Page 177

1      Veritext Legal Solutions
      1100 Superior Ave

2       Suite 1820
      Cleveland, Ohio 44114

3       Phone: 216-523-1313

4 June 22, 2023

5     To: Daniel J Kurowski, Esq ANIEL J KUROWSKI

6 Case Name: Hansen, Mark, et al v United Airlines, Inc

7 Veritext Reference Number: 5929313

8 Witness: Sean T Malone, PhD     Deposition Date: 6/6/2023

9

10 Dear Sir/Madam:

11 Enclosed please find a deposition transcript Please have the witness

12 review the transcript and note any changes or corrections on the

13 included errata sheet, indicating the page, line number, change, and

14 the reason for the change Have the witness' signature notarized and

15 forward the completed page(s) back to us at the Production address

16 shown

17 above, or email to production-midwest@veritext com

18 If the errata is not returned within thirty days of your receipt of

19 this letter, the reading and signing will be deemed waived

20

21 Sincerely,

22 Production Department

23

24

25 NO NOTARY REQUIRED IN CA

45 (Pages 174 - 177)

Page 178

1    DEPOSITION REVIEW
    CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 5929313
3    CASE NAME: Hansen, Mark, et al v United Airlines, Inc
    DATE OF DEPOSITION: 6/6/2023
4    WITNESS' NAME: Sean T Malone, PhD
5    In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6  my testimony or it has been read to me
7    I have made no changes to the testimony
    as transcribed by the court reporter
8
9  Date         Sean T  Malone, PhD
10    Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
    They have read the transcript;
13    They signed the foregoing Sworn
        Statement; and
14    Their execution of this Statement is of
       their free act and deed
15
16    I have affixed my name and official seal
17  this _____ day of_____, 20____
18    Notary Public
19
    Commission Expiration Date
20
21
22
23
24
25

Page 179

1    DEPOSITION REVIEW
    CERTIFICATION OF WITNESS
2
3    ASSIGNMENT REFERENCE NO: 5929313
    CASE NAME: Hansen, Mark, et al v United Airlines, Inc
    DATE OF DEPOSITION: 6/6/2023
4    WITNESS' NAME: Sean T Malone, PhD
5    In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6  my testimony or it has been read to me
7    I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s)
9    I request that these changes be entered
    as part of the record of my testimony
10
    I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein
13
    Date        Sean T  Malone, PhD
14
    Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17    They have read the transcript;
    They have listed all of their corrections
18     in the appended Errata Sheet;
    They signed the foregoing Sworn
19     Statement; and
    Their execution of this Statement is of
20     their free act and deed
21  I have affixed my name and official seal
22  this _____ day of_____, 20____
23
    Notary Public
24
25    Commission Expiration Date

Page 180

1    ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS MIDWEST
2    ASSIGNMENT NO: 5929313
3  PAGE/LINE(S) /     CHANGE    /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
  _____    _____
20  Date        Sean T. Malone, PhD
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23
    Notary Public
24
  _____
25    Commission Expiration Date

46 (Pages 178 - 180)